E-filing

FILED
08 MAY -7 PM 2:00
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1    <u>**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**</u>

2    Name M I R A N D A   R O G E L I O   R m.
     (Last)          (First)         (Initial)

3    Prisoner Number F 0 1 9 2 6

4    Institutional Address 4001 KING AVE. CORCORAN, CA 93212

5

6

7    **UNITED STATES DISTRICT COURT**
     **NORTHERN DISTRICT OF CALIFORNIA**

     **MH**

8    MONICA MIRANDA

     (Enter the full name of plaintiff in this action.)

     CV 08    2356

9                                    Case No. EE504139 (PR)

10                vs.                 (To be provided by the clerk of court)

     ROGELIO MIRANDA

11                                   **PETITION FOR A WRIT**
                                     **OF HABEAS CORPUS**
12

13   DERRAL ADAMS

14   (Enter the full name of respondent(s) or jailor in this action)

15

16              <u>Read Comments Carefully Before Filling In</u>

17   <u>When and Where to File</u>

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

1    <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1. What sentence are you challenging in this petition?

12           (a)    Name and location of court that imposed sentence (for example; Alameda

13                  County Superior Court, Oakland):

14   SANTA CLARA COUNTY SUPERIOR COURT, SUNNYVALE

15                  Court                            Location

16           (b)    Case number, if known  EE504139

17           (c)    Date and terms of sentence  OCTOBER 20, 2005 / 75-LIFE

18           (d)    Are you now in custody serving this term? (Custody means being in jail, on

19                  parole or probation, etc.)    Yes  X    No _____

20                  Where?

21                  Name of Institution:  CORCORAN STATE PRISON

22                  Address: 4001 KING AVE. CORCORAN, CA 93212

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   COUNT I, LEWD OR LASCIVIOUS ACT ON CHILD

27   UNDER 14, PENAL CODE 288.(a) COUNT II, PENAL

28   CODE 269, AGGRAVATED SEXUAL ASSAULT ON
CHILD UNDER 14 BY FORCIBLE FOREIGN OBJECT
PENETRATION, PENAL CODE 289.(a)(1)

Case 3:08-cv-02356-MHP    Document 1    Filed 05/07/2008    Page 3 of 9

CONTINUED 2. FOR WHAT CRIME WERE YOU GIVEN THIS SENTENCE?

COUNT III, PENAL CODE 269, AGGRAVATED SEXUAL ASSAULT ON CHILD UNDER 14 BY FORCIBLE FOREIGN OBJECT PENETRATION, PENAL CODE 289. (a)(1)

COUNT IV, PENAL CODE 269, AGGRAVATED SEXUAL ASSAULT ON CHILD UNDER 14 BY FORCIBLE FOREIGN OBJECT PENETRATION, PENAL CODE 289. (a)(1)

COUNT V, PENAL CODE 269, AGGRAVATED SEXUAL ASSAULT ON CHILD UNDER 14 BY FORCIBLE FOREIGN OBJECT PENETRATION, PENAL CODE 289. (a)(1)

COUNT VI, PENAL CODE 288 (b)(1), FORCIBLE LEWD AND LASCIVIOUS ACT ON CHILD UNDER 14.

COUNT VII, PENAL CODE 288(b)(1), FORCIBLE LEWD AND LASCIVIOUS ACT ON CHILD UNDER 14.

COUNT VIII, PENAL CODE 288(b)(1), FORCIBLE LEWD AND LASCIVIOUS ACT ON CHILD UNDER 14.

COUNT IX, PENAL CODE 288(b)(1), FORCIBLE LEWD AND LASCIVIOUS ACT ON CHILD UNDER 14.

1    3. Did you have any of the following?

2       Arraignment:                          Yes ⨯____    No ____

3       Preliminary Hearing:                  Yes ⨯____    No ____

4       Motion to Suppress:                   Yes ⨯____    No ____

5    4. How did you plead?

6       Guilty ____    Not Guilty ⨯____    Nolo Contendere ____

7       Any other plea (specify) _____

8    5. If you went to trial, what kind of trial did you have?

9       Jury ⨯____    Judge alone____    Judge alone on a transcript ____

10   6. Did you testify at your trial?                  Yes ____    No ⨯____

11   7. Did you have an attorney at the following proceedings:

12      (a)    Arraignment                    Yes ⨯____    No ____

13      (b)    Preliminary hearing            Yes ⨯____    No ____

14      (c)    Time of plea                   Yes ⨯____    No ____

15      (d)    Trial                          Yes ⨯____    No ____

16      (e)    Sentencing                     Yes ⨯____    No ____

17      (f)    Appeal                         Yes ⨯____    No ____

18      (g)    Other post-conviction proceeding   Yes ⨯____    No ____

19   8. Did you appeal your conviction?              Yes ⨯____    No ____

20      (a)    If you did, to what court(s) did you appeal?

21             Court of Appeal              Yes ____    No ⨯____

22             Year: _____    Result:_____

23             Supreme Court of California    Yes ⨯____    No ____

24             Year: 2007    Result: PETION FOR REVIEW DENIED ____

25             Any other court              Yes ____    No ⨯____

26             Year: _____    Result:_____

27

28      (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS          - 3 -

1   petition?                                              Yes _X_     No____

2        (c)   Was there an opinion?                       Yes ____    No _X_

3        (d)   Did you seek permission to file a late appeal under Rule 31(a)?

4                                                          Yes ____    No _X_

5              If you did, give the name of the court and the result:

6              _____

7              _____

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?        Yes ____    No _X_

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11  challenged the same conviction you are challenging now and if that petition was denied or dismissed

12  with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13  for an order authorizing the district court to consider this petition. You may not file a second or

14  subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15  U.S.C. §§ 2244(b).]

16        (a)   If you sought relief in any proceeding other than an appeal, answer the following

17              questions for each proceeding. Attach extra paper if you need more space.

18        I.    Name of Court: _____

19              Type of Proceeding: _____

20              Grounds raised (Be brief but specific):

21              a._____

22              b._____

23              c._____

24              d._____

25              Result: _____ Date of Result:_____

26        II.   Name of Court: _____

27              Type of Proceeding: _____

28              Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS              - 4 -

1       a._____

2       b._____

3       c._____

4       d._____

5       Result: _____Date of Result:_____

6    III.    Name of Court: _____

7       Type of Proceeding: _____

8       Grounds raised (Be brief but specific):

9       a._____

10      b._____

11      c._____

12      d._____

13      Result: _____Date of Result:_____

14   IV.    Name of Court: _____

15      Type of Proceeding: _____

16      Grounds raised (Be brief but specific):

17      a._____

18      b._____

19      c._____

20      d._____

21      Result: _____Date of Result:_____

22   (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                Yes \_\_\_\_    No X\_\_\_\_

24      Name and location of court: _____

25   B. GROUNDS FOR RELIEF

26      State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1   need more space.  Answer the same questions for each claim.

2       [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One: THE TRIAL COURT ERRED IN ALLOWING

6   THE JURY TO FIND THAT THE 'DURESS' NECESSARY – CONTINUED

7   Supporting Facts:

8   THERE WAS LITTLE OR NO EVIDENCE OF

9   ACTUAL FORCE OR FEAR

10

11  Claim Two: THERE WAS INSUFFICIENT EVIDENCE

12  OF HARDSHIP, SO AS TO QUALIFY AS DURESS, CONTINUED

13  Supporting Facts: INSUFFICIENT EVIDENCE WHEN

14  COMPARED WITH OTHER CASES

15  IN PEOPLE V. LEAL (2004) 33 Cal. 4th 999 THE

16  CALIFORNIA SUPREME COURT BROADLY CONSTRUED THE CONT

17  TERM "duress" IN TO INCLUDE "HARDSHIP"
    Claim Three:

18  THE THREATS HERE FAILED TO SATISFY THE DICTIONARY – CONT–

19  Supporting Facts: WEBSTERS DICTIONARY DEFINITION OF

20  "DURESS"

21

22

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 6 -

— TO MAKE THESE SEXUAL CRIMES QUALIFY AS FORCIBLE COULD INCLUDE MINOR SOCIAL 'HARDSHIPS', SUCH AS NOT BEING TAKEN TO THE MALL, OR NOT BEING TAKEN TO SINGING LESSONS.

CLAIM TWO:

— WITHIN THE MEANING OF PENAL CODE 288(b)(1) and 289 (a)(1)

CLAIM THREE:

— DEFINITION OF HARDSHIP ADOPTED BY THE SUPREME COURT IN LEAL

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    PEOPLE V. LEAL (2004) 33 Cal. 4th 999

5    PEOPLE V. RUBALCAVA (2000) 23 Cal. 4th 322, 332

6    PEOPLE V. SCHULZ (1992) 2 Cal. App. 4th 999

7    Do you have an attorney for this petition?        Yes____    No. X

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on  06-MAY-08                    Rogelio Mirando

14                 Date                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

E-filing

# IN THE COURT OF APPEAL

## FOR THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

|  |  |
|---|---|
| The People of the State of California,<br><br>    Plaintiff and Respondent<br><br>    v.<br><br>ROGELIO MIRANDA<br><br>    Defendant and Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)  No. H029494<br>)<br>)<br>)<br>)<br>) |

CV 08 2356

MHP

(PR)

Santa Clara County Superior Court Case No. EE504139
C. Randall Schneider, Judge

* * *

## APPELLANT'S OPENING BRIEF

STEPHEN B. BEDRICK
Attorney at Law
State Bar No. 058787
1970 Broadway, Suite 1200
Oakland, CA 94612
(510) 452-1900

In association with the
Sixth District Appellate Program

Attorney for Defendant and Appellant
ROGELIO MIRANDA

## TABLE OF CONTENTS

TABLE OF AUTHORITIES  ................................. v

STATEMENT OF THE CASE  ............................... 1

STATEMENT OF FACTS  ................................. 3

Prosecution Evidence  ........................................ 3

Defense Evidence  ........................................... 9

I.   THE TRIAL COURT ERRED IN ALLOWING THE JURY TO
     FIND THAT THE "DURESS" NECESSARY TO MAKE THESE
     SEXUAL CRIMES QUALIFY AS FORCIBLE COULD
     INCLUDE MINOR SOCIAL "HARDSHIPS," SUCH AS NOT
     BEING TAKEN TO THE MALL, OR NOT BEING TAKEN TO
     SINGING LESSONS  .................................... 12

     A.   Introduction and Facts  .............................. 12

     B.   There Was Insufficient Evidence of Hardship, So as to Qualify as
          Duress, Within the Meaning of Penal Code §288(b)(1) and
          §289(a)(1)  ...................................... 16

          1.  Insufficient evidence when compared with other cases  .... 16

          2.  The threats here failed to satisfy the dictionary definition of
              hardship adopted by the Supreme Court in Leal  .......... 19

     C.   The Trial Court's Jury Instructions on Hardship Were Erroneous
          Because They Did Not Satisfy the Standard Set by the Supreme
          Court in Leal  .................................... 21

     D.   Reversal Is Warranted, Because the Jury Was Presented with One
          Legally Valid Theory, and One Legally Invalid Theory, on Force,
          Fear, or Duress, and Because it Cannot Be Determined on Which
          Theory it Relied  .................................. 23

     E.   Leal's Definition of Hardship as Constituting Duress Was
          Improperly Vague, under the 5th and 14th Amendments' Due
          Process Clause  ................................... 24

i

## TABLE OF CONTENTS

F.  Prejudice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

II.  APPELLANT WAS DENIED A FAIR TRIAL WHEN THE
PROSECUTOR TOLD THE JURY THAT IT DID NOT HAVE TO BE
UNANIMOUS AS TO THE SPECIFIC INCIDENT WHICH
UNDERLAY EACH CHARGED COUNT  . . . . . . . . . . . . . . . . . . .  28

A.  Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

B.  The Prosecutor Committed Misconduct, Because His Argument
Was Legally Erroneous  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

1.  The argument was legally erroneous  . . . . . . . . . . . . . . . . . .  30

2.  This legally erroneous argument constituted misconduct  . . .  31

C.  Neither Trial Defense Counsel Nor the Trial Court Adequately
Cured the Prosecutor's Misconduct  . . . . . . . . . . . . . . . . . . . . . .  32

1.  Trial defense counsel rendered ineffective assistance when he
failed to object to this legally incorrect argument  . . . . . . . .  32

2.  Trial defense counsel's jury argument on this point did not solve
this problem  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

3.  The trial court's instruction did not cure the problem  . . . . . .  33

D.  Prejudice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

III.  THERE WAS INSUFFICIENT EVIDENCE OF FORCIBLE DIGITAL
PENETRATION DURING THE TIME PERIOD CHARGED IN
COUNT V OF THE INFORMATION, NAMELY, BETWEEN APRIL
27, 2002 THROUGH APRIL 26, 2003, AND THE TRIAL COURT
ERRED WITH RESPECT TO THE CORPUS DELICTI RULE ON
THIS POINT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

A.  Introduction Regarding Monica's Age and Grade Level  . . . . . .  36

B.  Insufficient Evidence of Forcible Digital Penetration Between April
22, 2002 and April 26, 2003, as Charged in Count V  . . . . . . . .  38

## TABLE OF CONTENTS

C.  Appellant's Admission to the Police Was Not Usable to Cure this
    Evidentiary Insufficiency, for Multiple Reasons, Including the
    Corpus Delicti Rule  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

D.  The Trial Court Erred in Failing to Instruct Sua Sponte on the
    Corpus Delicti Rule  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

E.  Trial Counsel Rendered Ineffective Assistance by Failing to Object,
    or Request Instructions, on the Corpus Delicti Principle  . . . . . .  43

IV. THE PROSECUTION COMMITTED MISCONDUCT WHEN IT
    OVERCHARGED THIS CASE SO AS TO SEEK, AND OBTAIN, A
    SENTENCE OF 75 YEARS TO LIFE, IN THE FACE OF REPEATED
    REQUESTS BY THE VICTIM AND HER MOTHER THAT
    APPELLANT RECEIVE A SENTENCE OF NO MORE THAN 15
    YEARS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

    A.  Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

    B.  The Prosecution Committed Misconduct by Seeking Such a
        Draconian Sentence and Refusing to Take the Interest of the Victim
        into Account  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

V.  THE TRIAL COURT ERRED WHEN IT RULED THAT IT WAS
    REQUIRED TO IMPOSE MANDATORY CONSECUTIVE
    SENTENCES ON THE FOUR COUNTS OF FORCIBLE DIGITAL
    PENETRATION FOR A TOTAL OF 60 YEARS TO LIFE; THE
    TRIAL COURT WOULD HAVE IMPOSED FOUR CONCURRENT
    15 - LIFE SENTENCES IF IT BELIEVED IT HAD THE
    DISCRETION TO DO SO  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

    A.  Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

    B.  The Trial Court Requested that this Court Reverse and Remand for
        Resentencing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

    C.  The Trial Court Erred in Sentencing Appellant Consecutively on
        Counts II-V; it Erred When it Ruled that it Had No Discretion as to
        Whether it Should Sentence Consecutively or Concurrently; the
        Jiminez Case, Which Judge Schneider Felt Obligated to Follow,

# TABLE OF CONTENTS

Was Wrongly Decided ............................... 56

1.  The mandatory consecutive sentencing scheme under §667.6(d)
    does not apply to violations of Penal Code §269 ........ 57

2.  Jiminez was wrongly decided and should not be followed .. 60

VI. SENTENCING APPELLANT TO A LIFE TERM FOR NON-
    VIOLENT DIGITAL PENETRATION CONSTITUTES
    CRUEL AND UNUSUAL PUNISHMENT .................... 62

# TABLE OF AUTHORITIES

## CASES                                                    PAGE

Apprendi v. New Jersey
(2000) 530 U. S. 436 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

Auto Equity Sales v. Superior Court
(1962) 57 Cal.2d 456.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Berger v. United States
(1935) 295 U. S. 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 50

Brosnahan v. Brown
(1982) 32 Cal.3d 236  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

Chapman v. California
(1967) 386 U. S. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 27, 31

Estelle v. McGuire
(1991) 502 U. S. 62, 112 S.Ct. 475 . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

Ewing v. California
(2003) ____ U.S. ____, 123 S.Ct. 1179, 155 L.Ed.2 . . . . . . . . . . . . . . .   63

Francis v. Franklin
(1985) 471 U. S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Grayned v. City of Rockford
(1972) 408 U. S. 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

Gregg v. Georgia
(1976) 428 U.S. 153  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

Griffin v. United States
(1991) 502 U.S. 46, 112 S.Ct. 466 . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Grupe Dev. v. Superior Court
(1993) 4 Cal.4th 911 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

Harmelin v. Michigan
(1991) 501 U.S. 957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE**

In re Lance W.
(1985) 37 Cal.3d 873    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    58

In re Lynch
(1972) 8 Cal.3d 410    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    62, 63

Jackson v. Virginia
(1979) 443 U. S. 307    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21, 40, 41

Lockyer v. Andrade
(2003) ____ U.S. ____, 123 S.Ct. 1166, 155 L.Ed.2d 194    . . . . . . . . . .    62

Mills v. Maryland
(1988) 486 U. S. 367, 108 S.Ct. 1860    . . . . . . . . . . . . . . . . . . . . . . . . . .    23

People v. Alvarado
(2001) 87 Cal.App.4th 178    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    65

People v. Alvarez
(2002) 27 Cal.4th 1161    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41, 42, 43

People v. Babcock
(1993) 14 Cal.App.4th 383    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

People v. Banks
(1993) 6 Cal.4th 926    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

People v. Beagle
(1972) 6 Cal.3d 441    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

People v. Bergschneider
(1989) 211 Cal.App.3d 144    . . . . . . . . . . . . . . . . . . . . . . . . . . .    18, 27, 30

People v. Crandall
(1988) 46 Cal.3d 833    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

People v. Crossdale
(2002) 27 Cal.4th 408    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    60

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE**

<u>People v. Cullen</u>
(1951) 37 Cal.2d 614 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

<u>People v. Deletto</u>
(1983) 147 Cal.App.3d 458 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

<u>People v. Diedrich</u>
(1982) 31 Cal.3d 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 31

<u>People v. Dillon</u>
(1983) 34 Cal.3d 441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62, 63, 66

<u>People v. Espinoza</u>
(1992) 3 Cal.4th 806 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

<u>People v. Fosselman</u>
(1983) 33 Cal.3d 572 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

<u>People ex rel. Gallo v. Acuna</u>
(1997) 14 Cal.4th 1090 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

<u>People v. Green</u>
(1980) 27 Cal.3d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

<u>People v. Harris</u>
(1994) 9 Cal.4th 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

<u>People v. Hauck</u>
(1961) 56 Cal.2d 687 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

<u>People v. Jiminez</u>
(2000) 80 Cal.App.4th 286 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 52-61

<u>People v. Johnson</u>
(1980) 26 Cal.3d 557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 40, 41

<u>People v. Jones</u>
(1990) 51 Cal.3d 294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 31

## TABLE OF AUTHORITIES

**CASES**                                          **PAGE**

<u>People v. Jones</u>
(1998) 17 Cal.4th 279 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

<u>People v. Jones</u>
(2001) 25 Cal.4th 98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

<u>People v. Kelly</u>
(1992) 1 Cal.4th 495 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

<u>People v. Kent</u>
(1981) 125 Cal.App.3d 207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

<u>People v. Leal</u>
(2004) 33 Cal.4th 999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 17-27

<u>People v. Lee</u>
(1987) 43 Cal.3d 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

<u>People v. Lyons</u>
(1956) 47 Cal.2d 311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

<u>People v. Marsden</u>
(1970) 2 Cal.3d 118. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

<u>People v. Marshall</u>
(1990) 50 Cal.3d 907 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  63

<u>People v. Martinez</u>
(1988) 197 Cal.App.3d 767 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 42

<u>People v. Martinez</u>
(1994) 26 Cal.App.4th 1098 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

<u>People v. McNeil</u>
(1980) 112 Cal.App.3d 330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

<u>People v. Nation</u>
(1980) 26 Cal.3d 169 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32, 44

## TABLE OF AUTHORITIES

**CASES**                                          **PAGE**

<u>People v. Palmer</u>
(2001) 86 Cal.App.4th 440  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    58, 60

<u>People v. Pope</u>
(1979) 23 Cal.3d 412  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32, 44

<u>People v. Rubalcava</u>
(2000) 23 Cal.4th 322  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

<u>People v. Schulz</u>
(1992) 2 Cal.App.4th 999  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13, 26

<u>People v. Senior</u>
(1992) 3 Cal.App.4th 765  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13, 26

<u>People v. Smith</u>
(2005) 132 App.4th 1537  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

<u>People v. Superior Court  (Greer)</u>
(1977) 19 Cal.3d 255  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51

<u>People v. Thompson</u>
(1995) 36 Cal.App.4th 843  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30, 31

<u>Richardson v. United States</u>
(1999) 526 U.S. 813, 143 L.Ed.2d 985  . . . . . . . . . . . . . . . . . . . . . . . . .    30

<u>Sandstrom v. Montana</u>
(1979) 442 U.S. 510  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23, 27

<u>Sheppard v. Rees</u>
(9th Cir. 1989) 909 F.2d 1234  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

<u>Solem v. Helm</u>
(1983) 463 U.S. 277  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    62, 63

<u>Strickland v. Washington</u>
(1984) 466 U.S. 668  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32, 43, 44

# TABLE OF AUTHORITIES

**CASES** **PAGE**

<u>Stromberg v. California</u>
(1931) 283 U.S. 359, 51 S.Ct. 532 . . . . . . . . . . . . . . . . . . . . . . . . . . .    23, 24

# TABLE OF AUTHORITIES

**PAGE**

## <u>STATUTES</u>

### <u>United States Constitution</u>

Fifth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 21, 23, 24, 30
Sixth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30
Eighth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62
Fourteenth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 21, 24

### <u>California Constitution</u>

Art. I, § 15  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 30
Art. I, § 16  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 30
Art. I, § 17  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
Art. I, § 28  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

### <u>Penal Code</u>

§220  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57, 60
§261  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57
§262  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57
§264  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57
§269  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 2, 12, 40, 46, 52-61
§288(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 53
§288(b)(1)  . . . . . . . . . . . . . . . . . . . . . .  2, 12, 16, 21, 24, 25, 28, 46, 53
§288.5  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45, 60
§289(a)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 12, 16, 21, 24, 36
§667.6(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  56, 57, 58, 59, 60
§669  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
§679  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49
§679.02  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49
§679.02(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49
§1118.1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
§1170(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48
§1191.1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48
§1191.15  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49
§1203.066(c)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

# TABLE OF AUTHORITIES

**PAGE**

§1203.067(a)(2) ......................................... 48
§1203.10 ............................................. 48
§1237 ............................................... 2

## California Rules of Court

4.414 (b)(5) ........................................... 48
4.425 .......................................... 57, 59
32.1 (b) ............................................. 7
976 (d) ............................................. 53

## OTHER AUTHORITIES

## CALJIC

1.00 ............................................. 33
2.72 .......................................... 42, 43
10.30 ........................................ 12, 13
10.42 ........................................ 12, 13
17.01 ..................................... 21, 32, 33

Webster's 3d New Internat. Dict. (2002) p. 703 .................... 19

Webster's Third New International Dictionary
(Merriam, 1966) at p. 2263 ................................... 19

Webster's Collegiate Dictionary
(Merriam-Webster, 10th ed., 1999) at p. 1165 ................. 19, 20

Rules of Professional Conduct of the State Bar of California,

Rule 5 -200 ........................................... 31

## STATEMENT OF THE CASE

Appellant Rogelio Miranda (Appellant) was charged by information, filed May 19, 2005, as follows: Count I, lewd or lascivious act on child under 14, Penal Code §288(a), on February 20, 2005.  Count II, Penal Code §269, aggravated sexual assault on child under 14 by forcible foreign object penetration, Penal Code §289(a)(1), on February 18, 2005.  Count III, Penal Code §269, aggravated sexual assault on child under 14 by forcible foreign object penetration, Penal Code §289(a)(1), between April 27, 2004 and February 17, 2005.  Count IV, Penal Code §269, aggravated sexual assault on child under 14 by forcible foreign object penetration, Penal Code §289(a)(1), between April 27, 2003 and April 26, 2004.  Count V, Penal Code §269, aggravated sexual assault on child under 14 by forcible foreign object penetration, Penal Code §289(a)(1), between April 27, 2002 and April 26, 2003.  Count VI, Penal Code §288(b)(1), forcible lewd and lascivious act on child under 14 between April 27, 2001 and April 26, 2002.  Count VII, Penal Code §288(b)(1), forcible lewd and lascivious act on child under 14 between April 27, 2004 and February 27, 2005.  Count VIII, Penal Code §288(b)(1), forcible lewd and lascivious act on child under 14 between April 27, 2004 and February 27, 2005.  Count IX, Penal Code §288(b)(1), forcible lewd and lascivious act on child under 14 between April 27, 2004 and February 27, 2005.  (CT 66-73)

The taking of evidence lasted approximately two and one half days. (CT 97, 102, 110, 115) The jury deliberated slightly more than one full day. (CT 115, 192) On July 22, 2002 the jury convicted Appellant as charged on all nine counts. (RT 180)

On October 20, 2005 the trial court sentenced Appellant as follows: Count I, Penal Code §288(a), three years, low term; count II, Penal Code §269, 15 years - life; count III, Penal Code §269, 15 years - life; count IV,

Penal Code §269, 15 years - life; count V, Penal Code §269, 15 years - life; count VI, Penal Code §288(b)(1), three years, low term; count VII, Penal Code §288(b)(1), three years, low term; count VIII, Penal Code §288(b)(1), three years, low term; count IX, Penal Code §288(b)(1), three years, low term. The trial court ran all those sentences consecutive, to give Appellant a sentence of 15 years determinate plus 60 years - life, indeterminate, for a total of 75 - life. Appellant is 36 years old.

The trial court stated that it believed it lacked the discretion to run the sentences on counts II-V concurrent. It believed that it was required to follow the only published appellate case on this point, People v. Jiminez (2000) 80 Cal.App.4th 286, which requires mandatory consecutive sentencing for multiple counts of Penal Code §269 committed against the same victim on separate occasions. However, the trial court believed that Jiminez was wrongly decided. The trial court stated that if it had sentencing discretion, it would have run all those four counts concurrent, to give Appellant a sentence of 15 years determinate plus 15 years - life indeterminate, for a total of 30 years - life. (RT 428-432, 447, 452) The trial court stated: "I hope this case is reversed on appeal so that I can impose a just and appropriate lower term." (RT 452)

**Statement of Appealability:** This is an appeal taken pursuant to Penal Code §1237 from a final judgment after a jury verdict.

## STATEMENT OF FACTS

### Prosecution Evidence

Rebecca Miranda (Rebecca) was Appellant's wife and the mother of Appellant's children, Monica "Doe," age 12 at the time of trial, and Adam Miranda, age 10. Monica was born April 27, 1993. When Monica was six years old, she told her mother that her father had touched her on her "bottom." Appellant denied any misdeeds. He said it was merely horseplay. (RT 31-33)

On February 20, 2005, when Monica was 11, Monica told her mother that Appellant had been touching her, and then pointed to the area of her vagina. Monica said that Appellant had been doing it a lot. Monica was crying. This conversation was in the women's bathroom at the community church which the family attended. (RT 33-37)

While still in the bathroom, Rebecca recounted Monica's accusations to her aunt, Esther Gonzales, and to her sister-in-law Elena. Aunt Esther asked family members to come to her house to discuss the issue further. She also asked the church pastor, Walter Fernandez, to attend, and he did. (RT 33-39) Rebecca persuaded Appellant to attend this conference by lying and saying that they were planning a surprise birthday party for their uncle George.

At her aunt's house, Rebecca confronted Appellant with Monica's accusation that he had been touching Monica on her private parts. Appellant first shook his head no; then he said yes. He said he was glad that it was over. He also said that he was tired of their marriage. (RT 39-42) Rebecca told Appellant to get his things and leave her house. Appellant departed. (RT 39-42)

Rebecca then telephoned to Appellant at their home. Appellant said

in that phone conversation that he never used his penis; that he only put his fingers in Monica's vagina. (RT 42-45)

Appellant returned to Esther Gonzales' house. By that point, Appellant's parents, Julia and Andres Miranda, had arrived. (RT 42-45) Rebecca had invited Appellant's parents to attend, so that they would not claim that she was making up these charges. Rebecca admitted that she previously had made false allegations that Appellant was flirting with another woman. (RT 73-75) When Appellant came to Esther Gonzales' house for the second time, he was crying. He apologized for shaming his parents. He did not specify exactly what he was apologizing for. (RT 45-47)

Appellant then wrote a letter to Monica, partially in English and partially in Spanish. He apologized to Monica for "overabusing your person." He wrote "May God forgive me for all the damage I've made you suffer." He wrote "I need a place of rehabilitation for myself." He also wrote to his son Adam, "I love you." (RT 45-51)

According to Rebecca, after Appellant returned to his aunt's house, and after his parents were present, he admitted that he had touched Monica's vagina with his fingers, but not with his penis. Appellant said he was sorry for shaming and disappointing the family. There was discussion that Appellant should live apart from his family but still continue to financially support the children. (RT 79-85)

Monica "Doe," daughter of Appellant and Rebecca, was 12 years old at the time of trial. She had just finished the 6th grade. She testified that when she was 6 years old, Appellant rubbed her butt on many occasions. She told her mother. Her mother said that her dad had said that it was an accident, and that he would stop. (RT 102-107)

In the 4th grade Appellant started putting his finger "around" her vagina. He tried, but could not get his finger inside her vagina. Sometimes it hurt. He did put his finger "in the opening." Sometimes she would try to get away, but he would grab her leg. On some occasions, Appellant would remove her pants and her underwear. When Monica objected, Appellant said that if she did not cooperate, he would not take her to places where she liked to go, for example, places where she could sing. (RT 107-112)

Also, when Monica was in the 4th grade, and when she was watching television in her parents' room, Appellant would take her clothes down and start touching her near her vagina. It happened more than once a week. (RT 109-112)

On redirect examination the prosecutor had Monica clarify her answer as to when Appellant first put his finger "in" her vagina. Monica said that it was not during 4th grade, but that it was during summer after 4th grade and before 5th grade.

> Q [prosecutor Benson]: Okay. And I'm sorry. I have just two questions that I need just to clarify. When your dad began putting you on top of him, were you in the fifth grade or fourth?
>
> A. [Monica]: Fifth.
>
> Q. Okay. And when your dad began putting his finger in your vagina that you were in the fourth grade, or was it –
>
> A: Fifth – I'm not sure.
>
> Q: Okay, I think you said fourth before. Is it fourth grade?
>
> A: Yes. Like in summer.
>
> Q. Okay. All right. (RT 158)

When Monica was in the 5th grade, Appellant frequently put his finger "in" her vagina. It still hurt. Then, Appellant would lie on the bed,

and put Monica on top of him. Sometimes, he would grab her legs to keep her on the bed. Sometimes, she would try to close her legs, and he would spread them apart with his hands. (RT 113-117)

Sometimes, in the 5th grade, Appellant would put Monica on top of him. Her pants and underwear were off. Appellant would have his underwear on. Monica would feel Appellant's penis. It was hard. She would feel it "on my ovaries," and on the "hard bone" above her vagina. Appellant sometimes would move her body against his. He would hug her tight. This happened "a couple of times a week" in the 5th grade. (RT 117-120)

When Monica was in the 6th grade, beginning in September 2004, Appellant touched her vagina with his finger more than once. He pulled down her pants to do that. He told Monica if she did not cooperate, that Appellant would not allow her to do "something." (RT 121) Monica was afraid to tell her mother. (RT 120-121) The last day when Appellant touched her vagina was a couple of days before she told the whole story to her mother, meaning approximately February 18, 2005. (RT 121)

On February 20, 2005 Appellant touched Monica on her chest. That made her feel "freaked out," so she decided to tell her mother. By that time, she thought if her mother did not believe her, she would tell someone else. (RT 125-127)

Later that day, Monica got into an argument with her father at church. Appellant spanked her because she was in the church gym instead of being in class. Monica went back to church. There was a visiting pastor. He was talking about telling the truth, so she did. (RT 125-130)

Esther Gonzales, aunt of Rebecca Miranda and great aunt of Monica,

heard Rebecca say in the church bathroom that Appellant was touching Monica sexually. Esther Gonzales asked Appellant and pastor Walter Fernandez to go to her house, because she wanted to hear the truth. At her house, Appellant said that he was sorry. He asked for forgiveness. He said that he was glad that Monica spoke up. Appellant said that he never had the courage to speak up when he was "violated" as a boy when he was in Mexico.[1] (RT 163-168)

Ms. Gonzales regularly saw Appellant and Monica together at church, including at dance practice. Monica had never made any complaints about her father. (RT 168-170)

At the family meeting at her house, Rebecca asked Appellant if he had touched Monica on the vagina, and Appellant said yes. (RT 175-177)

Terry Schillinger, Sunnyvale police officer, took a statement from Appellant. (RT 179-183) Appellant said in that statement that five years earlier he touched Monica on the "butt." On Friday, February 18, 2005 (four days before the interview) while Appellant and Monica were watching television, Appellant removed Monica's underwear. He rubbed her butt. He put one of her fingers in her vagina. She cried. (People's Exh. #5, pp. 4-7, Rule 32.1(b) materials).

On Sunday, February 20, 2005 (two days before the interview) Appellant put his hand on Monica's bare breast. He did that because it was exciting to Appellant. (People's Exh. #5, p. 7)

Appellant gave several inconsistent answers as to the number of times when he inserted his finger in Monica's vagina. Appellant first said that it only occurred on four occasions. (People's Exh. #5, pp. 10-11)

---

[1]Appellant told officer Schillinger that, when he was a child in Guadalajara, Mexico, a male friend of his mother sexually abused him. (People's Exh. #5, p. 19, Rule 32.1(b) materials)

Appellant then said that he had been touching Monica in her vagina beginning when she was 11 years old, over a period of a couple of months, but not every day. (People's Exh. #5, pp. 4-6) Appellant then said that for the last three years, he had been putting his finger in Monica's vagina, maybe twice a month. (People's Exh. #5, p. 11)

Appellant denied that he lay on his back and placed Monica's body on top of him. (People's Exh. #5, p. 13)

Appellant said, "I know what I did was wrong." He wrote a note of apology to his daughter. He wrote a note of apology to his son, because he would not be able to see him, because he would be in jail. (People's Exh. #5, pp. 19, 22)

Prior to taking that statement, officer Schillinger checked Appellant's criminal history. He did not have any criminal record whatsoever. (RT 184-187)

Walter Fernandez was a general contractor and a volunteer pastor at the Spanish-speaking ministry at the Santa Clara Assembly of God. They met at the community church in Santa Clara. On February 20, 2005, he was asked to go to Esther Gonzales' house. No one told him why. After he arrived at the house, Rebecca asked Appellant why he hurt Monica. At first, Appellant did not say anything. Then, Rebecca said that Appellant had to leave their house. Appellant said he was tired of the relationship. Appellant left. Appellant's parents arrived. Rebecca called Appellant on her cell phone. Then Appellant returned. Appellant's brother Carlos asked Appellant how he could do this to his own daughter. Appellant said "I am sorry. I failed you. I did not penetrate her with my penis. I just used my fingers." (RT 201-208)

When Fernandez recounted this story to his daughter, who worked as

a legal secretary, and to her boyfriend, a paralegal, they told him the matter was serious, and that he should talk to the senior pastor. After he talked to the senior pastor, he reported all this to the police. (RT 208-211)

Fernandez had known Appellant for more than 20 years. He saw Appellant two or three times a week at church. Appellant helped out with various kinds of equipment at church, including the sound equipment. (RT 211-215)

At the family conference, Rebecca was crying. She said that she may have to move back to Texas. That was all very difficult for Rebecca because Appellant was a good provider for his family. He worked two jobs. (RT 215-218)

### Defense Evidence

Josefina Elena Rivera (Elena), the wife of Appellant's brother Carlos, was in the women's bathroom at church on February 20, 2005. Monica was crying. Her mother was hugging her. The mother said that Appellant was abusing Monica. She did not understand that to mean sexual abuse. (RT 223-229)

Elena and her husband Carlos went to Esther Gonzales' house. Rebecca told Appellant that he had to leave their home. Appellant did not admit to abusing Monica sexually. Elena did not realize that these charges referred to sexual abuse until after she heard that Appellant was arrested. Elena never saw any difficulties between Appellant and Monica. (RT 229-231) Pastor Fernandez was incorrect when he said that Appellant admitted at the family meeting that he had penetrated Monica. Appellant did not admit that. (RT 235-237)

Carlos Miranda (Carlos), Appellant's brother, went to the family meeting. Esther Gonzales said that Appellant did something to his

daughter, but she did not describe it further.  Rebecca asked who was going to support her.  The major topic of conversation was money.  (RT 243-249)

Carlos thought this discussion was about Appellant and Rebecca getting separated.  He did not hear Appellant say that he only penetrated Monica with his finger but not with his penis.  Appellant was crying, but not saying much.  Carlos did not understand that the problem was sexual until Esther Gonzales said something about Appellant touching Monica.  The family's plan was for Appellant and Rebecca to separate, and for Appellant to support the family financially.  (RT 249-255)

On the previous day of trial, Carlos was in the courtroom and heard Appellant's taped confession.  He said it was not Appellant's voice.  It sounded like a little girl's voice.  (RT 255-257)

Julia Miranda and Andres Miranda, Appellant's parents, testified that Monica always wanted to be with her father, and that Monica never complained about any problems with her father.  When they went to Esther Gonzales' house, Appellant was crying.  All the discussion was about Rebecca going to Texas, and that Appellant would have to support the children.  Appellant denied all the sexual accusations against him.  (RT 257-264, 270-276)

Carmen Miranda (Carmen), Appellant's sister, was close to Monica.  She would see Monica two or three times a week.  Monica would talk about things at school.  Monica would play with Carmen's children.  Monica always wanted to be with her father.  She would cry if Appellant went out without her.  (RT 281-284)

When Carmen went to the family meeting on February 20, 2005, Rebecca was talking about wanting Appellant to work.  Walter Fernandez said that they were there because Monica said that Appellant touched her.

Appellant did not admit touching Monica sexually. He did not admit penetrating her with his fingers. Appellant said that he had always taken care of his family, and that he always would take care of them. (RT 284-287)

Carmen heard pastor Fernandez tell Rebecca that it was a good idea for her to go to Texas. Fernandez said they were there because Monica said she had been touched. Appellant's head was down on the table. He said that they were lying. (RT 290-295)

I.

## THE TRIAL COURT ERRED IN ALLOWING THE JURY TO FIND THAT THE "DURESS" NECESSARY TO MAKE THESE SEXUAL CRIMES QUALIFY AS FORCIBLE COULD INCLUDE MINOR SOCIAL "HARDSHIPS," SUCH AS NOT BEING TAKEN TO THE MALL, OR NOT BEING TAKEN TO SINGING LESSONS

### A.    Introduction and Facts

Appellant was convicted of four counts of Penal Code §269, for forcible foreign object penetration of a child, Penal Code §289(a)(1). Appellant was convicted of four counts of Penal Code §288(b)(1), for forcible lewd act upon a child. Appellant admitted most of the acts, but denied that force was involved. (RT 363-365) If the jury found that there was no force, or fear, or duress, Appellant would have been convicted of lesser crimes, with far less serious sentences.

The jury was instructed that it could find that these crimes were forcible if there was "force, violence, duress, menace, or the fear of immediate and unlawful bodily injury. . . ." The jury was then given a definition of "duress," as follows:

> "Duress" means a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which she would not otherwise have performed, or acquiesce in an act to which she otherwise would not have submitted. The total circumstances, including the age of the alleged victim, and her relationship to the defendant, are factors to consider in appraising the existence of the duress. (CALJIC 10.30, CT 152-153; CALJIC 10.42, CT 155-156)

The jury was given this definition twice, once in the instruction on Penal Code §289(a), forcible foreign object penetration on child, and once in the instruction on Penal Code §288(b)(1), forcible lewd act upon child. (Id.)

There was little or no evidence of actual force or fear. Monica did

testify that on a few occasions, when she attempted to pull away from Appellant, he grabbed her leg and pulled her back. However, there was no testimony that any such grabbing occurred during all eight instances charged in the information. Nor was there testimony that any such grabbing occurred during all of the foreign object penetration incidents, as opposed to during the lewd act incidents. Further, as to those few instances of alleged grabbing, there was an open question, on which reasonable jurors could differ, as to whether such grabbing qualified as "force" in this context, meaning "physical force that is substantially different from or substantially greater than that necessary to accomplish the lewd act itself." (CALJIC 10.30, CT 152; CALJIC 10.42, CT 155) Compare People v. Schulz (1992) 2 Cal.App.4th 999, 1004 (in which this Court found insufficient force when defendant grabbed victim's arm and held her while fondling her, "because a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force'"), and People v. Senior (1992) 3 Cal.App.4th 765, 775 (in which this Court similarly found insufficient force when defendant pulled the victim back when she tried to pull away from oral copulation), with People v. Babcock (1993) 14 Cal.App.4th 383, 386 (holding victim when she tries to pull away constitutes sufficient force).

The trial court did not think there was much force here. It explicitly found that any use of "force" here was merely "de minimis." (RT 431)

Because the evidence of "force" was so limited, the prosecutor did not totally rely on "force." Thus, after the prosecutor argued to the jury that there was sufficient force, he also argued, in the alternative, that the jury could rely upon "duress," and could rely upon "hardship," as proving duress, to provide the necessary aggravation to render these crimes forcible.

Monica's testimony as to "hardship" was as follows:

Q [prosecutor Benson]: Okay, Did you ever tell your dad that you didn't want to do this?

A [Monica]: Um, like, yeah, sometimes I told him I didn't want to, but he would say, like, if that he didn't he would just say something like I can't, like, do something. Like he wouldn't, like − like he wouldn't take me somewhere, like where I have to go or − like sometimes when I went, like, to church, like to practice to sing, he would say I won't take you there or something.

Q:    Okay.

A:    I won't take you somewhere. And that I really liked singing.

Q:    Okay. So sometimes like when you were in the fourth grade your dad would say, you know, if you don't do this I'm not going to take you somewhere, is that what you're saying?

A:    Yeah.

Q:    Essentially you'd be punished.

A:    He never, like, punished me or something.

Q:    You wouldn't say be spanked but he would not allow you to do something unless you did this −

A:    Yeah. (RT 110-111)

* * *

Q:    Okay. So he did it more than once while you were in the sixth grade; is that correct?

A:    Yeah.

Q:    All right. And is your dad putting his finger in your vagina?

A:    Yeah.

Q:    Is he still pulling down your pants?

A:    Yeah.

Q:    Is he still telling you that if you don't do this for him you're not going to get to do something?

A:    Yeah. (RT 121)

Based on this testimony, the prosecutor repeatedly argued to the jury that Monica suffered threats of hardship, and that such hardship could qualify as duress, sufficient to render these crimes forcible.

First, the prosecutor argued:

> Duress. And again, these are or's. Some of you might think that there was force used. Some of you might think that there was duress used. Again, he's stronger than she is. He was the disciplinarian in the family. He threatened to not take her places. Again, this is duress.

> One of the other things that the code section talks about is retribution. And Monica talked about that. Sometimes he would say, you know, if you don't do this, I'm not going to take you to the practice. I'm not going to take you to the store.

> Again, and finally, he's her father. What is she supposed to do? He's bigger than she is. He's stronger than she is. He's the one who does the enforcing in the family. She has no choice. (RT 323)

Then the prosecutor argued:

> You know, you can think back to when you were ten and the position that your parents held over you, and the fact that you're supposed to do what your parents want. Why? Because they're your parents. And on top of that, he's talking about I'm not going to take you to the store. I'm not going to take you to practice. And on top of that he's using -- he's physically overcoming her resistance. Don't even consider a lesser offense. (RT 327-328)

The prosecutor's argument that Appellant allegedly said that he would not take Monica to the store if she did not comply was not literally accurate. Monica merely testified that Appellant said that he wouldn't take me "somewhere." (RT 110-111, quoted on previous page) Monica did not say anything about a "store." Nonetheless, the prosecutor's argument that Appellant would not take her to the store fairly characterized the nature and triviality of the supposed hardship.

Trial defense counsel repeatedly objected, both orally and in writing, to the jury being told that the threat of social hardship -- such as not being taken to the mall or to singing practice -- could qualify as "duress," under Penal Code §289(a)(1) or §288(b)(1). (CT 107, RT 297-303) The trial court overruled those objections. (RT 303)

Trial counsel then moved for judgment of acquittal, Penal Code §1118.1, on the grounds that there was insufficient evidence of force, duress, or hardship sufficient to elevate the improper touchings to aggravated sexual assaults under §288(b)(1) and §289(a)(1). (RT 304-305) The trial court denied this motion, too. (RT 307-308)

**B.  There Was Insufficient Evidence of Hardship, So as to Qualify as Duress, Within the Meaning of Penal Code §288(b)(1) and §289(a)(1)**

**1.  Insufficient evidence when compared with other cases**

Penal Code §288(b)(1) and Penal Code §289(a)(1) elevate lewd touching and foreign object penetration to aggravated sexual assault if there is "force, violence, duress, menace, or the fear of immediate and unlawful bodily injury on the victim or another person."

In People v. Leal (2004) 33 Cal.4th 999 the California Supreme Court broadly construed the term "duress" in §288(b)(1) to include "hardship."

However, even under Leal, and under the 5th Amendment's due process clause, there still is a minimum level of hardship, below which evidence of hardship is legally insufficient to constitute duress, so as to elevate those wrongful acts to crimes warranting life in prison.

For example, is there duress, or "hardship," if an adult tells a child that she has to turn the television off a bit sooner than desired? Some children reasonably might think so. But it cannot be imagined that the

Legislature intended that such a trivial hardship could be equated with force, or fear, or duress, or that such a triviality could elevate a wrongful touching to an aggravated sexual assault warranting life in prison. The alleged hardships here are at that same level of triviality.

In People v. Leal, supra, the Supreme Court found that the defendant threatened the victim with two specific hardships. First, he threatened her that she would not be able to see her aunt again. (The defendant was the aunt's boyfriend.) Second, the defendant told the victim "not to tell anyone about these incidents." By telling her that, the defendant caused the victim to be "afraid she would be taken away from her parents, as had happened to friends of her who had been molested." People v. Leal, supra, 33 Cal.4th at 1002-1003. These threats are illustrative of how hardship could be equivalent to duress.

Is the threat in Leal that the victim would be taken away from her parents a hardship equivalent to duress? Indisputably. Is a threat in Leal that the victim would never be able to see a favorite aunt a hardship, equivalent to duress? Perhaps. However, the threats here that the defendant would not take the victim to the mall or to singing lessons are so trivial, when compared to the threats involved in Leal, that they cannot qualify to meet the Leal standard.

Further, the alleged threat here was not even a threat that Monica would be prohibited from going to the mall, or that Monica would be prohibited from taking singing lessons. Instead, it was merely a threat that Appellant would not personally take her there. Monica could have gone to the mall or to singing lessons with her mother, or with any of her several aunts, who were close to her. There was no evidence that Appellant threatened or prohibited any of those relatives from taking Monica there.

The threat that Appellant would not personally take Monica to the

store, or to singing lessons, is even less compelling than a threat to withhold a child's promised allowance, which threat Justice Kennard, dissenting in Leal, 33 Cal.4th at 1012-1013, found would be inadequate to establish hardship, amounting to duress.

In People v. Bergschneider (1989) 211 Cal.App.3d 144, 150, and fn. 3 (cited and relied upon by the Supreme Court in Leal, 33 Cal.4th at 1010), the court found sufficient evidence of hardship, amounting to duress, under the following circumstances: (1) The defendant stepfather told the 14 year old girl that, if she did not comply with his sexual demands, she would be put on "restriction," which the girl understood to mean "she couldn't go anywhere or spend the night with anyone," including her boyfriend. (2) The defendant told the girl if she told anyone about the sexual activities, that she would "go to juvie" (meaning to juvenile hall). (3) The defendant told the girl that, if she did not comply, her mom would be put out on the street. (4) When the girl stopped having sex with the defendant, he carried out those threats. He put the girl "on restriction" and took the car keys away from the girl's mother, so that she could not drive herself, or the girl, anywhere.

Thus, the threats in Bergschneider, amounting to duress, included (1) prohibiting anyone from taking the girl anywhere, (2) threatening to send the girl to juvenile hall, and (3) threatening to kick the mother out of the home. Not even one such factor was present here, where Appellant merely said that he personally would not take Monica to the store, or to singing lessons, but did nothing to bar anyone else from doing so.

For all these reasons, the threats in this case were below the minimum level, under the due process clause, where threats could constitute duress.

### 2. The threats here failed to satisfy the dictionary definition of hardship adopted by the Supreme Court in <u>Leal</u>

In <u>People v. Leal, supra</u>, 33 Cal.4th at 1009, when the Supreme Court held that hardship qualified as duress, it based that ruling upon the dictionary definition of hardship, which it adopted and quoted as follows: "Webster's Third New International Dictionary . . . currently includes the following definition of duress: 'restraint or check by force . . . stringent compulsion by threat of danger, hardship, or retribution . . . .' (Webster's 3d New Internat. Dict. (2002) p. 703)  We agree.  'Courts frequently consult dictionaries to determine the usual meaning of words.' (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 16.)"

That definition of duress may be reasonable.  However, that definition and that standard were not satisfied here, because there was insufficient evidence of two aspects of the dictionary's requirement of "stringent compulsion by threat of danger, hardship, or retribution."  The aspects which were not satisfied here were (i) that there must be "compulsion," and (ii) that the compulsion must be "stringent."

Webster's Third New International Dictionary (Merriam, 1966) at p. 2263 defines "stringent" as "marked by vigor, strictness or severity." and as "rigidly controlled by rule or standard, not loose or lax." Merriam-Webster's Collegiate Dictionary (Merriam-Webster, 10th ed., 1999) at p. 1165 similarly defines "stringent" as "marked by vigor, strictness or severity."

There was no evidence here of any threat that qualified as stringent or severe.  Appellant merely threatened that he would not personally take the child to an unnamed store, or to singing lessons.

Second, there was no evidence here of any "compulsion." Webster's Third New International Dictionary, <u>supra</u>, at p. 463 defines "compel" as to

"urge irresistibly by moral or social pressure;" "to force or cause irresistibly: call upon, require, or command without possibility of withholding or denying." Merriam-Webster's Collegiate Dictionary, supra, at p. 234 defines "compel" (the verb underlying compulsion) as "to cause to do so or occur by overwhelming pressure."

There was no such "overwhelming pressure" or "command without possibility of . . . denying" here. Most children can survive not going to the store.

Thus, the definition of duress adopted by the Supreme Court in Leal establishes that, for "hardship" to meet the dictionary standard of "duress," there must both be "compulsion by overwhelming pressure," and that such compulsion must be stringent, "severe" or vigor[ous]" or the equivalent. There was insufficient evidence to satisfy this test here.

Did the threat in Leal that the child will be taken away from her parents satisfy this definition of "severe" or "vigor[ous]" "compulsion by overwhelming pressure?" Absolutely. Did the threat in Leal that the child will not be able to see her aunt satisfy this definition? Perhaps. But does the threat in the instant case that Appellant will not personally take Monica to the mall or to singing lessons satisfy this definition? Not in a snowball's chance.

The evidence here was insufficient to meet Leal's dictionary definition in two ways. First, this threat lacked compulsion, or overwhelming pressure, This threat was not a "command without possibility of . . . denying." Second, this threat was not severe or vigorous. Accordingly, this threat did not satisfy the definition of hardship as established by the Supreme Court in Leal.

For all these reasons, there was insufficient evidence here of the necessary element of duress or hardship, as defined in Leal. Accordingly, it

violated due process under Calif. Const. Art. I, §§15, 16 and U. S. Constitution, 5th and 14th Amendments, to convict Appellant of the forcible aspects of Penal Code §288(b)(1) and Penal Code §289(a)(1) without sufficient evidence of the necessary element of duress. <u>Jackson v. Virginia</u> (1979) 443 U. S. 307; <u>People v. Johnson</u> (1980) 26 Cal.3d 557.

> ### C.    The Trial Court's Jury Instructions on Hardship Were Erroneous Because They Did Not Satisfy the Standard Set by the Supreme Court in <u>Leal</u>

The jury was twice instructed that the "duress" needed for Penal Code §288(b)(1) and §289(a)(1) was defined as follows:

> "Duress" means a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which she would not otherwise have performed, or acquiesce in an act to which she otherwise would not have submitted. The total circumstance, including the age of the alleged victim, and her relationship to the defendant, are factors to consider in appraising the existence of the duress. (CALJIC 10.30, CT 152-153; CALJIC 10.42, CT 155-156)

These instructions were erroneous because they did not satisfy the standard set by the Supreme Court in <u>Leal</u>.

Under <u>Leal</u>, and under the dictionary definition of hardship which <u>Leal</u> adopts and employs, duress means "stringent compulsion by threat of danger, hardship, or retribution."  However, nothing in the instructions given here told the jury that there must be "compulsion," or that such compulsion must be "stringent," meaning "marked by vigor, strictness or severity." (Merriam-Webster's Collegiate Dictionary, <u>supra</u>.)

Instead, the jury was given a weak and watered-down instruction, quoted directly above, that the hardship would be sufficient to constitute duress, even if it was of a much lesser degree, as long as it was sufficient to persuade a reasonable person to do something which she would not otherwise had done.  That instruction was defective because it failed to tell

the jury that actual compulsion was required, and that such compulsion needed to be "severe," "stringent," or "strict."

Worse, in child sex cases, the instruction given here is effectively a tautology. By definition, a reasonable child would not "perform an act which she would not otherwise have performed, or acquiesce in an act to which she otherwise would not have submitted" (CALJIC 10.30, 10.42) without inducement of some kind. Thus, essentially anything which causes the child reasonably to "acquiesce in an act to which she otherwise would not have submitted," qualifies as "hardship" under that definition. Under that definition any inducement, no matter how trivial, qualifies as a threat of hardship, as long as it achieves its intended result of acquiescence. That is why that instruction is an improper tautology. It is self-defining. And virtually anything satisfies it, as long as it is sufficient to cause the child reasonably to comply.

However, not every inducement, or every hardship, qualifies as "stringent," strict, or "severe" under <u>Leal</u>'s dictionary definition of hardship. Similarly, not every verbal threat qualifies as compulsion under the dictionary definition adopted and employed in <u>Leal</u>. Threatening to turn off a child's favorite TV show, or refusing to take her to the mall, might cause her reasonably to acquiesce in an act to which she otherwise would not have submitted. However, such an inducement indisputably does not qualify as "compulsion," let alone as "stringent" or "severe" compulsion, as required by the Supreme Court's definition of hardship in <u>Leal</u>.

Thus, the instructions given here were defective, because the standard they set was too low, and because they allowed any inducement, no matter how trivial, to qualify as a threat of hardship, as long as it successfully accomplished its intended result.

When, as here, the jury is misinstructed on a necessary element of a

crime, namely, "force, fear, or duress," that error violates the 5th Amendment's due process clause and warrants reversal. <u>Sandstrom v. Montana</u> (1979) 442 U.S. 510.[2]

### D. Reversal Is Warranted, Because the Jury Was Presented with One Legally Valid Theory, and One Legally Invalid Theory, on Force, Fear, or Duress, and Because it Cannot Be Determined on Which Theory it Relied

The jury was instructed that it could find force, fear, or duress either if it found sufficient force (a legally correct theory), or if it found hardship under the defective and watered-down instruction given here.

When the case is submitted to the jury on two alternate theories, one legally valid, and one legally invalid, and when, as here, it cannot be determined upon which theory the jury relied, a new trial is required under the due process clauses of both the United States Constitution, 5th Amendment, and the California Constitution, Article I, Sec. 15. <u>Griffin v. United States</u> (1991) 502 U.S. 46, 51, 112 S.Ct. 466; <u>Mills v. Maryland</u> (1988) 486 U.S. 367, 376, 108 S.Ct. 1860, 1866-1867; <u>Francis v. Franklin</u> (1985) 471 U.S. 307, 322; 105 S.Ct. 1965, 1973-1976; <u>Stromberg v. California</u> (1931) 283 U.S. 359, 367-368, 51 S.Ct. 532, 535.

As the High Court stated in <u>Mills v. Maryland</u>, <u>supra</u>, 486 U.S. at 376, 108 S.Ct. at 1866-1877,

---

[2]This instructional issue was neither raised nor decided in <u>Leal</u>. Although the jury in <u>Leal</u> was given an instruction similar to that given here, the defendant in <u>Leal</u> did not challenge that instruction on the grounds presented here. In particular, the defendant did not challenge this instruction for failing to satisfy the Supreme Court's dictionary definition of hardship, in part, because, prior to the decision in <u>Leal</u>, the Supreme Court had not adopted this dictionary definition of hardship. Accordingly, <u>Leal</u> cannot be read as having approved that instruction, especially as contrasted with the dictionary definition, because an opinion is not authority for a proposition not considered therein. <u>People v. Banks</u> (1993) 6 Cal.4th 926, 945.

with respect to findings of guilt on criminal charges, the Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict. See e.g. <u>Yates v. United States</u>, 354 U. S. 298, 312, 77 S.Ct. 1064, 1073 (1957); <u>Stromberg v. California</u>, 283 U. S. 359, 367-368, 51 S. Ct. 532, 535 (1931).

California law is in accord. When the jury is instructed on two alternate theories, one proper on the record, and the other legally erroneous, and where, as here, it cannot be determined on which theory the jury relied, reversal and a new trial are required. <u>People v. Harris</u> (1994) 9 Cal.4th 407, 420, fn. 7; <u>People v. Lee</u> (1987) 43 Cal.3d 666, 671-676; <u>People v. Green</u> (1980) 27 Cal.3d 1, 69.

The standard of review for prejudice for this due process violation is the harmless beyond a reasonable doubt standard set forth in <u>Chapman v. California</u> (1967) 386 U. S. 18, 24. <u>Sheppard v. Rees</u> (9th Cir. 1989) 909 F.2d 1234, 1237-1238.

### E. Leal's Definition of Hardship as Constituting Duress Was Improperly Vague, under the 5th and 14th Amendments' Due Process Clause

The Supreme Court's ruling in <u>People v. Leal</u> that the definition of "duress" within the meaning of §288(b)(1) [and also, by inference, in §289(a)(1)] could include a threat of "hardship" rendered those statutes unconstitutionally vague under the due process clause in the 5th and 14th Amendments to the United States Constitution.[3] The term "hardship" as set forth therein is too vague and too open to arbitrary application.

As Justice Kennard pointed out in her dissent in <u>Leal</u>, 33 Cal.4th at

---

[3]This argument is probably one which has to be considered by the Supreme Court in the first instance. See <u>Auto Equity Sales v. Superior Court</u> (1962) 57 Cal.2d 456.

1012:

> The distinction between section 288, subdivision (a) (lewd act on child under 14) and subdivision (b) (lewd act accomplished by force, violence, duress, menace, or fear) and the harsher punishment permitted by the latter provision show that the Legislature did not intend a standard under which practically all sexual touchings of a child may fall under subdivision (b). A definition of duress that includes the threat to inflict hardship, however, will have such an effect. "Hardship" is a vague and amorphous concept. It has been defined as "suffering" or "privation" (Webster's [**1080] 3d New Internat. Dict. (2002) p. 1033), a "lack of comfort" (Random House Webster's Unabridged Dict. (2d ed. 2001) p. 872), and "difficulty or suffering caused by a lack of something, especially money" (Encarta World English Dict. (1999) p. 816). A threat to withhold a child's promised allowance might well fall within these definitions, as would innumerable other threats.

A statute is unconstitutional for vagueness if it fails "to provide adequate notice to those who must observe its strictures" and if it "'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1115, quoting Grayned v. City of Rockford (1972) 408 U. S. 104, 108-109; People v. Rubalcava (2000) 23 Cal.4th 322, 332. Allowing "duress" to be defined as "hardship" in §§288(b)(1) and 289(a)(1), as Justice Kennard pointed out, is improperly vague, and thus it fails to provide adequate notice. Because those statutes delegate the definition of "hardship" to juries to resolve on an *ad hoc* and subjective basis, they are unconstitutional.

## F.    Prejudice

The failure to instruct on a correct definition of duress was prejudicial. At worst, there was relatively little evidence of force. Monica testified that on a few occasions Appellant grabbed her leg. However, there

was no testimony that such grabbing occurred during all of the separate

charged time periods.  Further, such grabbing often does not qualify as

force.  People v. Schulz, supra; People v. Senior, supra.  In addition, there

was no testimony that any such incidents of grabbing occurred during all

four of the foreign object penetration incidents -- each of which

established a  conviction carrying a life prison term -- as opposed to

occurring during the lesser incidents, charged as lewd acts.  As noted, the

trial judge found that the evidence of force was "de minimis."

Because the prosecutor recognized that the evidence of force was

minimal, he argued to the jury several times that it should rely on hardship

to find duress.  But the evidence of hardship was marginal, and it did not

satisfy either the factual test for duress or the dictionary definition of duress

adopted and applied by the Supreme Court in Leal.

Further evidence that the jury relied on hardship and duress, rather

than on force, was noted by trial counsel at sentencing:

> The jury noticed shortly before their verdict that there was a
> discrepancy between the charging document that charged force
> and duress and the jury instructions that talked about force or
> duress.  They asked a question.  They sent out a question asking
> which one controls, and the court sent in an answer to them that
> it was in the alternative, force or duress. [CT 177-179]  And
> within a very, very short period of time they returned their
> verdict, which clearly says they have grave doubts about the
> issue of force, but felt that duress was clear as it was defined to
> them by the court because it is defined so broadly. (RT 433)

Appellant has shown, and need not repeat, that a statement that

Appellant would not personally take Monica to the store, or that Appellant

would not personally take Monica to singing lessons, did not qualify as

hardship.  Those threats did not prohibit her from going to those places.

Appellant merely said that he would not personally take her.  He said

nothing about someone else not taking her there, and said nothing about her

being prohibited from going there, or to other places.[4] In any event, those statements do not qualify as threats of hardship, simply because they were so trivial. If the jury had been correctly instructed that hardship required compulsion, and that such compulsion needed to be "stringent" or "severe," it is highly unlikely that the jury would have found any hardship on the basis of those trivial threats.

Further, there was insufficient evidence that these threats were uttered during each one of the eight separate incidents of alleged forcible sexual activity.

For all these reasons, the failure to instruct correctly on the necessary element of duress was prejudicial under the harmless beyond a reasonable doubt standard which applies for federal constitutional error under Sandstrom. Chapman v. California (1966) 386 U. S. 18.

---

[4]C.f. People v. Bergschneider, supra, where the threat was absolute, such that the girl would be put on restriction, and that no one would take her anywhere. Further, the defendant backed up that threat by taking the mother's car keys away.

## II.

## APPELLANT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR TOLD THE JURY THAT IT DID NOT HAVE TO BE UNANIMOUS AS TO THE SPECIFIC INCIDENT WHICH UNDERLAY EACH CHARGED COUNT[5]

### A.    Facts

Count V charged that Appellant committed one violation of Penal Code §269 between the dates of April 27, 2002 and April 26, 2003, meaning when Monica was 9 years old.  Count IV charged that Appellant committed one violation of Penal Code §269 between April 27, 2003 and April 26, 2004, meaning when Monica was 10 years old.  Count III charged that Appellant committed one violation of Penal Code §269 between April 27, 2004 and February 17, 2005, meaning when she was 11 years old.[6]

Counts VII, VIII, and IX each charged that Appellant committed one lewd and lascivious act by force, fear or duress, Penal Code §288(b)(1), between April 27, 2004 and February 17, 2005, meaning when Monica was 11 years old.

When the prosecutor argued the case to the jury, he repeatedly told the jury that it did not have to be unanimous as to any specific incident which underlay counts III-V and VII-IX.  Instead, he told the jurors that it was sufficient if the jurors found that Appellant committed one such

---

[5]This argument applies to counts III-V and VII-IX of the information, insofar as they allege that the charged crime occurred on an unspecified day during the charged period of several months or a year.

This argument does not apply to count I and II, which allege that the stated crime occurred on a specific day.  Nor does it apply to count VI, which alleges a specific incident, namely, the first time when Appellant fondled Monica's buttocks.

[6]The information is confusing as to timing, because it charges counts I-V in reverse chronological order, but then charges counts VI-IX in correct chronological order.

charged act during each charged time period, regardless of whether or not the jurors agreed on the specific act. The prosecutor argued:

Count three, again, same crime as we just discussed in count two. . . .

Now, I charged a period of time. It's almost -- well, you all know how good I am with months. But it's about nine months, or it's a period of time here between April [2004] and February [2005]. And we know that this is happening at the very least two times a month. Probably believe Monica that it's happening a lot more than that.

Now, you don't have to agree on a specific date and time. You all don't have to agree that he did this on May 13th, and somebody else thinks that it happened on June 16th or something like that. There's no evidence of that. What you have to believe is that – what you have to agree upon, all 12 of you, is that between April 27th, 2004 and February 17th, 2005 that he did this at least once.

There's an abundance of evidence that he did this at least once during that time period. That's what you have to agree upon to find the defendant guilty in count three.

Count four, same thing. But what we're doing is we're going back the year before, between April 27th, 2003, when Monica was ten, to April 26th, 2004. Again, same acts. She testified that this has been going on since she entered the fourth grade. . . .

And again, you know, this has been going on, and all you have to agree upon is that you know what? One time that year this guy put his finger in his daughter's vagina to arouse his own sexual passions and he did that against her will and with force, duress, or fear. (RT 326-327)

* * *

The lewd or lascivious act on a child by force, violence, duress, menace, or fear again. You can take this again as the butt grabbing or the grinding that she talked about. But you have to agree amongst yourselves on which it is. You don't have to tell us, but between the dates -- let me see. I skipped one. Between the dates of last year, April 26th, 2004 to February I think it's 17th, 2005, that on at least one occasion the defendant either grabbed her butt, or as Monica described, pulled her on top of him -- (RT 330)

## B.    The Prosecutor Committed Misconduct, Because His Argument Was Legally Erroneous

### 1.    The argument was legally erroneous

The prosecutor gave a legally erroneous argument when he said that all 12 jurors did not have to be unanimous as to the specific incident which underlay each of these counts, as long as each of the jurors believed that Appellant committed one such act at some point during each of the various 9-month or 12-month charged periods.

A defendant has state and federal constitutional due process rights not to be convicted except by a jury verdict which is unanimous. California Constitution Art. I, Sec. 16; U. S. Constitution, 5th and 6th Amendments. When a defendant is charged with crimes or special circumstances which could be proven by more than one act, he has a right not to be convicted unless the jury is unanimous as to which act on which date. <u>Richardson v. United States</u> (1999) 526 U.S. 813, 143 L.Ed.2d 985; <u>People v. Jones</u> (1990) 51 Cal.3d 294, 321; <u>People v. Diedrich</u> (1982) 31 Cal.3d 263, 281-281; <u>People v. Thompson</u> (1995) 36 Cal.App.4th 843, 853. As the U. S. Supreme Court stated in <u>Richardson v. United States</u>, <u>supra</u>, 526 U. S. at 817, 143 L.Ed.2d at 992, a jury "cannot convict unless it unanimously finds that the Government has proved each element."

Unanimity is particularly important when there is a reasonable basis for the jury to distinguish between the two acts or situations. <u>People v. Crandall</u> (1988) 46 Cal.3d 833, 874. If the "evidence [is] sufficiently different as to each act," then unanimity is required. (<u>id</u>.)

Such disagreement could easily exist, because the jurors could have easily disagreed as to whether there was force, fear, or duress as to any or all of these counts, especially because Monica testified that Appellant only grabbed her on some occasions, but not others. Similarly, the jurors could have disagreed as to whether the lewd acts occurred during the alleged butt grabbing incidents, or during the alleged "grinding" incidents.

The failure to require unanimity violated Appellant's state and federal constitutional rights to jury unanimity. People v. Jones, supra, 51 Cal.3d 307, 321; People v. Diedrich, supra; Use Note to CALJIC 17.01; People v. Martinez (1988) 197 Cal.App.3d 767, 772-775; People v. McNeil (1980) 112 Cal.App.3d 330, 334.

Because the failure to require unanimity violated Appellant's federal constitutional right to a unanimous jury, it is the federal standard for prejudice, namely, the harmless beyond a reasonable doubt test which applies here. Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824. People v. Thompson (1995) 36 Cal.App.4th 843, 853; People v. Deletto (1983) 147 Cal.App.3d 458, 471; People v. Kent (1981) 125 Cal.App.3d 207, 213. People v. Smith (2005) 132 App.4th 1537 holds at p. 1545 that:

Federal due process requires that before one can be convicted of a crime the prosecution must convince a jury that the evidence establishes the defendant's guilt of the crime beyond a reasonable doubt. (*In re Winship* (1970) 397 U. S. 358.)

The unanimity error was prejudicial here because, as shown above, the jury could easily have disagreed upon (1) whether Appellant committed any or all of the acts by force, fear, or duress, and (2) which incident (grabbing or grinding) underlay each lewd act count.

## 2. This legally erroneous argument constituted misconduct

The prosecutor committed misconduct when he argued to the jury supposed legal principles which were directly contrary to established law. Rules of Professional Conduct of the State Bar of California, Rule 5-200 (attorneys shall not misrepresent law or facts to the court); Berger v. United States (1935) 295 U. S. 78; People v. Espinoza (1992) 3 Cal.4th 806, 820. By this misconduct, the prosecutor improperly tried to eliminate Appellant's right to jury unanimity.

## C.    Neither Trial Defense Counsel Nor the Trial Court Adequately Cured the Prosecutor's Misconduct

### 1.    Trial defense counsel rendered ineffective assistance when he failed to object to this legally incorrect argument

Trial defense counsel did not object to this inaccurate argument by the prosecutor.  However, when it was defense counsel's turn to argue to the jury, he did argue correctly regarding unanimity.  (See RT 352, quoted directly below)

Trial counsel's failure to object to the prosecutor's legally incorrect argument constituted ineffective assistance of counsel.  Strickland v. Washington (1984) 466 U.S. 668; People v. Fosselman (1983) 33 Cal.3d 572, 582; People v. Pope (1979) 23 Cal.3d 412.  This issue may be raised on direct appeal, because there could not have been any valid trial strategy for trial counsel to refrain from protecting Appellant from such argument, especially when defense counsel correctly argued the law on unanimity to the jury when it was his turn to argue. People v. Nation (1980) 26 Cal.3d 169, 180.

### 2.    Trial defense counsel's jury argument on this point did not solve this problem

When it came time for trial counsel to argue to the jury, he argued the law of unanimity correctly.  First, he quoted CALJIC 17.01 on unanimity. (RT 351-352) Then he told the jury:

. . . we run into seven additional counts where basically we have nine-month or year-long periods during which the offense might have been committed. . . .

It's true you don't have to agree that the particular act upon which you're basing a conviction as to a count occurred on some particular date, but you all must agree on the same act.

What that means, for example, is, if, just as an example, it doesn't necessarily relate to the case, juror number 1 says, well, I'm sure he did something in January, and juror number 2 says I'm sure he did something in

February, and juror number 3 says I'm sure he did something in March, et cetera, through the 12 jurors and 12 months, you can't have a conviction on the fact that you all agree he did something sometime. You have to all agree on the same act, and that may be a conundrum here because of the vagueness of time. (RT 352)

This argument did not cure the problem. In a situation of this sort, without specific guidance from the trial court, the jury is most likely to follow the prosecutor's interpretation of the disputed instructions, especially when, as here, it accepts the remainder of the prosecutor's arguments and convicts the defendant as charged.

### 3.     The trial court's instruction did not cure the problem

The trial court correctly instructed the jury on unanimity, pursuant to CALJIC 17.01, as follows:

The defendant is accused of having committed a violation of Section 269 in Counts 2-5, and a violation of Section 288(b) in Counts 6-9. The prosecution has introduced evidence for the purpose of showing that there are multiple acts upon which a conviction for those offenses in Counts 2-9 may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of the acts sufficient for a conviction. However, in order to return a verdict of guilty to any particular offense alleged in Counts 2-9, all jurors must agree that he committed the same act or acts necessary for a conviction as to the particular count. It is not necessary that the particular act or acts agreed upon be stated in your verdict. (CT 165)

The fact that the trial court correctly instructed on unanimity did not cure the problem. There is, of course, the general rule that misstatements of law in argument may be deemed harmless, if the instructions are accurate, on the theory that the jury is told, and presumed, to follow the instructions, if there is any conflict between instructions and argument. (See CALJIC 1.00) That general rule should not be followed, because to apply it here would be to adopt an inaccurate legal fiction.

When instructions and jury argument on those instructions conflict,

as occurred here, the question is whether there is a "reasonable likelihood" that the jury incorrectly understood the pertinent legal principles, such that it applied the challenged instructions in an unconstitutional way. <u>Estelle v. McGuire</u> (1991) 502 U. S. 62, 112 S.Ct. 475, 481-482; <u>People v. Kelly</u> (1992) 1 Cal.4th 495, 525. In the instant case, it was reasonably likely that the jury understood and applied the instruction in an unconstitutional way. Thus, reversal is warranted.

When instructions are as abstruse as and as technical as those on unanimity, a jury of laypersons could not possibly understand them without help. Thus, a normal jury will ordinarily follow the prosecutor's explanation of those pertinent principles, whether accurate or not, especially when the jury follows the prosecutor's other arguments in convicting the defendant. It is unlikely that the jury would follow defense counsel's contrary explanation, especially when it convicts the defendant. It is also unlikely that the jury would follow the unadorned text of the instructions, when that conflicts with the prosecutor's argument, unless the trial court takes steps to explain to the jury how the prosecutor has argued incorrectly, and takes steps to correct that misargument. However, that was not done here. Accordingly, there is a reasonable probability, indeed, a strong probability, that the jury followed the prosecutor's argument. If so, then it applied the unanimity principle in an inaccurate and unconstitutional manner.

### D.    Prejudice

The failure to inform the jury correctly on unanimity was prejudicial. As shown above, juror disagreement could easily exist, because the jurors could have easily disagreed as to whether there was force, fear, or duress as to any, or all, of the six subject counts, especially because Monica testified that Appellant only grabbed her on some occasions, but not others. Thus,

the jurors could have thought that Appellant committed multiple digital penetrations during one charged period, but they could have disagreed as to the occasions when the penetration was brought about by force or duress. The jurors could also have disagreed whether the grabbing occurred during the digital penetration incidents, or during the lewd acts incidents. Similarly, the jurors could have disagreed as to whether the lewd acts were committed by the alleged butt grabbing incidents, or by the alleged "grinding" incidents. For all these reasons, the jurors could have disagreed on facts establishing necessary elements of these crimes. Thus, the failure to inform the jury correctly on unanimity principles was prejudicial.

## III.

**THERE WAS INSUFFICIENT EVIDENCE OF FORCIBLE DIGITAL PENETRATION DURING THE TIME PERIOD CHARGED IN COUNT V OF THE INFORMATION, NAMELY, BETWEEN APRIL 27, 2002 THROUGH APRIL 26, 2003, AND THE TRIAL COURT ERRED WITH RESPECT TO THE CORPUS DELICTI RULE ON THIS POINT**

### A.      Introduction Regarding Monica's Age and Grade Level

Count V charged that Appellant violated Penal Code §269 by forcible foreign object penetration, Penal Code §289(a)(1), between the dates of April 27, 2002 and April 26, 2003, meaning when Monica was 9 years old. This was the first chronological period when Appellant was charged with foreign object penetration.[7]

Monica's testimony as to when various events occurred was generally stated in terms of what grade she was in, not in terms of how old she was. That makes perfect sense. Children normally recall when past events occurred in terms of what grade they were in, rather than in terms of when they were 9, 10, or 11 years old. Accordingly, and to make this argument more understandable, Appellant sets forth on the next page a chart which matches up Monica's age and her grade in school.

Monica was born on April 27, 1993. (RT 26-28) When Monica testified at trial in July, 2005, she was 12 years old. She had progressed normally in school. She had neither skipped a grade, nor been held back a grade. (RT 30, 100-103)

---

[7]Count IV charged that Appellant violated Penal Code §269 with forcible foreign object penetration between April 27, 2003 and April 26, 2004, meaning when Monica was 10 years old. Count III charged that Appellant violated Penal Code §269 with forcible foreign object penetration between April 27, 2004 and February 17, 2005, meaning when she was 11 years old.

Monica's ages and grade levels were as follows:

| Kinder-garten | September, 1998-June, 1999 | Monica was five years old for all but the last month or so, when she turned six |
| 1st Grade | September, 1999-June, 2000 | Monica was six years old for all but the last month or so, when she turned seven |
| 2nd Grade | September, 2000-June, 2001 | Monica was seven years old for all but the last month or so, when she turned eight |
| 3rd Grade | September, 2001-June, 2002 | Monica was eight years old for all but the last month or so, when she turned nine |
| 4th Grade | September, 2002-June, 2003 | Monica was nine years old for all but the last month or so, when she turned ten |
| Summer after 4th grade | There was testimony that some events occurred during the summer after 4th grade, meaning between June, 2003 and September, 2003. | Monica was 10 years old. |
| 5th Grade | September, 2003-June, 2004 | Monica was 10 years old for all but the last month or so, when she turned 11 |
| 6th Grade | September, 2004-June, 2005 | Monica was 11 years old for all but the last month or so, when she turned 12 |
| Summer after 6th grade | Monica testified at trial in July, 2005 | Monica was 12 |

**B.    Insufficient Evidence of Forcible Digital Penetration Between April 22, 2002 and April 26, 2003, as Charged in Count V**

Appellant was charged in count V with the crime of Penal Code §269, aggravated sexual assault on child, for committing forcible foreign object penetration during the period of April 27, 2002 through April 26, 2003, meaning when Monica was nine years old. For the first month or six weeks of the one year period covered by count V, Monica was in the 3rd grade. Then there was a summer. For the last eight months or so of the time when Monica was nine years old, she was in the 4th grade. Monica turned 10 in late April when she was in the fourth grade.

Monica testified that Appellant committed many lewd acts when she was in the fourth grade, meaning when she was nine, and shortly after she turned 10. However, Monica testified that Appellant's acts of digital penetration only began in the summer after the fourth grade, which means after she turned 10.

Monica testified that when she was in the 4th grade Appellant started putting his finger "around" her vagina. He tried to, but could not, get his finger "inside" her vagina.

> Q [prosecutor Benson]: Okay. The -- when you were in fourth grade, when your dad -- and you said he started putting his finger around your vagina, did he put it inside your vagina?
>
> A. [Monica]: Well, he tried to, but he never couldn't. (sic)
>
> Q. Okay. Did it hurt?–
>
> A: Sometimes. (RT 107)

Monica also testified somewhat inconsistently that Appellant did put his finger "in the opening." (RT 107) Sometimes she would try to get away,

but he would grab her leg. On some occasions, Appellant would remove her pants and her underwear. When Monica objected, Appellant said that if she did not cooperate, he would not take her to places where she liked to go, for example, places where she could sing. (RT 107-112)

Also, when Monica was in the 4th grade, and when she was watching television in her parents' room, Appellant would take her clothes down and start touching her near her vagina. It happened more than once a week. (RT 109-112)

Because there was arguable ambiguity as to when Appellant first put his finger "in" Monica's vagina, as opposed to "around" or near her vagina, on redirect examination the prosecutor had Monica clarify her answer as to when Appellant first put his finger "in" her vagina. Monica said that it was not during 4th grade, but that it was during summer after 4th grade and before 5th grade.

> Q [prosecutor Benson]: Okay. And I'm sorry. I have just two questions that I need just to clarify. When your dad began putting you on top of him, were you in the fifth grade or fourth?
>
> A. [Monica]: Fifth.
>
> Q. Okay. And when your dad began putting his finger in your vagina that you were in the fourth grade, or was it –
>
> A: Fifth – I'm not sure.
>
> Q: Okay, I think you said fourth before. Is it fourth grade?
>
> A: Yes. Like in summer.
>
> Q. Okay. All right. (RT 158)

Thus, on redirect examination, Monica first said that digital penetration began when she was in the fifth grade (meaning when she was 10 years old). But then, on further questioning, she clarified her testimony

and said that penetration first occurred during the summer between fourth and fifth grade. Monica turned 10 in April while in the fourth grade. Thus, this testimony establishes that digital penetration first occurred during the summer after fourth grade, when Monica was 10. Accordingly, there was insufficient evidence that Appellant committed forcible digital penetration, when Monica was 9 years old, as charged in count V of the information.

It violates the due process clauses of both the state and federal constitutions to convict a defendant when there is insufficient evidence of the crime charged. People v. Johnson, supra; Jackson v. Virginia, supra.

Although some other bits of Monica's testimony, if viewed in isolation, might arguably suggest that digital penetration began when she was nine years old in the fourth grade, in examining the question of sufficient evidence, a court must examine the issue "in the light of the whole record." As the Supreme Court held in People v. Johnson, supra, 26 Cal.3d at 577:

> The court does not, however, limit its review to the evidence favorable to the respondent. As *People v. Bassett, supra,* 69 Cal.2d 122, explained, "our task . . . is twofold. First, we must resolve the issue in the light of the *whole record* -- i.e., the entire picture of the defendant put before the jury -- and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to 'some' evidence supporting the finding, for 'Not every surface conflict of evidence remains substantial in the light of other facts." (69 Cal.2d at p. 138) (Fn. omitted.) (emphasis added)

Here, "in the light of the whole record," it was Monica's testimony, as summarized on redirect examination, that digital penetration did not begin until summer after fourth grade. She was 10 years old at that point. Thus, there was insufficient evidence that Appellant committed digital penetration, Penal Code §269/289(a)(1) as charged in count V, when

Monica was 9 years old.  Accordingly, the conviction for count V should be reversed. People v. Johnson, supra; Jackson v. Virginia, supra.

### C.    Appellant's Admission to the Police Was Not Usable to Cure this Evidentiary Insufficiency, for Multiple Reasons, Including the Corpus Delicti Rule

When Appellant spoke to officer Schillinger on February 22, 2005, he said that he had been digitally penetrating Monica for "three years." (People's Exh. #11, p. 5) Three years before February, 2005 was February, 2002.  Monica was eight at that time.  However, this answer does not adversely affect this argument for two reasons.

First, officer Schillinger did not ask Appellant to clarify whether he meant, by his use of the phrase "three years," the previous 36 months, or whether he meant during the last three calendar years, meaning in 2003, 2004, and 2005.  For most of 2003, Monica was 10.

Because Appellant's statement was ambiguous on this point, it cannot overcome Monica's testimony that digital penetration did not begin until the summer after fourth grade, meaning the summer of 2003, when she was 10.  That testimony is consistent with the latter interpretation of Appellant's statement, namely, that he was referring to the last three calendar years, 2003-2005.  That also is consistent with the rule of People v. Johnson, supra, that sufficiency of the evidence must be examined in light of the record as a whole.

Second, the only evidence on the record as a whole, People v. Johnson, supra, that Appellant may have committed digital penetration when Monica was nine years old came from Appellant's own statement. However, under the time-honored *corpus delicti* doctrine, a crime cannot be proven upon the confession of the defendant, unless there is prima facie proof of the major elements of the crime from other sources.  People v. Alvarez (2002) 27 Cal.4th 1161, 1168; People v. Cullen (1951) 37 Cal.2d

614, 624; <u>People v. Martinez</u> (1994) 26 Cal.App.4th 1098, 1105. Proof that the crime occurred during the charged time period is one such element.

The showing of such a <u>prima facie</u> case must be a reasonable one. <u>People v. Jones</u> (1998) 17 Cal.4th 279. No such <u>prima facie</u> proof was presented here of any forcible penetration between April 2002 to April 2003, as alleged in count V, because Monica testified that penetration did not begin until summer after fourth grade, meaning until after June, 2003. Accordingly, because of the *corpus delicti* rule, Appellant's statement cannot be used to fill the gap as to the insufficiency of the evidence on this point.

### D.    The Trial Court Erred in Failing to Instruct <u>Sua Sponte</u> on the *Corpus Delicti* Rule

Alternatively, before the jury could rely upon Appellant's confession as evidence of penetration when Monica was nine years old, the jury had to be instructed, and had to find, that the *corpus delicti* rule was satisfied.

Under the *corpus delicti* rule, before relying on the defendant's statement, the jury must be instructed, and must find, that there is <u>prima facie</u> evidence, or "some proof," of each element of the crime in addition to the defendant's statement. <u>People v. Alvarez</u>, <u>supra</u>, 27 Cal.4th at 1178-1180. The jury must be so instructed on this point. (<u>Id.</u>) One such element, on which the jury must be instructed, and must find, is that the crime was committed during the time period charged in the information. Accordingly, the trial court erred when it failed to instruct on the *corpus delicti* principle with respect to this point.

The *corpus delicti* "rule is intended to ensure that one will not be falsely convicted by his or her untested words alone of a crime that never happened." <u>People v. Alvarez</u>, <u>supra</u>, 27 Cal.4th at 1169. Here, the rule ensures that Appellant will not be convicted when the imprecision of his words, or his sloppy overstatement as to time, or the inaccuracy of his

memory, leads him to state that criminal events occurred significantly earlier than they actually did.

CALJIC 2.72, the standard *corpus delicti* instruction, provided at the time of trial as follows:

> ### CALJIC 2.72: CORPUS DELICTI MUST BE PROVED INDEPENDENT OF ADMISSION OR CONFESSION
>
> No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any [confession] [or] [admission] made by [him] [her] outside of this trial.
>
> The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a] [an] [confession] [or] [admission].

The Use Note to CALJIC 2.72 declares that this instruction must be given <u>sua sponte</u> when the evidence warrants it, citing <u>People v. Beagle</u> (1972) 6 Cal.3d 441, 445 and <u>People v. Hauck</u> (1961) 56 Cal.2d 687, 707. Thus, the failure to deliver the *corpus delicti* instruction was error. <u>People v. Alvarez</u>, <u>supra</u>; <u>People v. Beagle</u>, <u>supra</u>.

The error was prejudicial because, as shown above, and without Appellant's statement, there was insufficient evidence that the penetration alleged in count V was committed within the charged time period.

### E. Trial Counsel Rendered Ineffective Assistance by Failing to Object, or Request Instructions, on the *Corpus Delicti* Principle

Trial defense counsel did not object to, or request instructions, on the *corpus delicti* principle. If, <u>arguendo</u>, and in the alternative, trial counsel was required to do so, in order to preserve the issue for appeal, then such omissions constituted ineffective assistance of counsel (IAC). <u>Strickland v.</u>

<u>Washington</u> (1984) 466 U.S. 668; <u>People v. Pope</u> (1979) 23 Cal.3d 412.
These aspects of IAC may be raised on direct appeal, because there could
not have been any valid strategy for trial counsel not to have objected or
sought instructions on *corpus delicti* grounds. <u>People v. Nation</u> (1980) 26
Cal.3d 169, 180.

  These aspects of IAC were prejudicial under <u>Strickland,</u> because, as
shown above, there was a reasonable probability of a more favorable
verdict, because there was insufficient evidence from Monica's testimony
that Appellant committed forcible penetration during this specific one-year
period.

## IV.

**THE PROSECUTION COMMITTED MISCONDUCT WHEN IT OVERCHARGED THIS CASE SO AS TO SEEK, AND OBTAIN, A SENTENCE OF 75 YEARS TO LIFE, IN THE FACE OF REPEATED REQUESTS BY THE VICTIM AND HER MOTHER THAT APPELLANT RECEIVE A SENTENCE OF NO MORE THAN 15 YEARS**

### A.    Facts

On the night when Monica revealed to her relatives that Appellant had been molesting her, the Miranda family had a pair of meetings. At those meetings, it was the family's opinion that Appellant should move out of the family home; that Appellant should continue working (he was working at two jobs) to continue to support his wife and two children; and that this solution would adequately shame and punish Appellant.

That plan was quickly upset when lay pastor Walter Fernandez went to the police with this story.

During the <u>Marsden</u>[8] hearing held prior to trial on June 6, 2005, trial defense counsel informed the trial court as follows: He had attempted to reach a negotiated settlement with the district attorney's office. The DA's office was offering a plea to multiple felony counts, with an intended sentence of 33 years - life. Trial defense counsel believed that was extremely harsh. He suggested a plea to Penal Code §288.5, continuous

---

[8]<u>People v. Marsden</u> (1970) 2 Cal.3d 118.

sexual abuse of child, with an aggravated term sentence of 16 years.[9]  The
DA refused. (RT June 6, 2005, pp. 8-9)

Appellant had no prior criminal record.  He was fully employed,
working two jobs to support his family.

Trial defense counsel Cavagnaro stated that he "had several
conversations with Mr. Walter Fernandez, who is the minister for Rogelio
(Appellant), for Monica, for Rebecca, the wife, in which he indicated to me
that Monica and Rebecca were horrified by the district attorney's position.
That that wasn't what they wanted, and they wanted to know how they
could communicate their feelings.  I explained to Mr. Fernandez that they
could talk to Ms. Brown or deputy district attorney Ms. Rubino, and let their
feelings be known." (RT June 6, 2005, pp. 8-9)

Trial counsel continued: "I know, based on conversations I had with
Mr. Fernandez and the district attorney, that he at least communicated
Monica's and Rebecca's feelings to Ms. Brown or Ms. Rubino, but that
they were unaffected by the pleas of the victim, or her mother, or their
pastor, to treat this in a less harsh manner." (Id.)

At trial, defense counsel tried to introduce evidence that Monica told
her aunt Carmen that she wanted to sign a declaration to help her father, but
that he mother would not let her.  The trial court struck and excluded this

_____

[9]The complaint, filed on February 24, 2005, originally charged three
counts of sexual misconduct: count I, Penal Code §269, aggravated sexual
assault by forcible foreign object penetration; count II, Penal Code
§288.5(a), continuous sexual abuse for the period of April 2002 through
February 2005; and count III, Penal Code §288(b)(1) lewd and lascivious
act during the period April 27, 2001 through April 26, 2002.  According to
trial counsel the maximum penalty for the crimes charged in the complaint
was 38 years - life.  After the preliminary examination, the district
attorney's office filed an information which charged numerous additional
and specific counts of molestations, both forcible and non-forcible, in lieu
of the one count previously charged for continuous sexual abuse.

testimony by Carmen on hearsay grounds. (RT 289-290)

The victim's mother, Rebecca, told the probation officer after trial that an appropriate sentence would be 15 years. She said that 75 years was too long. The probation officer wrote:

> According to the victim's mother, she is upset that the defendant assaulted her daughter and she thinks it was a "terrible thing;" however, she believes that a prison commitment of 75 years is too long. A more appropriate sentence would be 15 years, along with rehabilitation, and when released he stays away from her family and does not hurt anyone else. (CT 204)

At sentencing, trial defense counsel told the trial court that Monica and her mother Rebecca had tried to meet prior to trial with a supervisor in the district attorney's office, to ask for a lower and more reasonable sentence than that which the district attorney's office had offered in their proposed plea bargain, but that the various district attorneys refused to meet with them.

> [Mr. Cavagnaro]: When I informed another deputy district attorney, not Mr. Benson [the trial prosecutor here] that the child and the mother wished to meet with the − supervisor of the team to plead for a more reasonable sentence than the People were offering, which was 33 - life, I was told it won't matter, it doesn't matter, showing a callous disregard in my opinion, not only of the wishes of the victim, but of the needs and health, psychologically of the victim. I believe the Legislature trusted the office of the district attorney to give some consideration to the families of the victims . . . I believe that the [75 - life] sentence is not only cruel to Mr. Miranda but is cruel to his daughter, and basically will put her in a position where it's virtually impossible that she will ever heal from the damage that his been done to her and her family, not only by the defendant, but by the prosecution, which is choosing to handle the case in this manner. I believe this will be a cruel sentence to Mr. Miranda and to his daughter, and thus an unconstitutional sentence. (RT 435-436)

Trial defense counsel also argued that the effective life without

parole sentence was cruel, unusual, and unjust with regard to Appellant's son, Adam, who was then approximately 10 years old.  Trial counsel argued: "To deprive her and his son, who is an absolutely innocent victim here, just as the daughter is, of normal relations with their father for the rest of their lives, as well as the rest of Rogelio's life" is cruel, unusual, and unjust. (RT 437)

### B. The Prosecution Committed Misconduct by Seeking Such a Draconian Sentence and Refusing to Take the Interest of the Victim into Account

The following statutes and Rules of Court require that the wishes of the victim and the victim's family be taken into account with regard to sentencing:

(1) California Constitution, Article I, §28, the "Victim's Bill of Rights," established the rights of victims.  It has "the purpose of protecting or promoting the rights of victims of crime." Brosnahan v. Brown (1982) 32 Cal.3d 236, 242.

(2) Penal Code §1170(b) provides that the victim, or the family of the victim, may submit a statement in mitigation, as well as a statement in aggravation.

(3) Rule of Court 4.414(b)(5) directs that sentencing take into account "the likely effect of imprisonment on the defendant and his or her dependents."

(4) Penal Code §1203.066(c)(2) allows probation in child sex cases, where it otherwise might be prohibited, if the defendant is a parent, and if "a grant of probation to the defendant is in the best interest of the child."

(5) Penal Code §1203.067(a)(2) provides that before probation shall be given to a defendant convicted of child molestation "the victim shall be notified of the hearing by the prosecuting attorney, and be given an opportunity to address the court."

(6) Penal Code §1203.10 directs that after a verdict of guilty the probation officer must inquire into "the antecedents, character, history, family environment . . ."

(7) Penal Code §1191.1 provides that victim or her parent may "reasonably express his, her, or their views concerning the crime, the person responsible and the need for restitution. The court, in imposing sentence, shall consider the statements of victims, parents, . . ."

(8) Penal Code §1191.15 provides that the victim may present such a statement to the court in written or recorded form. It provides "the court shall consider the statement filed with the court prior to imposing judgment and sentence."

(9) Penal Code §679 provides in pertinent part: "that all victims and witnesses of crime are treated with dignity, respect, courtesy, and sensitivity. It is the further intent that the rights enumerated in §679.02 relating to victims and witnesses of crime are honored and protected by law enforcement agencies, prosecutors, and judges in a manner no less vigorous than the protections afforded criminal defendants."

(10) Penal Code §679.02(3) provides that the victim and the victim's parents have the right "to be notified of all sentencing proceedings and the right to appear, to reasonably express his or her views . . ."

Although many of these statutes and rules focus on sentencing after conviction, the same principles should apply to the entire sentencing process, which begins with the plea negotiation. If all of these criteria apply after trial, or after a plea, they should similarly apply when the sentence is being determined by negotiations between the prosecutor and defense counsel prior to the plea.

The prosecutor, does, of course, have discretion in charging a case, and does have discretion in conducting negotiations, but that discretion, like

all discretion, is not unfettered, and may not be exercised arbitrarily or capriciously.

The prosecutor's office here acted totally contrary to the spirit, if not the letter, of each and every one of the above-quoted provisions when it refused to accept input from the victim and her family in order to discuss proposed sentencing, or to discuss the impact of such sentencing upon the victim and her family.

Is the victim being protected, and are her rights being preserved, when the victim must live for the rest of her life with the knowledge that her cooperation with law enforcement resulted in her father receiving an effective sentence of life without parole, when the victim and her family believed that was far too long a sentence? How can the victim obtain closure under such circumstances? And are the rights of the victim and her family being preserved, when the victim's 10 year old brother is deprived of a father for the rest of his life?

By the prosecutors' refusal to meet with, or even listen to, the victim and her family, the prosecution violated its elementary duty not merely to win convictions, but also to achieve justice:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . .He may prosecute with earnestness and vigor --indeed, he shall do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States (1935) 295 U.S. 78, 88.

This language has often been quoted by California courts, and is accepted as a definitive statement of the limitations on methods employed

by prosecutors. <u>People v. Lyons</u> (1956) 47 Cal.2d 311, 317-319; <u>People v.
Superior Court  (Greer)</u> (1977) 19 Cal.3d 255, 266.

For all these reasons, the prosecution committed misconduct when it
refused to accept input from the victim and her family on sentencing, when
it sought a draconian sentence far in excess of that desired by the victim's
family, and when, in so doing, it did substantial and unwarranted permanent
damage to both the victim and her family.

## V.

### THE TRIAL COURT ERRED WHEN IT RULED THAT IT WAS REQUIRED TO IMPOSE MANDATORY CONSECUTIVE SENTENCES ON THE FOUR COUNTS OF FORCIBLE DIGITAL PENETRATION FOR A TOTAL OF 60 YEARS TO LIFE; THE TRIAL COURT WOULD HAVE IMPOSED FOUR CONCURRENT 15 - LIFE SENTENCES IF IT BELIEVED IT HAD THE DISCRETION TO DO SO

### A. Facts

The key sentencing issue after trial was whether the trial court would sentence concurrently, or consecutively, on the four counts of Penal Code §269, which were committed by forcible foreign object (digital) penetration, Penal Code §289(a). The trial judge noted that at the time of trial there were two conflicting published appellate opinions on whether consecutive sentencing for violations of Penal Code §269 against a single victim on multiple occasions was mandatory, or whether the trial court had discretion to sentence either concurrently or consecutively.

In People v. Jiminez (2000) 80 Cal.App.4th 286, 290 the Fifth District held that consecutive sentencing was mandatory. The trial judge noted that in People v. Dalby (formerly published at (2005) 123 Cal.App.4th 1083, 1097) the Third District ruled to the contrary, shortly before trial commenced here, that a trial court had discretion to sentence either concurrently or consecutively. The Third District stated in Dalby that it believed that Jiminez was wrongly decided.[10]

However, the Supreme Court granted review in Dalby on another

---

[10]Appellant refers to the depublished Dalby opinion only because the trial court discussed it at great length. (See infra.)

issue,[11] and then, several months later, after trial here, but before sentencing, it dismissed review. That had the effect of rendering the Third District's <u>Dalby</u> opinion unpublished. California Rules of Court, Rule 976(d).

The trial court discussed <u>Dalby</u> at great length. It stated that it believed that <u>Dalby</u> was correctly decided; that it believed that <u>Jiminez</u> was wrongly decided; that it wished, pursuant to <u>Dalby,</u> to sentence Appellant concurrently on all four §269/289(a) counts, such that on those four counts Appellant would receive one concurrent 15 year - life sentence; that it desired to run that 15 year - life sentence consecutive to the 15 year determinate term it was imposing on the five counts of §288(a) and §288(b)(1) (five counts times three years mitigated term, for each), so that Appellant would receive a total sentence of 30 years - life; that it would have sentenced Appellant in that way if <u>Dalby</u> remained published; but that, once <u>Dalby</u> was effectively depublished, there was only published opinion on this point, namely, <u>Jiminez;</u> that it believed it was required to follow <u>Jiminez</u> because, and only because, it was the sole published opinion on this point; and thus that it was imposing four consecutive sentences for the four counts of §269/289(a) solely because <u>Jiminez</u> held that such consecutive sentencing was mandatory. (RT 428-431, 447-452)

Because of <u>Jiminez,</u> the trial court imposed a total sentence of four consecutive terms of 15 - life on each of the four counts of §269, plus 15 years determinate, for a total of 75 - life.

The trial court stated as follows:

> In reading <u>Dalby</u> with regard to whether or not the court should have the power given the statutory and legislative history of

---

[11]Review, with grant and hold status, was temporarily granted in <u>Dalby</u> on the question of whether California's sentencing scheme satisfied <u>Apprendi v. New Jersey</u> (2000) 530 U. S. 436.

Penal Code Section 269 and 667.6(d) and (c), I believe that the
Dalby argument by the now depublished – in the now
depublished opinion by the Court of Appeal for the Third
District makes more sense, and I think its correctly decided. But
it's now been deleted from the appellate authorities. I cannot
cite a depublished opinion and rely upon it. And the only
authority on this issue now is Jiminez.

So even though I disagree with it, even though I think its
wrongfully decided or wrongly decided, I think I have to follow
the Jiminez case. And following the Jiminez case, which
requires the mandatory full consecutive sentence for each of the
269 violations, that means on counts two through five in this
matter I have no alternative but to impose four consecutive 15-
to-life sentences for a total of 60 years to life on counts two
through five.

With regards to counts one, six, seven, eight and nine, it would
be my intention to impose the absolute minimum sentence I
could impose and for the following reasons:

Mr. Miranda has no prior criminal history. Mr. Miranda,
although he was convicted of very serious and ongoing criminal
activity, fortunately no direct physical harm was inflicted by him
on his daughter. The nature of the crime, although I believe the
evidence is sufficient to sustain the verdict of the jury -- or the
verdicts of the jury, nonetheless, the nature of the crime was not
aggravated in itself other than the fact that there were multiple
violations over several years. Fortunately, at this point it does
not appear that the victim, the daughter, has suffered any long-
term, or chronic or permanent psychological disability as a result
of this other than the fact that she's been put in a position of
having her father's side of the family think less of her because
she got up and told her story. . . .

The defendant, who was a victim of abuse himself as a child
apparently in Mexico. . . . admitted his responsibility,
cryptically, but he did admit his responsibility. He in the
presence of the family pastor apologized for what he had done.
He wrote to his daughter and to his son as well an apology for
what he had done. . . .

I think it would be entirely appropriate to impose, something

like the initial recommendation of the probation department.[12] But legally I cannot because I'm bound by the appellate authorities. . . .

Although I think this is probably a very cruel result to the defendant, I think it is -- it's a result that I believe is inappropriate, I don't believe it's in the interest of justice . . . . The element of force in this case has been, I would have to say, diminimuus. (sic)[13] (RT 428-431)

## B. The Trial Court Requested that this Court Reverse and Remand for Resentencing

Judge Schneider followed this statement with a direct plea to this Court of Appeal to re-examine this question of discretionary concurrent or mandatory consecutive sentencing. He asked this Court to restore a trial court's right to exercise discretion on this issue. He asked this Court to hold that <u>Jiminez</u> was wrongly decided; to hold that the theory underlying <u>Dalby</u> (before it was depublished) was correct; to hold that a trial court has discretion to sentence either concurrently or consecutively on multiple counts of §269/289(a) against a single victim on multiple occasions; and to rule that he (Judge Schneider) was incorrect when he believed himself obligated, and without any discretion, to sentence consecutively.

Judge Schneider stated:

> On the other issue, and Mr. Cavagnaro [trial defense counsel] has raised this adequately and argued very compellingly, that the Dillon case and the cases associated with cruel and unusual punishments constitutionally gives me the authority to reduce the punishment so that I could impose concurrent sentences rather than consecutive sentences. That's a legal determination. My view of Dillon is not consistent with Mr. Cavagnaro's. I may be wrong. I hope I am wrong. I hope, and I want to tell the

---

[12]The probation department's initial recommendation was a sentence of 33 years - life. (CT 208)

[13]De minimis.

appellate court and the Supreme Court, if they review this case, that I hope you find that Dalby is the law. If you don't find that Dalby is the law in the appellate court or in the Supreme Court, I hope that you find that Dillon applies to this case. I can't find it to be so at this level. But I completely defer to you. And I want the appellate court to know that I'm imposing this sentence of 75 years to life only because I believe I have no other choice. (RT 447-448)

\* \* \*

I hope the appellate court makes a decision that as a matter of law I am wrong on this case and that the appellate court determines that the Dalby case is correctly decided, or they decide that the Dillon case does apply to these facts and sends it back to me so I can resentence the defendant to a lesser term that I think is appropriate, to a term that is consistent with the initial recommendation of the probation department. That reduced sentence would still be very, very severe. (RT 450)

Judge Schneider concluded:

I hope that I see this case again. Usually I do not say that. I hope this case is reversed on appeal and remanded back for further sentencing so that I can impose a just and appropriate lesser term. (RT 452)

**C. The Trial Court Erred in Sentencing Appellant Consecutively on Counts II-V; it Erred When it Ruled that it Had No Discretion as to Whether it Should Sentence Consecutively or Concurrently; the <u>Jiminez</u> Case, Which Judge Schneider Felt Obligated to Follow, Was Wrongly Decided**

The trial court sentenced Appellant consecutively on all four counts of Penal Code §269 for a total of 60 years - life, plus 15 years determinate, for a total of total of 75 years to life pursuant to §667.6(d).

Because the trial court believed that the <u>Jiminez</u> case required it to sentence consecutively, the trial court failed to exercise any discretion in deciding whether to sentence Appellant consecutively or concurrently. The

trial court stated that it wished to exercise its discretion and sentence concurrently, but it believed that <u>Jiminez</u> prevented it from doing so.

The <u>Jiminez</u> case was wrongly decided. This Court should rule that a trial court has discretion to sentence either concurrently or consecutively when multiple counts of Penal Code §269 are committed against the same victim on separate occasions.

### 1.  The mandatory consecutive sentencing scheme under §667.6(d) does not apply to violations of Penal Code §269

Penal Code §269 punishes various sexual acts committed on a child who is under 14 years of age and ten or more years younger than the defendant. Sec. 269(b) provides: "any person who violates this section is guilty of a felony and shall be punished by imprisonment in the state prison for 15 years to life." Sec. 269 was adopted by the Legislature in 1994.

Penal Code §269 does not make any reference to mandatory consecutive sentencing under §667.6(d), or under any other statute. Thus, under Penal Code §269, as under almost every other statute, the trial court has the discretion to decide whether to sentence consecutively or concurrently. See, e.g., Rule 4.425.

There is a mandatory consecutive sentencing scheme under Penal Code §667(d) for specific sexual assault crimes. These crimes are listed in Penal Code §667.6(d). Under §667.6(d) a "full separate and consecutive term shall be served for each violation of" certain enumerated sexual offenses, including various subdivisions of §§220, 261, 262, 264, 288, and 289(a), "if the crimes involve separate victims, or involve the same victim on separate occasions." This provision substantially enhances the punishment for those crimes, which otherwise would be punished by determinate sentences of three, six, or eight years.

The crime of which Appellant was convicted, Penal Code §269,

aggravated sexual assault of a child, is not included in the list of crimes for which §667.6(d) provides mandatory consecutive sentencing.  Under the basic rule of statutory construction of <u>inclusio unius est exclusio alterius,</u> when the Legislature enumerates several crimes in a statute, but excludes others, the courts may not read into that statute the excluded crimes.  <u>Grupe Dev. v. Superior Court</u> (1993) 4 Cal.4th 911, 921; <u>In re Lance W.</u> (1985) 37 Cal.3d 873, 888; <u>People v. Palmer</u> (2001) 86 Cal.App.4th 440.

There are several reasons why the Legislature did not include Penal Code §269 in the list of the crimes in §667.6(d), which receive mandatory consecutive sentencing.

The first reason is because §269 already carries its own extraordinary high sentence of 15 years to life.  That is the same sentence imposed for second degree murder.  The minimum sentence under §269, namely 15 years, is already two and one-half times longer than the ordinary midterm sentence provided for the crimes enumerated in §667.6(d), which sentences are 3-6-8 years.

The second reason why the Legislature did not direct that §269 receive mandatory consecutive sentencing is that the maximum under §269 is a life top.  Thus, the Legislature had no logical reason to impose mandatory consecutive sentencing on §269, because §269, by creating a life top, already imposed a huge increase over and above the 3-6-8 year sentencing triad.

A third reason why the Legislature did not include §269 in §667.6(d) is because §269 carries a 15 year mandatory minimum, in addition to an indeterminate life top.  Thus, the Legislature did not see any need to increase the penalty for §269 by imposing mandatory consecutive sentencing, (1) because the minimum penalty for that crime is already the highly enhanced term of 15 years; and (2) because the maximum penalty for

a violation of §269 is the even more aggravated term of life in prison.

A fourth reason why the Legislature did not intend to impose mandatory consecutive sentencing for §269 is because the trial court always has discretion to sentence consecutively for multiple violations of §269 in those instances when the trial court believes that aggravation is such that consecutive sentences are warranted.

Fifth, it is a basic premise under California's sentencing scheme that a trial judge generally has discretion to choose among alternate sentences at each level of sentencing, and to choose between sentencing concurrently and consecutively. See Rule 4.425. There was no reason for the Legislature to diverge from this basic principle, or to take such discretion away from trial judges, (1) when §269 already imposed very severe sanctions for sex crimes against minors, and (2) when discretionary consecutive sentencing was already allowed.

Thus, there were at least five logical reasons why the Legislature chose not to designate Penal Code §269 as one of the crimes requiring mandatory consecutive sentencing under §667.6(d) when that crime is committed against the same victim on multiple occasions.

For all these reasons, because there is no statutory linkage between §269 and §667.6(d), and because of the doctrine of <u>inclusio unius est exclusio alterius</u>, the mandatory consecutive sentencing scheme provided for under §667.6(d) does not apply to the sex crimes against children punished by §269.

Thus, although a trial court could exercise its discretion to sentence consecutively under §269, there is no statute that requires it to sentence consecutively thereunder, or which restricts its discretion to sentence concurrently. The trial court erred when it ruled otherwise.

### 2. <u>Jiminez</u> was wrongly decided and should not be followed

There is one published opinion to the contrary. In <u>People v. Jiminez</u>, <u>supra</u>, 80 Cal.App.4th at 290, the Fifth District held that the mandatory consecutive sentencing scheme of §667.6(d) applied to §269, even though §269 is not included or listed in §667.6(d). <u>Jiminez</u> is poorly reasoned and should not be followed. The <u>Jiminez</u> court misanalyzed the issue. It improperly read into the list of enumerated offenses in §667.6(d) another section -- namely, §269 -- that just plain is not there. That interpretation violated the principle of <u>inclusio unius est exclusio alterius</u>.

The rationale of <u>Jiminez</u> is that §269 ought to get mandatory consecutive sentencing, because §667.6(d) includes some sex crimes which are supposed lesser-included offenses of §269. That rationale is wrong. Many statutes which are listed in §667.6(d) are not necessarily included lesser offenses of §269. For example, a repeat violation of Penal Code §220 or a violation of §261(a), subsecs. (1), (4), and (5) or a violation of §288.5 (continuous sexual abuse) will trigger mandatory consecutive sentencing under §667.6(d), but will not violate §269. Accordingly, there fails to be any necessarily-included offense relationship between §§667.6(d) and §269. See <u>People v. Palmer</u> (2001) 86 Cal.App.4th 440, 445.

If the Legislature wanted to make consecutive sentencing under §269 mandatory, it knew how to do so, by putting such an explicit provision in either §269 or in §667.6(d). Instead, it did not. An appellate court should not be rewriting a statute, so clear on its face, to say something other than what the Legislature said. <u>People v. Crossdale</u> (2002) 27 Cal.4th 408, 412 (court may not read one statute into another, merely because it might be logical to do so; Legislature knew how to incorporate one statute into another, but did not); <u>People v. Palmer</u>, <u>supra</u>, 86 Cal.App.4th at 446.

The <u>Jiminez</u> court deemed it "irrational" to suppose the Legislature

intended to exclude those convicted of violating §269 from "the aggravated punishment prescribed by section 667.6" because of the aggravated circumstances of the crime." Jiminez, supra, 80 Cal.App.4th at p. 291. However, as the Jiminez court observed, the Legislature enacted §269 in 1994, 15 years after it adopted §667.6. (Stats. 1994, ch. 878, §1, p. 4434; Stats. 1979, ch. 944, §10, p. 3258.) The Legislature was then aware that §269(b) provides for an aggravated sentence of 15 years - life for each violation, and that §669 gave the trial court discretion to sentence on multiple violations either consecutively or concurrently. Given this sentencing scheme, it was logical, not "irrational," for the Legislature to exclude violations of §269 from the mandatory provisions of §667.6(d). There was no need to enhance what was already an enhanced sentence.

In People v. Jones (2001) 25 Cal.4th 98, 107 the Supreme Court held that statutes which impose indeterminate life sentences for sexual assaults committed during one incident should be limited to situations where both the language of the statute and the intent of the Legislature are clear. Here, to the contrary, neither the language of the statute, nor the intent of the statute, are clear that the mandatory consecutive sentencing in §667.6(d) includes §669. Thus, mandatory consecutive sentencing does not apply.

Jones was decided a year after Jiminez. The reasoning in Jones effectively supercedes Jiminez on this point. Jiminez is no longer good law because of the Supreme Court's decision in Jones.

For all these reasons, under traditional rules of statutory construction, as well as under the "rule of lenity" explained by the Supreme Court in Jones, §269 may not be read into the list of statutes requiring mandatory consecutive sentencing under §667.6(d).

Accordingly, this case should be remanded for resentencing.

## VI.

## SENTENCING APPELLANT TO A LIFE TERM FOR NON-VIOLENT DIGITAL PENETRATION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

Sentencing Appellant to 75 years to term for non-violent, digital penetration of one victim on multiple occasions violates the constitutional proscriptions against cruel and unusual punishment. U. S. Const. 8th Amend.; Cal. Const., art I, §17. Thus, the trial court erred in denying Appellant's motion to reduce his sentence on the grounds that it constituted cruel and unusual punishment. (RT 430-432, 447-450)

The subject acts were non-violent. The jury's determination that these acts were forcible was most likely based upon a finding of duress. However, that finding of duress was merely based on trivial hardships, such as Appellant telling Monica that he would not take her to the store. (See sec. I, supra.)

A punishment is excessive under the 8th Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." Gregg v. Georgia (1976) 428 U.S. 153, 173 [96 S.Ct. 2909, 2925, 49 L.Ed.2d 859]. A punishment may violate article I, section 17 of the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." In re Lynch (1972) 8 Cal.3d 410, 424.

Specific punishments may be deemed to violate the cruel and unusual punishment clause in non-capital as well as capital contexts. Solem v. Helm (1983) 463 U.S. 277; People v. Dillon (1983) 34 Cal.3d 441. The Eighth Amendment to the U.S. Constitution forbids extreme sentences that are grossly disproportionate to the crime. Harmelin v. Michigan (1991) 501 U.S. 957; Accord: Lockyer v. Andrade (2003) ____ U.S. ____, 123 S.Ct.

1166, 155 L.Ed.2d 194; Ewing v. California (2003) ____ U.S. ____, 123 S.Ct. 1179, 155 L.Ed.2d 108, 117. The California prohibition, while separate and independent, requires a similar review as federal law. People v. Marshall (1990) 50 Cal.3d 907; People v. Dillon, supra.

In determining whether a particular punishment is cruel and/or unusual, courts examine the nature of the particular offense and offender, the penalty imposed in the same jurisdiction for other offenses, and the punishment imposed in other jurisdictions for the same offense. Solem v. Helm, supra, 463 U. S. at 290-291; In re Lynch, supra, 8 Cal.3d at 425-427.

With regard to the nature of the offense, the crime which triggered the life sentence involved non-violent, digital penetrations of a 9 to 12 year old girl. Penal Code §§269, 289(a)(1).

The ordinary punishment range for each count of that crime, without the GBI allegation turning punishment into a life sentence, is 3-6-8 years.

The trial court found that the level of force was *de minimis*. The prosecutor alternatively urged the jury to find force, fear, or duress based on "hardship." The alleged hardship was that Appellant would not take Monica to the store or to singing lessons. It is difficult to imagine any hardship any more trivial than the defendant telling the child that he would not take her to the store. While this crime certainly warrants punishment, there is no characteristic of this trivial level of hardship, even if it amounts to duress, which remotely warrants life imprisonment.

With regard to the nature of the defendant, Appellant had no prior criminal record. He was working two jobs to support his family. He submitted more than 20 letters of support at sentencing. (CT 220-258) Those letters of support described Appellant as a highly respected member of his community. More than 30 members of the Hispanic ministry of the Community Church in Santa Clara wrote that Appellant was a good father

and provider to his family, and that he had performed many valuable services for his church. (CT 220) Appellant helped with the electrical equipment at church. (CT 234-235) Supporters wrote that Appellant was an excellent, dependable, and well-respected person. (CT 221) One sibling wrote that when Appellant became employed, he bought his mother her very first washing machine. Before that, "she had always washed by hand, in our bathroom tub. . . . Sometimes, she would have us stomp on the clothes, while we scrubbed them together." (RT 223)

Appellant's cousin Ricardo Verdin, a corporal in the Marines, wrote that Appellant "has always been the male role model for the family. He has always had a smile for everyone, and a shoulder. He is an avid churchgoer and a very hard worker." (CT 229-230) Appellant's niece, Lourdes Rojas wrote about Appellant: "I miss him a lot. It's like a piece of my heart that's been taken from me. . . . He would make everybody laugh with his jokes." (CT 222-223) Appellant's nephew, Israel Rojas, wrote that Appellant was a wonderful uncle. He took his nieces and nephews to the theaters, to the mountains, and to San Francisco to see the seals at Pier 39. (CT 235-236)

Appellant began supporting his family when he was nine years old. When he lived in Mexico, he helped the butcher clean his store. He gave all his earnings to his mother to pay for food, because Appellant's father, by that time, had left. (CT 240-241)

Appellant's sister-in-law Elena wrote that Appellant regularly helped her family. Even when he was tired, he would come to her house if they needed help. He cosigned and loaned them money so they could buy their first automobile. (CT 248)

There are almost 40 pages of letters and support, some in English, some in Spanish. (CT 220-258) They tell the story of a hard-working, well-respected, kind, generous, and reliable man, who unfortunately made

poor decisions regarding his daughter. This is not the story of a man who needs to be locked in prison with the key thrown away.

Counsel does not need to explain the damage done to a family when one parent is removed forever. Even if Appellant no longer qualifies as the ideal parental figure for his daughter, he still remains an important figure for his natural son, Adam, aged 10, who will suffer the worst from the absence of a father.

One might argue that Appellant should have thought of that before he committed these crimes. Perhaps so, but that may be a reason to punish Appellant. That is not a reason to punish his son, Adam, by imprisoning his father for life, with no logical possibility of parole.

From the very beginning, Appellant expressed remorse for these crimes. He knew he did wrong. At his very first interview with the police, he wrote letters of apology to both Monica and Adam. His lack of criminal record, his history as a productive member of society, and his sincere remorse all militate for more lenient punishment.

Concerning the relative punishment for other offenses in California, Appellant's 75 - life sentence is the same as that imposed for five counts of second degree murder, or for three counts of first degree murder. Murder of one person, let alone of multiple persons, is a categorically more serious crime than digital penetration of a minor. Imposing a life sentence on Appellant for such non-violent conduct is so disproportionate as to be shocking.

With regard to penalties in other jurisdictions for the same offense, Appellant knows of no other state which imposes life imprisonment on a first offender for similar non-violent sexual offenses on one victim. See People v. Alvarado (2001) 87 Cal.App.4th 178, 200.

The penalty here is cruel and unusual in still another way. The

California statutory scheme employed here did not allow for any judicial discretion at all in sentencing.

The trial judge stated that if he had discretion to sentence concurrently, he would do so, and that he would sentence Appellant thereunder to 30 - life. Such choice would leave Appellant severely punished, but would not punish his family forever, as the current 75 - life term does.

The trial judge also made an explicit plea to this Court to rule that the effect of this mandatory consecutive sentencing was to produce a sentence which constituted cruel and unusual punishment under <u>Dillon</u>.

> I hope, and I want to tell the appellate court and the Supreme Court, if they review this case, that I hope you find that <u>Dalby</u> is the law. If you don't find that <u>Dalby</u> is the law in the appellate court or in the Supreme Court, I hope that you find that <u>Dillon</u> applies to this case. I can't find it to be so at this level. (RT 447)

For all these reasons, the 75 - life term imposed here violates the cruel and unusual punishment clauses, and the case should remanded for resentencing.

WHEREFORE, Appellant prays that his conviction for the forcible aspects of these crimes be reversed, and that the case be remanded for resentencing.

DATE: March __, 2006

Respectfully submitted,

_____
STEPHEN B. BEDRICK
Attorney for Appellant

E-filing

**IN THE SUPREME COURT**

**FOR THE STATE OF CALIFORNIA**

| | |
|---|---|
| The People of the State of California, | ) ) ) |
| Plaintiff and Respondent | ) ) ) |
| v. | ) ) |
| ROGELIO MIRANDA | ) ) ) |
| Defendant and Appellant. | ) ) ) |

CV 08 2356

MHP

Case no. ____

(Court of Appeal case no. H029494)

**(PR)**

Santa Clara County Superior Court Case No. EE504139
C. Randall Schneider, Judge

\* \* \*

**PETITION FOR REVIEW**

STEPHEN B. BEDRICK
Attorney at Law
State Bar No. 058787
1970 Broadway, Suite 1200
Oakland, CA 94612
(510) 452-1900

In association with the
Sixth District Appellate Program

Attorney for Defendant and Appellant
ROGELIO MIRANDA

## **TABLE OF CONTENTS**

PETITION FOR REVIEW ................................... 1

QUESTIONS PRESENTED .................................. 1

GROUNDS FOR REVIEW ................................. 1

STATEMENT OF THE CASE AND OF THE FACTS .............. 3

I   THE TRIAL COURT ERRED IN ALLOWING THE JURY TO
FIND THAT THE "DURESS" NECESSARY TO MAKE THESE
SEXUAL CRIMES QUALIFY AS FORCIBLE COULD
INCLUDE MINOR SOCIAL "HARDSHIPS," SUCH AS NOT
BEING TAKEN TO THE MALL, OR NOT BEING TAKEN TO
SINGING LESSONS ................................... 5

A.  Introduction and Facts ............................... 5

B.  There Was Insufficient Evidence of Hardship, So as to Qualify as
Duress, Within the Meaning of Penal Code §288(b)(1) and
§289(a)(1) ........................................ 8

    1. Insufficient evidence when compared with other cases ..... 8

    2. The threats here failed to satisfy the dictionary definition of
    hardship adopted by this Court in <u>Leal</u> ................ 10

C.  The Trial Court's Jury Instructions on Hardship Were Erroneous 11

D.  Reversal Is Warranted, Because the Jury Was Presented with One
Legally Valid Theory, and One Legally Invalid Theory, on Force,
Fear, or Duress, and Because it Cannot Be Determined on Which
Theory it Relied ................................... 13

E.  <u>Leal</u>'s Definition of Hardship as Constituting Duress Was
Improperly Vague, under the 5th and 14th Amendments' Due
Process Clause ................................... 13

F.  Prejudice ........................................ 14

# TABLE OF CONTENTS

II. THE PROSECUTION COMMITTED MISCONDUCT WHEN IT
OVERCHARGED THIS CASE TO SEEK, AND OBTAIN, A
SENTENCE OF 75 YEARS TO LIFE, IN THE FACE OF REPEATED
REQUESTS BY THE VICTIM AND HER MOTHER THAT
APPELLANT RECEIVE A SENTENCE OF NO MORE THAN 15
YEARS  ............................................. 16

   A.  Facts  ........................................... 16

   B.  The Prosecution Committed Misconduct by Seeking Such a
      Draconian Sentence and Refusing to Take the Interest of the Victim
      into Account  ...................................... 18

III. THE TRIAL COURT ERRED WHEN IT RULED THAT IT LACKED
DISCRETION TO SENTENCE CONCURRENTLY, AND THAT IT
WAS REQUIRED TO IMPOSE MANDATORY CONSECUTIVE
SENTENCES ON THE FOUR COUNTS OF FORCIBLE DIGITAL
PENETRATION FOR A TOTAL OF 60 YEARS TO LIFE; THE
TRIAL COURT WOULD HAVE SENTENCED CONCURRENTLY
IF IT HAD THE DISCRETION TO DO SO  .................. 20

   A.  Facts  ........................................... 20

   B.  The Trial Court Requested that this Court Reverse and Remand for
      Resentencing  ..................................... 22

   C.  The Trial Court Erred in Sentencing Appellant Consecutively on
      Counts II-V; it Erred When it Ruled that it Had No Discretion as to
      Whether it Should Sentence Consecutively or Concurrently; the
      Jiminez Case, Which Judge Schneider Felt Obligated to Follow,
      Was Wrongly Decided  ............................. 23

      1.  The mandatory consecutive sentencing scheme under §667.6(d)
         does not apply to violations of Penal Code §269  ........ 23

      2.  Jiminez was wrongly decided  ...................... 26

IV. SENTENCING APPELLANT TO A LIFE TERM FOR NON-
VIOLENT DIGITAL PENETRATION CONSTITUTES CRUEL AND
UNUSUAL PUNISHMENT  ............................. 29

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE**

Berger v. United States
(1935) 295 U.S. 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

Brosnahan v. Brown
(1982) 32 Cal.3d 236 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

Chapman v. California
(1967) 386 U. S. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13, 15

Gallo v. Acuna
(1997) 14 Cal.4th 1090 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Grayned v. City of Rockford
(1972) 408 U. S. 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Griffin v. United States
(1991) 502 U.S. 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

Grupe Dev. v. Superior Court
(1993) 4 Cal.4th 911 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

In re Lance W.
(1985) 37 Cal.3d 873 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

In re Lynch
(1972) 8 Cal.3d 410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

Jackson v. Virginia
(1979) 443 U. S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Lockyer v. Andrade
(2003) ____ U.S. ____, 123 S.Ct. 1166, 155 L.Ed.2 . . . . . . . . . . . . . .   29

Mills v. Maryland
(1988) 486 U. S. 367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

People v. Babcock
(1993) 14 Cal.App.4th 383 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE**

<u>People v. Banks</u>
(1993) 6 Cal.4th 926, 945. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

<u>People v. Crossdale</u>
(2002) 27 Cal.4th 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

<u>People v. Dillon</u>
(1983) 34 Cal.3d 441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

<u>People ex rel.</u> <u>Gallo v. Acuna</u>
(1997) 14 Cal.4th 1090 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

<u>People v. Harris</u>
(1994) 9 Cal.4th 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

<u>People v. Jiminez</u>
(2000) 80 Cal.App.4th 286 . . . . . . . . . . . . . . .    2, 3, 20, 21, 22, 23, 26, 27

<u>People v. Johnson</u>
(1980) 26 Cal.3d 557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

<u>People v. Jones</u>
(2001) 25 Cal.4th 98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27, 28

<u>People v. Leal</u>
(2004) 33 Cal.4th 999 . . . . . . . . . . . . . . . . .    2, 8, 9, 10, 11, 12, 13, 14

<u>People v. Marsden</u>
(1970) 2 Cal.3d 118. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

<u>People v. Palmer</u>
(2001) 86 Cal.App.4th 440 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26, 27

<u>People v. Schulz</u>
(1992) 2 Cal.App.4th 999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 14

<u>People v. Senior</u>
(1992) 3 Cal.App.4th 765 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 14

# TABLE OF AUTHORITIES

**PAGE**

Sandstrom v. Montana
(1979) 442 U.S. 510 ........................................  12

Sheppard v. Rees
(9th Cir. 1989) 909 F.2d 1234 ...............................  13

Solem v. Helm
(1983) 463 U. S. 277 ...................................  28, 29

# TABLE OF AUTHORITIES

**PAGE**

## STATUTES

### United States Constitution

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 12, 13, 28
Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29
Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 19

### California Constitution

Article 1, §17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Article 1, §28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

### Rules of Court

4.414(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
4.425 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
8.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
976(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

### Penal Code

§220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26
§261 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§261(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
§262 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§264 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§269 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 5, 20-28
§288 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
§288(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21
§288(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5, 8, 11, 13, 21
§288.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 26
§289(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 8, 11, 13
§667.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
§667.6(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 23-28
§669 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27
§1118.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
§1170(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
§1191.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TABLE OF AUTHORITIES

**PAGE**

§1203.066(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

§1203.067(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## <u>OTHER AUTHORITIES</u>

Proposition 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## <u>CALJIC</u>

10.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 12

10.42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 12

Webster's 3d New Internat. Dict. (2002) p. 703 . . . . . . . . . . . . . . . 10

Merriam-Webster's Collegiate Dictionary (Merriam-Webster, 10th ed., 1999) at p. 1165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

## PETITION FOR REVIEW

Defendant and Appellant ROGELIO MIRANDA (Appellant) respectfully petitions for review of the decision of the Court of Appeal, Sixth District, which affirmed his convictions for child molestation. <u>People v. Miranda</u>, case #H029494, opinion filed January 26, 2007. (Exhibit A.)

## QUESTIONS PRESENTED

1. Is the "duress," which is necessary to make certain sexual crimes qualify as "forcible," established by threatening the child victim with minor social "hardships," such as not being taken to the mall, or not being taken to singing lessons?

2. Did the prosecution commit misconduct when it overcharged this case so as to seek, and obtain, a sentence of 75 years to life, in the face of repeated requests by the victim and her mother that appellant receive a sentence of no more than 15 years?

3. Does Penal Code §667.6(d) *sub silentio* eliminate the trial court's discretion to sentence concurrently, rather than consecutively, on multiple counts of sexual molestation under Penal Code §269?

4. Does sentencing Appellant to 75-life for non-violent digital penetration of one victim constitute cruel and unusual punishment?

## GROUNDS FOR REVIEW

Review is warranted under Rule 8.500 to secure uniformity of decision and for the settlement of important questions of law. In addition:

(1) On the question of when hardship can qualify as duress, to render a sex crime forcible, review is warranted on two issues:

(a) Is there sufficient evidence of hardship to qualify as duress when a defendant tells a child that unless she complies, he will not personally take her to the store, and he will not personally take her to singing lessons?

Appellant contends that the trivial nature of such social hardships is insufficient to qualify as duress, equivalent to force. The Court of Appeal ignored this issue.

(b) In <u>People v. Leal</u> (2004) 33 Cal.4th 999, 1009 this Court construed the term "duress" in Penal Code §288(b)(1) to include hardship. That allows a threat of hardship to turn an otherwise non-forcible sexual assault into a forcible sexual assault, to warrant enhanced punishment for forcible crimes. In <u>Leal</u> this Court relied upon a dictionary definition of duress, which included hardship, to wit, "restraint or check by force . . . stringent compulsion by threat of danger, hardship, or retribution."

The question presented here, not reached in <u>Leal,</u> is whether the jury must be instructed, pursuant to the definition established in <u>Leal,</u> to find that any threat of hardship involved "compulsion" which was "stringent." No such definition of hardship was given here. That allowed the jury to find hardship based on trivialities.

(2) On the question of whether Penal Code §667.6(d) *sub silentio* eliminates the trial court's discretion to sentence concurrently, rather than consecutively, on multiple counts of sexual molestation under Penal Code §269, which statute already provides for an indeterminate life sentence, review is warranted because there is a conflict between courts.

In <u>People v. Jiminez</u> (2000) 80 Cal.App.4th 286, the Court of Appeal, Fifth District, ruled that §667.6(d) made the imposition of consecutive 15 - life sentences under §269 mandatory, without the trial judge having any discretion to decide, in less serious cases, that concurrent sentences were more appropriate.

However, the trial judge in this case, Judge Randall Schneider of Santa Clara County, believed that <u>Jiminez's</u> reading of that statute was inaccurate. He wished to sentence Appellant concurrently, for numerous

reasons, including because he believed that any force in this case was *de minimis*, and because no long term damage was done to the child. Judge Schneider wished to follow a decision from the Third District Court of Appeal which disagreed with <u>Jiminez</u>, and which ruled that a trial court has discretion to sentence concurrently. However, Judge Schneider ultimately found himself unable to follow that Third District decision, because it was effectively depublished during the pendency of proceedings against Appellant, for reasons unrelated to this issue. Instead, he believed himself obligated to follow the only published opinion on the topic, <u>Jiminez</u>. Judge Schneider explicitly requested that this Court overrule <u>Jiminez</u> and allow trial judges to exercise discretion.

### STATEMENT OF THE CASE AND OF THE FACTS

Appellant was convicted of one count of Penal Code §288(a), lewd and lascivious act on child under 14; four counts of Penal Code §288(b)(1), forcible lewd and lascivious acts on child under 14; and four counts of Penal Code §269/289(a)(1), forcible sexual assault on child under 14 by means of foreign object (digital) penetration. The prosecution's evidence established that Appellant fondled and digitally penetrated his daughter Monica several times when she was in the fourth and fifth grades. Appellant admitted many of the acts, but denied using force, duress, or threat of hardship.

As to the four counts of digital penetration, it was the prosecution's theory that Appellant accomplished those by force, duress, or the threat of hardship. The trial judge declared that any evidence of force was *de minimis*. As to duress, the prosecution's theory was that duress was established in two ways: first because Appellant was Monica's father, and was bigger than she was, and second, by hardship, because Appellant told Monica that, if she did not cooperate, he would not drive her to the store, or

to singing lessons.

The taking of evidence lasted approximately two and one-half days. The jury deliberated slightly more than one full day. It convicted Appellant as charged. (CT 92, 102, 110, 115, 192)

The trial court sentenced Appellant to the low term on each of the five counts of lewd and lascivious act for a total of 15 years to life. On the four counts of forcible digital penetration, the trial court sentenced Appellant to 15 years to life on each count, consecutive. The total sentence was 75 years to life.

The trial court believed that it was obligated by the only published case on the subject to impose mandatory consecutive sentences on the four counts of forcible digital penetration. The trial court disagreed with the holding of that case. The trial court stated that, if it had sentencing discretion, it would have sentenced those four counts concurrently, to give Appellant a sentence of 15 years determinate, plus 15 years to life indeterminate, for a total of 30 years to life. (RT 428-432, 447, 452) The trial court stated "I hope this case is reversed on appeal, so I can impose a just and appropriate lower term." (RT 452)

# I.

## THE TRIAL COURT ERRED IN ALLOWING THE JURY TO FIND THAT THE "DURESS" NECESSARY TO MAKE THESE SEXUAL CRIMES QUALIFY AS FORCIBLE COULD INCLUDE MINOR SOCIAL "HARDSHIPS," SUCH AS NOT BEING TAKEN TO THE MALL, OR NOT BEING TAKEN TO SINGING LESSONS

### A.   Introduction and Facts

Appellant was convicted of four counts of Penal Code §269, forcible foreign object penetration of a child, Penal Code §289(a)(1), and of four counts of Penal Code §288(b)(1), forcible lewd act upon a child. Appellant admitted most acts, but denied that force was involved. (RT 363-365) If the jury found no force, or fear, or duress, Appellant would have been convicted of lesser crimes.

The jury was instructed to find these crimes forcible if there was "force, violence, duress, menace, or the fear of immediate and unlawful bodily injury. . . ." "Duress" was defined as follows:

> "Duress" means a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which she would not otherwise have performed, or acquiesce in an act to which she otherwise would not have submitted. The total circumstances, including the age of the alleged victim, and her relationship to the defendant, are factors to consider in appraising the existence of the duress. (CALJIC 10.30, CT 152-153; CALJIC 10.42, CT 155-156)

There was little or no evidence of actual force or fear. Monica did testified that on a few occasions, when she attempted to pull away from Appellant, he grabbed her leg and pulled her back. However, that grabbing did not occur during all eight charged instances. Further, as to those few instances of alleged grabbing, there was an open question, on which reasonable jurors could differ, as to whether such grabbing qualified as "force" in this context, meaning "physical force that is substantially

different from or substantially greater than that necessary to accomplish the lewd act itself." (CALJIC 10.30, CT 152; CALJIC 10.42, CT 155) Compare People v. Schulz (1992) 2 Cal.App.4th 999, 1004 (insufficient force when defendant grabbed victim's arm and held her while fondling her, "because a modicum of holding and even restraining cannot be regarded as substantially different or excessive 'force'"), and People v. Senior (1992) 3 Cal.App.4th 765, 775 (insufficient force when defendant pulled the victim back when she tried to pull away from oral copulation), with People v. Babcock (1993) 14 Cal.App.4th 383, 386 (holding victim, when she tries to pull away constitutes sufficient force).

The trial court did not think there was much force. It explicitly found that any use of "force" here was merely "de minimis." (RT 431)

Because the evidence of "force" was so limited, the prosecutor did not totally rely on "force." He also argued, in the alternative, that the jury could rely upon "duress," and could rely upon "hardship," as proving duress.

Monica's testimony as to "hardship" was as follows:

Q [prosecutor Benson]: Okay, Did you ever tell your dad that you didn't want to do this?

A [Monica]: Um, like, yeah, sometimes I told him I didn't want to, but he would say, like, if that he didn't he would just say something like I can't, like, do something. Like he wouldn't, like — like he wouldn't take me somewhere, like where I have to go or — like sometimes when I went, like, to church, like to practice to sing, he would say I won't take you there or something.

Q: Okay.

A: I won't take you somewhere. And that I really liked singing.

Q: Okay. So sometimes like when you were in the fourth grade your dad would say, you know, if you don't do this I'm not going to take you somewhere, is that what you're saying?

A:    Yeah. (RT 110-111)

* * *

Q:    Okay. So he did it more than once while you were in the sixth grade; is that correct?

A:    Yeah.

Q:    All right. And is your dad putting his finger in your vagina?

A:    Yeah.

Q:    Is he still pulling down your pants?

A:    Yeah.

Q:    Is he still telling you that if you don't do this for him you're not going to get to do something?

A:    Yeah. (RT 121)

Based on this testimony, the prosecutor argued to the jury that

Monica suffered threats of hardship, which could qualify as duress,

sufficient to render these crimes forcible.

First, the prosecutor argued:

Duress. And again, these are or's. Some of you might think that there was force used. Some of you might think that there was duress used. Again, he's stronger than she is. He was the disciplinarian in the family. He threatened to not take her places. Again, this is duress.

One of the other things that the code section talks about is retribution. And Monica talked about that. Sometimes he would say, you know, if you don't do this, I'm not going to take you to the practice. I'm not going to take you to the store. (RT 323)

Then the prosecutor argued:

You know, you can think back to when you were ten and the position that your parents held over you, and the fact that you're supposed to do what your parents want. Why? Because they're your parents. And on top of that, he's talking about I'm not going to take you to the store. I'm not going to take you to practice. And on top of that he's using -- he's physically

overcoming her resistance.  Don't even consider a lesser offense. (RT 327-328)

The prosecutor's argument that Appellant said he would not take Monica to the store was not literally accurate.  Monica merely testified that Appellant said that he wouldn't take me "somewhere."  (RT 110-111)  Monica did not say anything about a "store."  Nonetheless, the prosecutor's argument that Appellant would not take her to the store fairly characterized the triviality of the supposed hardship.

Trial defense counsel unsuccessfully repeatedly objected to the threat of social hardship -- such as not being taken to the mall or to singing practice -- qualifying as "duress," under Penal Code §289(a)(1) or §288(b)(1).  (CT 107, RT 297-303)

Trial counsel unsuccessfully moved for judgment of acquittal, Penal Code §1118.1, on the grounds that there was insufficient evidence of force or duress.  (RT 304-308)

**B.    There Was Insufficient Evidence of Hardship, So as to Qualify as Duress, Within the Meaning of Penal Code §288(b)(1) and §289(a)(1)**

**1.    Insufficient evidence when compared with other cases**

Penal Code §§288(b)(1) and 289(a)(1) elevate lewd touching and foreign object penetration to aggravated sexual assault if there is "force, violence, duress, menace, or the fear of immediate and unlawful bodily injury on the victim or another person."

In People v. Leal (2004) 33 Cal.4th 999 this Court broadly construed the term "duress" in §288(b)(1) to include "hardship."  However, even under Leal, and under the 5th Amendment's due process clause, there still is a minimum level of hardship, below which evidence of hardship is legally insufficient to constitute duress.

For example, is there duress, or "hardship," if an adult tells a child

that she has to turn the television off a bit sooner than desired? Some children reasonably might think so. But it cannot be imagined that the Legislature intended that such a trivial hardship could be equated with force, or fear, or duress, or that such a triviality could elevate a wrongful touching to an aggravated sexual assault warranting life in prison. The alleged hardships here manifest that same level of triviality.

In People v. Leal, supra, this Court found that the defendant threatened the victim with two specific hardships. (1) she would not be able to see her aunt again; (2) the defendant told the victim "not to tell anyone about these incidents." This caused the victim to be "afraid she would be taken away from her parents, as had happened to friends of her who had been molested." People v. Leal, supra, 33 Cal.4th at 1002-1003. These threats are illustrative of how hardship could be equivalent to duress.

However, the threats that the defendant would not take the victim to the mall or to singing lessons are so trivial, when compared to the threats involved in Leal, that they cannot qualify to meet the Leal standard. This is especially true, because there was no evidence that Appellant threatened or prohibited anyone else from taking Monica to the mall.

The threat that Appellant would not personally take Monica to the store, or to singing lessons, is even less compelling than a threat to withhold a child's promised allowance, which threat Justice Kennard, dissenting in Leal, 33 Cal.4th at 1012-1013, found would be inadequate to establish hardship, amounting to duress.[1]

---

[1] The Court of Appeal refused to address Appellant's argument that the threats not to take Monica to the store or to singing lessons were too trivial to qualify as hardship, or duress, on the ground that there was other, sufficient evidence of duress. (Slip op. 17-18)

### 2. The threats here failed to satisfy the dictionary definition of hardship adopted by this Court in <u>Leal</u>

In <u>People v. Leal</u>, <u>supra</u>, 33 Cal.4th at 1009, when this Court held that hardship qualified as duress, it based that ruling upon the dictionary definition of hardship. "Webster's Third New International Dictionary . . . currently includes the following definition of duress: 'restraint or check by force . . . stringent compulsion by threat of danger, hardship, or retribution . . . .' (Webster's 3d New Internat. Dict. (2002) p. 703) We agree. 'Courts frequently consult dictionaries to determine the usual meaning of words.' (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 16.)"

That definition and that standard were not satisfied here, because there was insufficient evidence of two aspects of the dictionary's requirement of "stringent compulsion by threat of danger, hardship, or retribution." The aspects which were not satisfied here were (i) that there must be "compulsion," and (ii) that the compulsion must be "stringent."

Webster's Third New International Dictionary (Merriam, 1966) at p. 2263 defines "stringent" as "marked by vigor, strictness or severity." and as "rigidly controlled by rule or standard, not loose or lax." Merriam-Webster's Collegiate Dictionary (Merriam-Webster, 10th ed., 1999) at p. 1165 similarly defines "stringent" as "marked by vigor, strictness or severity."

There was no evidence here of any threat that qualified as stringent or severe. Appellant merely threatened that he would not personally take the child to an unnamed store, or to singing lessons.

Second, there was no evidence here of any "compulsion." Webster's Third New International Dictionary, <u>supra</u>, at p. 463 defines "compel" as to "urge irresistibly by moral or social pressure;" "to force or cause irresistibly: call upon, require, or command without possibility of withholding or denying." Merriam-Webster's Collegiate Dictionary, <u>supra</u>,

at p. 234 defines "compel" (the verb underlying compulsion) as "to cause to do so or occur by overwhelming pressure."

There was no such "overwhelming pressure" or "command without possibility of . . . denying" here. Most children can survive not going to the store.

Because these threats did not satisfy the definition of hardship as established by this Court in <u>Leal</u>, it violated due process under U. S. Constitution, 5th and 14th Amendments, to convict Appellant of the forcible aspects of Penal Code §288(b)(1) and Penal Code §289(a)(1) without sufficient evidence of the necessary element of duress. <u>Jackson v. Virginia</u> (1979) 443 U. S. 307; <u>People v. Johnson</u> (1980) 26 Cal.3d 557.

### C.    The Trial Court's Jury Instructions on Hardship Were Erroneous

The instructions on duress were erroneous because they did not satisfy the standard set by this Court in <u>Leal</u>. Under <u>Leal</u>'s dictionary definition of hardship, duress means "stringent compulsion by threat of danger, hardship, or retribution." However, nothing in the instructions said there must be "compulsion," or that such compulsion must be "stringent," meaning "marked by vigor, strictness or severity." (Merriam-Webster's Collegiate Dictionary, <u>supra</u>.)

Instead, the jury was given a weak and watered-down instruction, quoted directly above, that the hardship would be sufficient to constitute duress, even if it was of a much lesser degree, as long as it was sufficient to persuade a reasonable person to do something which she would not otherwise had done. That instruction was defective because it failed to tell the jury that actual compulsion was required, and that such compulsion needed to be "severe," "stringent," or "strict."

Worse, in child sex cases, the instruction given here is effectively a tautology. By definition, a reasonable child would not "perform an act

which she would not otherwise have performed, or acquiesce in an act to which she otherwise would not have submitted" (CALJIC 10.30, 10.42) without inducement of some kind. Under that definition any inducement, no matter how trivial, qualifies as a threat of hardship, as long as it achieves its intended result of acquiescence. That is why that instruction is an improper tautology. It is self-defining.

However, not every inducement, or every hardship, qualifies as "stringent," strict, or "severe" under <u>Leal</u>'s dictionary definition of hardship. Threatening to turn off a child's favorite TV show, or refusing to take her to the mall, might cause her reasonably to acquiesce in an act to which she otherwise would not have submitted. However, such an inducement indisputably does not qualify as "compulsion," let alone as "stringent" or "severe" compulsion, as required by the Supreme Court's definition of hardship in <u>Leal</u>.

Thus, the instructions given here were defective, because the standard they set was too low, and because they allowed any inducement, no matter how trivial, to qualify as a threat of hardship, as long as it successfully accomplished its intended result.

When, as here, the jury is misinstructed on a necessary element of a crime, namely, "force, fear, or duress," that error violates the 5th Amendment's due process clause and warrants reversal. <u>Sandstrom v. Montana</u> (1979) 442 U.S. 510.[2]

_____

[2]The Court of Appeal refused to address this issue, too.

This instructional issue was neither raised nor decided in <u>Leal</u>. Accordingly, <u>Leal</u> cannot be read as having approved that instruction, especially as contrasted with the dictionary definition. An opinion is not authority for a proposition not considered therein. <u>People v. Banks</u> (1993) 6 Cal.4th 926, 945.

**D.     Reversal Is Warranted, Because the Jury Was Presented with One Legally Valid Theory, and One Legally Invalid Theory, on Force, Fear, or Duress, and Because it Cannot Be Determined on Which Theory it Relied**

The jury was instructed that it could find force, fear, or duress either if it found sufficient force (a legally correct theory), or if it found hardship under the defective instruction given here.

When the case is submitted to the jury on two alternate theories, one legally valid, and one legally invalid, and when, as here, it cannot be determined upon which theory the jury relied, a new trial is required under the due process clause. United States Constitution, 5th Amendment. Griffin v. United States (1991) 502 U.S. 46, 51; Mills v. Maryland (1988) 486 U. S. 367, 376; People v. Harris (1994) 9 Cal.4th 407, 420, fn. 7.

The standard of prejudice for this due process violation is harmless beyond a reasonable doubt. Chapman v. California (1967) 386 U. S. 18, 24; Sheppard v. Rees (9th Cir. 1989) 909 F.2d 1234, 1237-1238.

The Court of Appeal ignored this argument, too.

**E.     Leal's Definition of Hardship as Constituting Duress Was Improperly Vague, under the 5th and 14th Amendments' Due Process Clause**

This ruling in People v. Leal that the definition of "duress" within the meaning of §288(b)(1) [and also, by inference, in §289(a)(1)] could include a threat of "hardship" rendered those statutes unconstitutionally vague under the 5th and 14th Amendments' due process clause. The term "hardship" used therein is too vague. It would effectively allow all touchings to be treated as forceful.

As Justice Kennard pointed out in her dissent in Leal, 33 Cal.4th at 1012:

> "Hardship" is a vague and amorphous concept. It has been defined as "suffering" or "privation" (Webster's [**1080] 3d New Internat. Dict. (2002) p. 1033), a "lack of comfort"

> (Random House Webster's Unabridged Dict. (2d ed. 2001) p.
> 872), and "difficulty or suffering caused by a lack of something,
> especially money" (Encarta World English Dict. (1999) p. 816).
> A threat to withhold a child's promised allowance might well
> fall within these definitions, as would innumerable other threats.

A statute is unconstitutional for vagueness if it fails "to provide adequate notice to those who must observe its strictures." <u>People ex rel. Gallo v. Acuna</u> (1997) 14 Cal.4th 1090, 1115, quoting <u>Grayned v. City of Rockford</u> (1972) 408 U. S. 104, 108-109.

### F.    Prejudice

The failure to instruct correctly on duress was prejudicial. There was minimal evidence of force. Monica testified that on a few occasions Appellant grabbed her leg. However, there was no testimony that such grabbing occurred during all of the separate charged offenses. Further, such grabbing often does not qualify as force. <u>People v. Schulz</u>, <u>supra</u>; <u>People v. Senior</u>, <u>supra</u>. As noted, the trial judge found that the evidence of force was "de minimis."

The prosecutor repeatedly told the jury to rely on hardship to find duress. But the alleged hardship was trivial and it did not satisfy either the factual test for duress, or the dictionary definition of duress adopted and applied in <u>Leal</u>.

Finally, it is likely that the jury relied on hardship and duress, rather than on force. As defense counsel noted at sentencing:

> The jury noticed shortly before their verdict that there was a
> discrepancy between the charging document that charged force
> <u>and</u> duress and the jury instructions that talked about force <u>or</u>
> duress. They asked a question. They sent out a question asking
> which one controls, and the court sent in an answer to them that
> it was in the alternative, force or duress. [CT 177-179] And
> within a very, very short period of time they returned their
> verdict, which clearly says they have grave doubts about the
> issue of force, but felt that duress was clear as it was defined to

them by the court because it is defined so broadly. (RT 433, emphasis added)

For all these reasons, the failure to instruct correctly on the necessary element of duress was prejudicial. <u>Chapman v. California</u>, <u>supra</u>.

## II.

## THE PROSECUTION COMMITTED MISCONDUCT WHEN IT OVERCHARGED THIS CASE TO SEEK, AND OBTAIN, A SENTENCE OF 75 YEARS TO LIFE, IN THE FACE OF REPEATED REQUESTS BY THE VICTIM AND HER MOTHER THAT APPELLANT RECEIVE A SENTENCE OF NO MORE THAN 15 YEARS

### A.    Facts

The night when Monica told her relatives that Appellant had been molesting her, the Miranda family had long discussions. It was the family's opinion that Appellant should leave the family home; that Appellant should continue working (he was working at two jobs) to continue to support his wife and two children; and that this solution would adequately shame and punish Appellant.

That plan was quickly upset when lay pastor Walter Fernandez went to the police with this story.

During the pre-trial <u>Marsden</u>[3] hearing, trial defense counsel stated: He sought a negotiated settlement with the district attorney's office. It was offering a plea to multiple felony counts, with a sentence of 33 years - life. That was extremely harsh. He suggested a plea to Penal Code §288.5, continuous sexual abuse of child, with an aggravated term sentence of 16 years.[4] The DA refused. (RT June 6, 2005, pp. 8-9)

Appellant had no prior criminal record. He was fully employed, working two jobs to support his family.

_____

[3] <u>People v. Marsden</u> (1970) 2 Cal.3d 118.

[4] The complaint, filed on February 24, 2005, originally charged three counts of sexual misconduct. After the preliminary examination, the district attorney's office filed an information which charged numerous additional counts of molestations, in lieu of the one count previously charged for continuous sexual abuse.

Defense counsel Cavagnaro "had several conversations" with the Miranda family's minister, Walter Fernandez. He said that Appellant's daughter "Monica and [wife] Rebecca were horrified by the district attorney's position. That that wasn't what they wanted, and they wanted to know how they could communicate their feelings. I explained to Mr. Fernandez that they could talk to Ms. Brown or deputy district attorney Ms. Rubino, and let their feelings be known." (RT June 6, 2005, pp. 8-9) He "communicated Monica's and Rebecca's feelings to Ms. Brown or Ms. Rubino, but that they were unaffected by the pleas of the victim, or her mother, or their pastor, to treat this in a less harsh manner." (Id.)

At trial, defense counsel tried to introduce evidence that Monica told her aunt Carmen that she wanted to sign a declaration to help her father, but that he mother would not let her. (RT 289-290)

The victim's mother, Rebecca, told the probation officer after trial that an appropriate sentence would be 15 years. She said that 75 years was too long. (CT 204)

Trial counsel said at sentencing: .

> When I informed another deputy district attorney, . . . that the child and the mother wished to meet with the  −  supervisor of the team to plead for a more reasonable sentence than the People were offering, which was 33 - life, I was told it won't matter, it doesn't matter, showing a callous disregard in my opinion, not only of the wishes of the victim, but of the needs and health, psychologically of the victim. . . .  [the sentence] is cruel to his daughter, and basically will put her in a position where it's virtually impossible that she will ever heal from the damage that his been done to her and her family, not only by the defendant, but by the prosecution, which is choosing to handle the case in this manner. (RT 435-436)

The effective life without parole sentence was also cruel, unusual, and unjust with regard to Appellant's son, Adam, who was then 10 years old. Trial counsel argued: "To deprive her and his son, who is an absolutely

innocent victim here, just as the daughter is, of normal relations with their father for the rest of their lives, as well as the rest of Rogelio's life" is cruel, unusual, and unjust. (RT 437)

### B. The Prosecution Committed Misconduct by Seeking Such a Draconian Sentence and Refusing to Take the Interest of the Victim into Account

Numerous statutes and Rules of Court require that the wishes of the victim and the victim's family be taken into account with regard to sentencing:

(1) California Constitution, Article I, §28, the "Victim's Bill of Rights," establishes the rights of victims. It has "the purpose of protecting or promoting the rights of victims of crime." Brosnahan v. Brown (1982) 32 Cal.3d 236, 242.

(2) Penal Code §1170(b) provides that the victim, or the family of the victim, may submit a statement in mitigation, as well as a statement in aggravation. And so do Rule of Court 4.414(b)(5), Penal Code §1203.066(c)(2), and Penal Code §1203.067(a)(2).

Penal Code §1191.1 provides that the court, in imposing sentence, shall consider the statements of victims, parents, . . ."

The prosecutor's office here violates these provisions when it refused to discuss the impact of such sentencing upon the victim and her family.

Is the victim being protected, when she must live for the rest of her life with the knowledge that her cooperation with law enforcement resulted in her father receiving an effective sentence of life without parole, when the victim and her family believed that was far too long a sentence? And are the rights of the victim and her family being preserved, when the victim's 10 year old brother is deprived of a father for the rest of his life?

By the prosecutors' refusal to meet with, or even listen to, the victim

and her family, the prosecution violated due process under the 14th Amendment.[5] <u>Berger v. United States</u> (1935) 295 U.S. 78, 88.

---

[5]The Court of Appeal rejected this argument on the ground that the prosecutor has unfettered discretion to overcharge a case, regardless of any damage to the victim or her family. Appellant disagrees. Such discretion is subject to Calif. Const. Art. I, §28, the Victims' Bill of Rights, which has "The purpose of protecting or promoting the rights of victims of crime."

## III.

## THE TRIAL COURT ERRED WHEN IT RULED THAT IT LACKED DISCRETION TO SENTENCE CONCURRENTLY, AND THAT IT WAS REQUIRED TO IMPOSE MANDATORY CONSECUTIVE SENTENCES ON THE FOUR COUNTS OF FORCIBLE DIGITAL PENETRATION FOR A TOTAL OF 60 YEARS TO LIFE; THE TRIAL COURT WOULD HAVE SENTENCED CONCURRENTLY IF IT HAD THE DISCRETION TO DO SO

### A. Facts

The key sentencing issue was whether to sentence concurrently, or consecutively, on the four counts of digital penetration. Penal Code §§269 and 289(a). The trial judge discussed two conflicting opinions on whether consecutive sentencing for violations of Penal Code §269 against a single victim on multiple occasions was mandatory under Penal Code §667.6(d), or whether the trial court had discretion to sentence either concurrently or consecutively.

In People v. Jiminez (2000) 80 Cal.App.4th 286, 290 the Fifth District held that consecutive sentencing was mandatory.

In People v. Dalby (formerly published at (2005) 123 Cal.App.4th 1083, 1097) the trial judge noted that the Third District ruled to the contrary, shortly before trial commenced here, that a trial court had discretion to sentence concurrently. The Third District stated in Dalby that it believed that Jiminez was wrongly decided.

This Court granted review (grant and hold) in Dalby on an unrelated issue but, several months later, it dismissed review. That had the effect of depublishing Dalby. Rule 976(d).

The trial court wished, pursuant to Dalby, to sentence Appellant concurrently on all four digital penetration counts, to one 15 years - life sentence. It desired to run that 15 year - life sentence consecutive to the 15

year determinate term it was imposing on the five counts of lewd and
lascivious acts under §288(a) and §288(b)(1) (five counts times three years
mitigated term, for each). That would produce a total sentence of 30 years -
life. The trial court would have sentenced Appellant in that way if <u>Dalby</u>
remained published. However, once <u>Dalby</u> was effectively depublished, the
trial court believed it was required to follow <u>Jiminez</u> because it was the sole
remaining published opinion on this point. Thus, it imposed four
consecutive 15 - life sentences for the four counts of §269/289(a) for a total
of 60 - life, solely because <u>Jiminez</u> held that such consecutive sentencing
was mandatory, plus 15 years determinate, for a total of 75 - life.   (RT
428-431, 447-452)

     The trial court stated:

> In reading <u>Dalby</u> with regard to whether or not the court should
> have the power given the statutory and legislative history of
> Penal Code Section 269 and 667.6(d) and (c), I believe that the
> <u>Dalby</u> argument . . . makes more sense, and I think its correctly
> decided. But it's now been deleted from the appellate
> authorities. I cannot cite a depublished opinion and rely upon it.
> And the only authority on this issue now is <u>Jiminez</u>.

> So even though I disagree with it, even though I think its
> wrongfully decided or wrongly decided, I think I have to follow
> the <u>Jiminez</u> case. . . .

> With regards to counts one, six, seven, eight and nine, it would
> be my intention to impose the absolute minimum sentence I
> could impose and for the following reasons:

> Mr. Miranda has no prior criminal history. Mr. Miranda,
> although he was convicted of very serious and ongoing criminal
> activity, fortunately no direct physical harm was inflicted by him
> on his daughter. The nature of the crime, although I believe the
> evidence is sufficient to sustain the verdict of the jury -- or the
> verdicts of the jury, nonetheless, the nature of the crime was not
> aggravated in itself other than the fact that there were multiple
> violations over several years. . . .

> I think it would be entirely appropriate to impose, something

like the initial recommendation of the probation department.[6]
But legally I cannot because I'm bound by the appellate
authorities. . . .

Although I think this is probably a very cruel result to the
defendant, I think it is -- it's a result that I believe is
inappropriate, I don't believe it's in the interest of justice . . . .
The element of force in this case has been, I would have to say,
diminimuus. (sic)[7] (RT 428-431)

## B. The Trial Court Requested that this Court Reverse and Remand for Resentencing

Judge Schneider made a direct plea to the appellate courts to re-
examine this question. He asked this Court to restore a trial court's right to
exercise discretion on this issue. He asked this Court to overrule <u>Jiminez</u>;
to hold that the theory underlying <u>Dalby</u> (before it was depublished) was
correct; to hold that a trial court has discretion to sentence either
concurrently or consecutively on multiple counts of §269/289(a) against a
single victim on multiple occasions; and to rule that he (Judge Schneider)
was incorrect when he believed himself without any discretion to sentence
concurrently.

Judge Schneider stated:

I hope, and I want to tell the appellate court and the Supreme
Court, if they review this case, that I hope you find that Dalby is
the law. If you don't find that Dalby is the law in the appellate
court or in the Supreme Court, I hope that you find that Dillon
applies to this case. I can't find it to be so at this level. But I
completely defer to you. And I want the appellate court to know
that I'm imposing this sentence of 75 years to life only because I
believe I have no other choice. (RT 447-448)

\* \* \*

---

[6]The probation department's initial recommendation was a sentence
of 33 years - life. (CT·208)

[7]De minimis.

I hope the appellate court makes a decision that as a matter of law I am wrong on this case and that the appellate court determines that the Dalby case is correctly decided, or they decide that the Dillon case does apply to these facts and sends it back to me so I can resentence the defendant to a lesser term that I think is appropriate, to a term that is consistent with the initial recommendation of the probation department. That reduced sentence would still be very, very severe. (RT 450)

Judge Schneider concluded:

I hope that I see this case again. Usually I do not say that. I hope this case is reversed on appeal and remanded back for further sentencing so that I can impose a just and appropriate lesser term. (RT 452)

**C. The Trial Court Erred in Sentencing Appellant Consecutively on Counts II-V; it Erred When it Ruled that it Had No Discretion as to Whether it Should Sentence Consecutively or Concurrently; the <u>Jiminez</u> Case, Which Judge Schneider Felt Obligated to Follow, Was Wrongly Decided**

Based on <u>Jiminez</u>, the trial court failed to exercise discretion in deciding whether to sentence consecutively or concurrently.

<u>Jiminez</u> was wrongly decided. A trial court should have discretion to sentence either concurrently or consecutively when multiple counts of Penal Code §269 are committed against the same victim on separate occasions.

**1.    The mandatory consecutive sentencing scheme under §667.6(d) does not apply to violations of Penal Code §269**

Penal Code §269 punishes sexual acts committed on a child who is under 14 years of age and ten years younger than the defendant. Sec. 269(b) provides for punishment for 15 years to life. Sec. 269 was adopted by the Legislature in 1994.

Penal Code §269 does not make any reference to mandatory

consecutive sentencing under §667.6(d), or under any other statute. Thus, under Penal Code §269, as under almost every other statute, the trial court should have the discretion to decide whether to sentence consecutively or concurrently. See, e.g., Rule 4.425.

There is a mandatory consecutive sentencing scheme under Penal Code §667.6(d). Under §667.6(d) a "full separate and consecutive term shall be served for each violation of" certain enumerated sexual offenses, including various subdivisions of §§220, 261, 262, 264, 288, and 289(a), "if the crimes involve separate victims, or involve the same victim on separate occasions." This provision substantially enhances the punishment for those crimes, which otherwise would be punished by determinate sentences of three, six, or eight years.

The crime of which Appellant was convicted, Penal Code §269, aggravated sexual assault of a child, is not included in the list of crimes for which §667.6(d) provides mandatory consecutive sentencing. Under the basic rule of statutory construction of <u>inclusio unius est exclusio alterius,</u> when the Legislature enumerates several crimes in a statute, but excludes others, the courts may not read into that statute the excluded crimes. <u>Grupe Dev. v. Superior Court</u> (1993) 4 Cal.4th 911, 921; <u>In re Lance W.</u> (1985) 37 Cal.3d 873, 888.

There are several reasons why the Legislature did not include Penal Code §269 in the list of the crimes in §667.6(d), which receive mandatory consecutive sentencing:

(1) Sec. 269 already carries its own extraordinary high sentence of 15 years to life. That is the same sentence imposed for second degree murder. The minimum sentence under §269, namely 15 years, is already two and one-half times longer than the ordinary midterm sentence provided for the crimes enumerated in §667.6(d), which sentences are 3-6-8 years.

(2) The maximum under §269 is a life top. Thus, the Legislature had no logical reason to impose mandatory consecutive sentencing on §269, because §269, by creating a life top, already imposed a huge increase over and above the 3-6-8 year sentencing triad.

(3) Sec. 269 carries a 15 year mandatory minimum, in addition to an indeterminate life top. Thus, the Legislature did not see any need to increase the penalty for §269 by imposing mandatory consecutive sentencing, (1) because the minimum penalty for that crime is already the highly enhanced term of 15 years; and (2) because the maximum penalty for a violation of §269 is the even more aggravated term of life in prison.

(4) The trial court always has discretion to sentence consecutively for multiple violations of §269 when it is warranted.

(5) A trial judge normally has discretion to choose among alternate sentences at each level of sentencing, and to choose between sentencing concurrently and consecutively. See Rule 4.425. There was no reason for the Legislature to diverge from this basic principle, or to take such discretion away from trial judges, (1) when §269 already imposed very severe sanctions for sex crimes against minors, and (2) when discretionary consecutive sentencing was already allowed.[8]

Thus, there were at least five logical reasons why the Legislature chose not to designate Penal Code §269 as one of the crimes requiring mandatory consecutive sentencing under §667.6(d) when that crime is committed against the same victim on multiple occasions.

---

[8]Subsequent to Appellant's trial, Penal Code §667.6 was amended twice, first, by the Legislature in September 2006, and second, by the voters in Proposition 83 in 2006. In neither instance was the statute amended to include Penal Code §669 in §667.6 as a crime warranting mandatory consecutive sentences. This further supports Appellant's argument that the Legislature did not intend such inclusion.

For all these reasons, because there is no statutory linkage between §269 and §667.6(d), and because of the doctrine of <u>inclusio unius est exclusio alterius,</u> the mandatory consecutive sentencing scheme in §667.6(d) does not include violations of §269.

Thus, although a trial court could exercise its discretion to sentence consecutively under §269, there is no statute that requires consecutive sentencing, or which restricts its discretion to sentence concurrently.

### 2. <u>Jiminez</u> was wrongly decided

There is one published opinion to the contrary. In <u>People v. Jiminez, supra,</u> 80 Cal.App.4th at 290, the Fifth District held that the mandatory consecutive sentencing scheme of §667.6(d) applied to §269, even though §269 is not included or listed in §667.6(d). <u>Jiminez</u> is poorly reasoned and should not be followed. The <u>Jiminez</u> court misanalyzed the issue. It improperly read into the list of enumerated offenses in §667.6(d) another section -- namely, §269 -- that just plain is not there. That interpretation violated the principle of <u>inclusio unius est exclusio alterius</u>.

The rationale of <u>Jiminez</u> is that §269 ought to get mandatory consecutive sentencing, because §667.6(d) includes some sex crimes which could qualify as lesser-included offenses of §269. That rationale is wrong. Many statutes listed in §667.6(d) are not necessarily included lesser offenses of §269. For example, a repeat violation of Penal Code §220 or a violation of §261(a), subsecs. (1), (4), and (5) or a violation of §288.5 (continuous sexual abuse) will trigger mandatory consecutive sentencing under §667.6(d), but will not violate §269. Accordingly, there fails to be any necessarily-included offense relationship between §§667.6(d) and §269. See <u>People v. Palmer</u> (2001) 86 Cal.App.4th 440, 445.

If the Legislature wanted to make consecutive sentencing under §269 mandatory, it would have placed such an explicit provision in either §269 or

in §667.6(d). Instead, it did not. An appellate court should not be rewriting a statute, so clear on its face, to say something other than what the Legislature said. People v. Crossdale (2002) 27 Cal.4th 408, 412 (court may not read one statute into another, merely because it might be logical to do so; Legislature knew how to incorporate one statute into another, but did not); People v. Palmer, supra, 86 Cal.App.4th at 446.

The Jiminez court deemed it "irrational" to suppose the Legislature intended to exclude those convicted of violating §269 from "the aggravated punishment prescribed by section 667.6" because of the aggravated circumstances of the crime." Jiminez, supra, 80 Cal.App.4th at p. 291. However, as the Jiminez court observed, the Legislature enacted §269 in 1994, 15 years after it adopted §667.6. (Stats. 1994, ch. 878, §1, p. 4434; Stats. 1979, ch. 944, §10, p. 3258.) The Legislature was then aware that §269(b) provides for an aggravated sentence of 15 years - life for each violation, and that §669 gave the trial court discretion to sentence on multiple violations either consecutively or concurrently. Given this sentencing scheme, it was fully logical, not "irrational," for the Legislature to exclude violations of §269 from the mandatory provisions of §667.6(d). There was no need to enhance what was already an enhanced sentence.

In People v. Jones (2001) 25 Cal.4th 98, 107 this Court held that statutes which impose indeterminate life sentences for sexual assaults should be limited to situations where both the language of the statute and the intent of the Legislature are clear. Here, to the contrary, neither the language of the statute, nor the intent of the statute, are clear that the mandatory consecutive sentencing in §667.6(d) includes §669. Thus, mandatory consecutive sentencing should not apply.

Jones was decided a year after Jiminez. The reasoning in Jones effectively supercedes Jiminez on this point.

For all these reasons, §269 may not be read into the list of statutes requiring mandatory consecutive sentencing under §667.6(d).

Finally, mandatory consecutive life sentences in a non-violent case like this violate due process, under the 5th Amendment, and violates the 8th Amendment's cruel and unusual punishment clause. <u>Solem v. Helm</u> (1983) 463 U. S. 277.

Accordingly, this case should be remanded for resentencing, so that the trial court may exercise its discretion.[9]

---

[9]The Court of Appeal affirmed by merely following <u>Jiminez</u>, without conducting independent analysis. (Slip op. 29-32) It improperly ignored this Court's limitation upon indeterminate life sentences for sexual assaults in <u>People v. Jones</u>, <u>supra</u>, 25 Cal.4th at 107.

## IV.

## SENTENCING APPELLANT TO A LIFE TERM FOR NON-VIOLENT DIGITAL PENETRATION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

Sentencing Appellant to 75 years to life for non-violent, digital penetration of one victim on multiple occasions constitutes cruel and unusual punishment. U. S. Const. 8th Amend.; Cal. Const., art I, §17. The subject acts were non-violent. The jury's determination that these acts were forcible was most likely based upon a finding of duress. However, that finding of duress was based on trivial hardships, such as Appellant telling Monica that he would not take her to the store. The trial court found that any force was "*de minimis*."

This punishment "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." In re Lynch (1972) 8 Cal.3d 410, 424. Solem v. Helm (1983) 463 U.S. 277; Accord: Lockyer v. Andrade (2003) ____ U.S. ____, 123 S.Ct. 1166, 155 L.Ed.2d 194.

Appellant had no prior criminal record. He was working two jobs to support his family. He submitted more than 20 letters of support at sentencing. (CT 220-258) Those letters described Appellant as a highly respected member of his community and church, and a good father and provider to his family. (CT 220-258)

Even if Appellant no longer qualifies as the ideal parental figure for his daughter, he still remains an important figure for his natural son, Adam, aged 10, who will suffer the worst from the absence of a father.

From the very beginning, Appellant expressed remorse. He wrote letters of apology to both Monica and Adam. His lack of criminal record, his history as a productive member of society, and his sincere remorse all militate for more lenient punishment.

The penalty here is cruel and unusual in still another way. The California statutory scheme as interpreted here did not allow for any judicial discretion at all in sentencing.

The trial judge stated that, if he had discretion to sentence concurrently, he would do so, and sentence Appellant thereunder to 30 - life. Such term would leave Appellant severely punished, but would not punish his family forever, as the current 75 - life term does.

The trial judge also made an explicit plea to this Court to rule that the effect of this mandatory consecutive sentencing constituted cruel and unusual punishment under People v. Dillon (1983) 34 Cal.3d 441.

> I hope, and I want to tell the appellate court and the Supreme Court, if they review this case, that I hope you find that Dalby is the law. If you don't find that Dalby is the law in the appellate court or in the Supreme Court, I hope that you find that Dillon applies to this case. I can't find it to be so at this level. (RT 447)

WHEREFORE, Appellant prays that review be granted.

DATE: February 16, 2007

Respectfully submitted,

STEPHEN B. BEDRICK
Attorney for Appellant

## Certification of Word Count

I certify that, according to our computer's word count, the text of this Petition for Review is 8,187 words.

DATED: February 16, 2007

 

 

 

STEPHEN B. BEDRICK
Attorney for Appellant

**APPENDIX A**

**COPY**

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.

**FILED**

JAN 26 2007

MICHAEL J. YERLY, Clerk

By _____ DEPUTY

| | |
|---|---|
| THE PEOPLE, | H029494 |
| Plaintiff and Respondent, | (Santa Clara County Super.Ct.No. EE504139) |
| v. | |
| ROGELIO MIRANDA, | |
| Defendant and Appellant. | |

Defendant Rogelio Miranda was charged with nine sex crimes involving his preteen daughter, M., that were alleged to have occurred over a time span of nearly four years. The information charged him with one count of a lewd and lascivious act on a child under the age of 14 (Pen. Code, § 288, subd. (a));[1] four counts of forcible lewd and lascivious acts on a child under the age of 14 (§ 288, subd. (b)(1)); and four counts of aggravated sexual assault on a child under the age of 14 by forcible foreign object penetration (§§ 269, 289, subd. (a)(1)). Defendant was convicted after a jury trial of all nine charges. He was sentenced to a total prison term of 75 years to life (15 years determinate, plus 60 years to life indeterminate).

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

Defendant claims that the convictions for forcible foreign object penetration and forcible lewd acts cannot stand because there was insufficient evidence to support the jury's finding of "duress" for those convictions, and the court erroneously permitted the jury to base that finding on an incorrect legal standard. He makes a separate sufficiency-of-the-evidence argument as to the count 5 conviction (§§ 269, 289, subd. (a)(1)). Defendant also argues that there was prosecutorial misconduct because (1) the deputy district attorney repeatedly argued that the jury need not reach a unanimous decision as to any specific incident underlying counts 3 through 5 (§§ 269, 289, subd. (a)(1)), and counts 7 through 9 (§ 288, subd. (b)(1); and (2) the prosecution "overcharged" the case in order to obtain an allegedly excessive sentence of 75 years to life, where the victim and the victim's mother repeatedly requested a much lower sentence. He contends that the court erred by imposing consecutive sentences on the four convictions for forcible foreign object penetration; that sentencing (defendant argues) was based upon the erroneous assumption that the court was required to impose consecutive sentences and had no discretion to impose concurrent sentencing. Finally, defendant asserts that the cumulative sentence imposed by the trial court constituted cruel and unusual punishment under the federal and state constitutions.

We conclude that there was no error. We will therefore affirm the judgment.

## FACTS

We present a summary of the evidence from the trial utilizing the applicable standard. We resolve factual conflicts in support of the verdict. (*People v. Holt* (1997) 15 Cal.4th 619, 667-668.)

    I.    *Prosecution Evidence*

        A.    *Testimony of R. Miranda*

R. Miranda and defendant have been married since 1992. They have a daughter, M., and a son, who is younger than his sister. Defendant is 24 years older than his daughter and is more than one foot taller than she. Although R. Miranda was primarily

2

the parent who punished the two children, defendant was also involved in disciplining them. He would discipline M. by not letting her sleep at the house of R. Miranda's aunt or by not letting M. go out.

When M. was six, she told her mother that defendant "had touched her bottom." R. Miranda confronted defendant; he denied it, and said that if he had touched her, it had been an accident as a result of horseplay. M. had no further complaints about defendant's behavior until 2005.

In the early evening on February 20, 2005, M. (then 11) told her mother that defendant had been touching her vagina. (M., who was crying at the time, pointed to her vagina rather than actually stating that defendant had touched her vagina.) R. Miranda asked if M. was sure, and she responded, " 'Yes, he's been doing it a lot.' "[2] The conversation took place in the bathroom at the community church the family attended. R. Miranda then told her aunt (Esther[3]) and sister-in-law (Elena) that M. had reported that defendant had molested her.

That evening, R. Miranda and defendant went to the home of Esther and her husband. The four of them, along with the pastor of the church (Walter Fernandez), sat around a table. R. Miranda asked her husband if he had been "touching [M.'s] private parts in the front." Defendant at first shook his head. Afterward, "[h]e said, '[Y]es,' and then said 'I'm glad it's over.' " He later said he was also tired of the marriage. Defendant then got up to leave; R. Miranda followed him out and told him to pack up his things and leave the home.

---

[2] Quotation marks do not appear in the reporter's transcript. For the sake of clarity, we add single quotations here and in other portions of the recitation of facts where we believe it to be clear that the witness was quoting another person's statement.

[3] We refer to several of the witnesses by their first names as a matter of convenience and not out of a lack of respect. (See *People v. Farrow* (1993) 13 Cal.App.4th 1606, 1609, fn. 1.)

. Later that evening, R. Miranda called her husband. During the conversation, defendant said "that he never used his penis thing on [M.]. It was just his fingers" that he put in M.'s vagina. R. Miranda asked him to come back to Esther's house because defendant's parents were coming over. She did this "[s]o they wouldn't think that it was just our story." Defendant complied; during his second visit, defendant's parents, sister, brother, and sister-in-law were also present. Defendant was crying and apologizing to his family for having "sham[ed] them for what he had done." He said that he had not penetrated M.'s vagina with his penis, but only with his fingers.

When R. Miranda returned to the home the next day, she found a letter in defendant's handwriting, signed by him, written partially in English and partially in Spanish. R. Miranda testified that the letter read: "I want you to forgive me, [M.], for overabusing your . . . person . . . . [¶] . . . [¶] And that may God forgive me for all the damage that I've made you suffer. And I have lots of problems with myself that I have to fix. Forgive me. I know that I'm not going to see you very much. Still I love you even though I haven't been a good father because I did not know how to value my family. Forgive me, [M.] and [Son], . . . [Son], I love you very much. . . . Forgive me, [R. Miranda], . . . and I hope that one day you will forgive me for all this damage. I need a place of rehabilitation . . . for myself."

B.    *Testimony of M.*

M. was 12 years old at the time of trial in July 2005. She was born in the spring of 1993. As of the time of trial, she was about to enter the seventh grade.

Her father was mostly responsible for punishments around the house. If M. did something bad, he would send her to her room. If she "did something really, really, really bad, then he would" spank her with a belt or a sandal.

When M. was six years old, defendant rubbed her bottom over her clothes. At first, M. thought "that he was just, like, playing around or something." Later, she became scared because "he started getting serious" rubbing her bottom underneath her clothes

4

every day. She told her mother; her mother later told M. that it had possibly been an accident and that defendant had said that he wouldn't do it again. After one or two days, defendant started touching M.'s bottom again.

When M. was in the fourth grade, her father "started putting his finger around [her] vagina." Initially, he tried but could not put his finger inside of her. It hurt sometimes. On other occasions while M. was in the fourth grade, defendant stuck his finger in her vagina. M. would try to get away, "but sometimes [she] couldn't because he would just grab [her] leg or something." When M. tried to stop her father from taking her pants down, "he would still . . . grab [her] leg or something. . . ." (M. testified on more than one occasion that her father is stronger than she.) M. was scared when defendant did this because she thought that if she told her mother, she wouldn't believe her.

M. was not afraid of her father all of the time, but was scared of him when he molested her. Sometimes M. would tell defendant that she "didn't want to, but he would say, like, if that he didn't he would just say something like I can't, like, do something. Like he wouldn't . . . take me somewhere, like where I have to go or . . . to church, like to practice to sing, he would say, 'I won't take you there' or something. . . . [¶] . . . [¶] 'I won't take you' somewhere. And that I really liked singing."

On some occasions, M. would be in her parents' bedroom watching television. Defendant would come into the room, grab M.'s leg "so his hand could reach [her] butt." He would unbutton M.'s clothes and pull them off and then "rub[ her] butt and . . . start touching her vagina." Defendant would hide what he was doing by covering them both with a blanket. The molestations occurred more than once a week while M. was in the fourth grade.

When M. was in the fifth grade, defendant was still putting his finger in M.'s vagina, and it still hurt. Defendant would still take down M.'s pants and would say that "he wouldn't let [M.] go places" if she didn't comply. On occasion, M. would try to get away from defendant. "[S]ometimes [she] would just go in [her] room, but then at night

he would just go in." When M. tried to leave, he would grab her legs to keep her from getting off the bed. M. also tried to keep her father from putting his finger in her vagina by closing her legs. M. testified that after she did this, "Well, I think he would put 'em apart again [with his hands]."

Defendant "started putting [M.] on top of him" while she was in the fifth grade. Defendant would lie on the bed. He would have her pants and underwear off, and his pants would also be off (but his underwear would be on). She could feel defendant's erect penis against her body. (M. testified that she felt defendant's penis "on my ovaries." She clarified that she felt him against the bone above her vagina.) Defendant would hug M. tight and would move her body against his. This would happen twice a week every week.

During the sixth grade, defendant continued to pull down M.'s pants and put his finger inside her vagina on multiple occasions. When he did this, he still told M. that she wouldn't get to do something if she refused. Specifically, on February 18, 2005 (two days before she told her mother that she was being molested), defendant took M.'s pants off. (She tried to stop him from pulling her pants down but he overpowered her.) He then put his finger inside her vagina; he could not put his finger all the way inside because it hurt M.

On the afternoon of February 20, 2005, while M. lay on the couch and her mother was at the corner of the couch, defendant came home from work. He covered M. with a jacket or blanket and then put his hands under M. shirt and bra and touched her breast. M. did not tell her mother about the incident when it happened because she was afraid that her father would physically hurt her. But M. "felt freaked out [and she] just decided to tell [her] mom again one more time. If she d[id]n't believe [her], then [M. was] just going to tell [her] aunt or someone else." She was worried that her father's conduct was getting worse. Thus, after church that evening, M. told her mother while they were in the bathroom that defendant "was just touching around [her], like, in [her] vagina and chest,

6

and then that he was rubbing [her] butt." M. cried and thought that her mother would not believe her, but her mother did believe her.

C.    *Testimony of Esther*

Esther is R. Miranda's aunt. On February 20, 2005, she had a conversation with her niece in the bathroom of the Community Church that they both attend. R. Miranda told her that defendant had been "touching [M.] sexually." Esther invited Walter Fernandez, the pastor of the church, to attend a family gathering at her home that evening to discuss the issue. During the family gathering, defendant admitted that he had molested his daughter and "he asked for forgiveness; . . . he was repentant or sorry for having done it." He began to cry. Defendant said that M. had the courage to say that she had been molested, but "that he had never had the courage to say that he had been violated when he was a boy."

D.    *Testimony of Detective Terry Schillinger*

Detective Terry Schillinger, a police investigator with the Sunnyvale Department of Public Safety, interviewed defendant on the afternoon of February 22, 2005. The interview was audiotaped. At the beginning of the interview, defendant was advised of his *Miranda* rights.[4]

Defendant admitted that he began touching "[M.'s] butt" when she was about six. He knew what he was doing was wrong. M. told defendant's wife, and he stopped the activity for about two years.

When M. was about eight years old, defendant began touching her again. He admitted that in the past three years, he had put his finger inside M.'s vagina "[m]aybe twice on the month." Sometimes (maybe 50 percent of the time) he would masturbate with one hand while he touched M.'s genitals with his other hand. He denied that he had

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

ever placed M. on top of him so that her pelvis would be against his pelvis, or that he ever rubbed his penis against her.

On the Friday of the week before the interview (i.e., February 18, 2005), defendant took off M.'s underwear and inserted his finger in her vagina. M. did not say that she did not want to be touched; "[s]he just cried and cried." Defendant got an erection.

Defendant also admitted that he placed his hands on M.'s bare breasts on the Sunday before the interview (i.e., February 20, 2005). He did this for sexual reasons—because it was exciting to him.

He wrote a note that he left for his wife. He apologized to M. because he was sorry that he had touched her.

E.    *Testimony of Walter Fernandez*

Walter Fernandez is a general contractor and volunteer pastor at the Community Church in Santa Clara. On the evening of February 20, 2005, he went to Esther's home because she requested that he be there for an important meeting. R. Miranda asked defendant why he had hurt M. He initially did not respond. R. Miranda "was pushing him saying, 'How come you did this to . . . your own daughter?' " She said that they could not live with him and he had to leave the house. Defendant said that he was tired of the relationship and then left.

Later that evening, defendant returned to Esther's home. His parents and other family members arrived separately. Fernandez heard defendant crying in the other room with his family members. Defendant then came into the room and sat at the table with his head down most of the time. Both R. Miranda and defendant's brother, Carlos, asked defendant, in effect, "How could he have done this to his daughter?" In response, defendant told his parents that he had failed them. He then said that he did not penetrate M. with his penis; the he just used his fingers.

8

After speaking with the senior pastor the next day, Fernandez determined that he needed to report the matter to the police. He reported the matter to the Sunnyvale Department of Public Safety.

## II.    *Defense Evidence*

### A.    *Testimony of Elena*

Elena is defendant's sister-in-law. On February 20, 2005, she observed Esther, R. Miranda, and M. in the church bathroom; M. was crying. When Elena asked why M. was crying, R. Miranda responded that "[defendant] was being abusive to her." No one told her that the abuse was sexual in nature.

Later that evening, Elena attended a family meeting at Esther's home. Elena did not hear what had happened to M. R. Miranda said that defendant had to leave the home. Defendant did not admit that he had in any way abused M. Elena had never observed any difficulties between defendant and his daughter.[5]

### B.    *Testimony of Julia*

Julia is defendant's mother. She frequently saw her son and M. together and never observed any problems between them.

Julia and her husband attended a family meeting at Esther's house at the request of her other son, Carlos. Defendant was crying but she did not understand why he was doing this. R. Miranda said that she and the children would be going to Texas for a while

---

[5] Carlos, defendant's younger brother, similarly testified that he never observed any problems between his brother and M. During the meeting at Esther's home, Carlos heard R. Miranda express concern about how she was going to be supported financially. The general topic of conversation during the family meeting was money, and Carlos did not hear anyone say what defendant had done to M. But he suspected there was an issue of sexual abuse because Esther said defendant "might have touched . . . his daughter."

and that defendant would be sending her money. After the meeting, Julia was informed by Carlos that there was an accusation that defendant had abused M.[6]

## PROCEDURAL BACKGROUND

Defendant was charged by information with nine counts. In count 1, it was alleged that on February 20, 2005, defendant violated section 288, subdivision (a) (lewd and lascivious acts on a child under the age of 14).[7] The information charged defendant with four counts of aggravated sexual assault on a child under the age of 14 (§ 269)[8] by forcible foreign object penetration (§ 289, subd. (a)(1)),[9] specifically as follows:

---

[6] Although Julia testified that she did not understand until after the meeting that there was an allegation of sexual abuse, she testified (somewhat contradictorily) that during the meeting, in response to Esther accusing defendant of molestation, he denied penetrating and violating M. Julia's husband (defendant's stepfather), Andres, and defendant's half-sister, Carmen, similarly testified that they observed that defendant had a fine relationship with M. and that there were never any problems. Andres confirmed that during the family meeting on February 20, 2005, R. Miranda said that she would be taking the children to Texas and that defendant would continue to work to support them. Andres testified that R. Miranda said something "very light" about M. having complained that defendant had touched her inappropriately. Defendant did not say anything, but he was crying.

[7] "Any person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years." (§ 288, subd. (a).)

[8] "Any person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child: [¶] . . . [¶] (5) Sexual penetration, in violation of subdivision (a) of Section 289." (§ 269, subd. (a).)

[9] "Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years." (§ 289, subd. (a)(1).)

10

occurring on February 18, 2005 (count 2); occurring between April 27, 2004, and February 17, 2005 (count 3); occurring between April 27, 2003, and April 26, 2004 (count 4); and occurring between April 27, 2002, and April 26, 2003 (count 5). Lastly, defendant was charged with four counts of forcible lewd and lascivious acts on a child under the age of 14 (§ 288, subd. (b)(1)),[10] specifically as follows: occurring between April 27, 2001, and April 26, 2002 (count 6); occurring between April 27, 2004, and February 27, 2005 (count 7); occurring between April 27, 2004, and February 17, 2005 (count 8); and occurring between April 27, 2004, and February 17, 2005 (count 9).

Following a trial by jury, defendant was convicted of all nine counts charged in the information. On October 20, 2005, the court sentenced defendant to a total aggregate term of 75 years to life. It imposed separate three-year determinate terms for the convictions in counts 1, 6, 7, 8, and 9, aggregated to a total determinate term of 15 years. The court sentenced defendant further to separate, consecutive indeterminate terms of 15 years to life for the convictions in counts 2, 3, 4, and 5, for a total indeterminate term of 60 years to life. Defendant filed a timely notice of appeal from the judgment.

## DISCUSSION

I.    *Contentions On Appeal*

Defendant asserts six challenges to the judgment. These claims of error are as follows:

1.    The four convictions (counts 2 through 5) for violating section 269, based upon aggravated sexual assault (forcible object penetration under § 289, subd. (a)(1)), and the four convictions (counts 6 through 9) for violating section 288, subdivision (b) must be reversed. Each conviction was based upon an erroneous submission to the jury,

---

[10] "Any person who commits an act described in subdivision (a) [see fn. 7, *ante*] by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years." (§ 288, subd. (b)(1).)

11

because (a) there was insufficient evidence as a matter of law that the charged sex crimes were committed through "duress," and (b) the court gave an erroneous definition of "duress" in its instructions to the jury.

2.     Defendant was denied a fair trial because the prosecution argued repeatedly that the jury need not agree unanimously that defendant committed the same unlawful act at the same time to convict him of the crimes charged in counts 3 through 5, and counts 7 through 9.

3.     There was insufficient evidence to support the conviction for violating section 269 (based upon forcible foreign object penetration, § 289, subd. (a)(1) [count 5]) because there was no evidence that defendant committed such act during the charged time period (April 27, 2002, to April 26, 2003).

4.     The prosecution was guilty of misconduct in taking extraordinarily harsh positions in the charging of crimes, plea bargain attempts, and in sentencing.

5.     The trial court erred by imposing a consecutive sentence for the four convictions under section 269; it imposed this sentence based upon the erroneous belief that it had no discretion under former section 667.6, subdivision (d) (§ 667.6(d)), and it therefore incorrectly concluded that it was required to run the sentence for each conviction consecutively.

6.     The sentence imposed on defendant for the nine convictions constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and California Constitution, article I, section 17.

II.     *Evidence Of Duress Supporting The Convictions Of Forcible Sex Crimes*

A.     *Contentions of the Parties*

Defendant was charged and convicted in counts 2 through 5 with aggravated sexual assault on a child under the age of 14 by forcible foreign object penetration (§§ 269, 289, subd. (a)(1)).  By statutory definition, the predicate crime of violating section 289, subdivision (a)(1) required proof that defendant committed the act of sexual

12

penetration with a foreign object "against the victim's will by means of force, violence,
duress, menace, or fear of immediate and unlawful bodily injury . . . ." Similarly,
defendant was charged and convicted in counts 6 through 9 with forcible lewd conduct in
violation of section 288, subdivision (b)(1), which required proof that the lewd acts
committed upon the child were done "by use of force, violence, duress, menace, or fear
of immediate and unlawful bodily injury on the victim . . . ."

Defendant contends that there was insufficient evidence as a matter of law to
support the conclusion that any of the crimes charged in counts 2 through 9 were
committed by means of duress. He argues further that there was only slight evidence that
any of the crimes were committed by use of force—where "force" is defined as the
"defendant us[ing] physical force substantially different from or substantially greater than
that necessary to accomplish the lewd act itself." (*People v. Cicero* (1984) 157
Cal.App.3d 465, 474.) The prosecution (defendant argues) submitted the case to the jury
on alternative theories that the crimes charged in counts 2 through 9 were accomplished
by means of force *or* duress. Duress required to support a forcible lewd act on a child
conviction (§ 288, subd. (b)(1)) is defined as "a direct or implied threat of force, violence,
danger, hardship or retribution sufficient to coerce a reasonable person of ordinary
susceptibilities to . . . perform an act which otherwise would not have been performed
or . . . acquiesce in an act to which one otherwise would not have submitted." (*People v.
Pitmon* (1985) 170 Cal.App.3d 38, 50, fn. omitted (*Pitmon*); see also CALCRIM. Nos.
1045, 1111 (2006); CALJIC Nos. 10.30, 10.42 (2005 revision).) Focusing on the
"hardship" aspect of duress, defendant contends that there was insufficient evidence of
hardship to support a trier of fact's conclusion that any of the charged sex crimes were
accomplished by means of duress. Therefore (defendant urges), since it cannot be
determined whether the jury's guilty verdicts as to counts 2 through 9 were based upon

13

findings that the crimes were accomplished by means of force or, alternatively, duress, the convictions must be reversed.[11]

The Attorney General responds that there was substantial evidence of duress here. When the court views the evidence based upon the totality of the circumstances—which includes a review of matters *other than* threats of hardship—it is clear that a rational trier of fact could have readily concluded that the sex crimes charged in counts 2 through 9 were accomplished by means of duress.

B.    *Standard of Review*

In addressing appellate claims of insufficiency of the evidence,[12] our role "is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Id.* at p. 576; see also *People v. Iniguez* (1994) 7 Cal.4th 847, 854.) In conducting this review, we give due deference to the trier of fact in assessing the credibility of witnesses, "and [do] not substitute [our] evaluation of a witness's credibility for that of the fact-finder. [Citations.]" (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304.) "In reviewing the evidence, our perspective favors the judgment. [Citation.]" (*People v. Matian* (1995) 35 Cal.App.4th 480, 484.)

---

[11] Other related appellate arguments made by defendant challenging the convictions on counts 2 through 9 are identified and addressed in this part, section D, *post.*

[12] This standard of review is equally applicable to our discussion (see pt. IV, *post*) of defendant's contention that there was insufficient evidence to support the count 5 conviction.

But as defendant points out, our review is of the *entire* record, not simply that of the evidence the People point to as supporting the guilty verdict. "The court does not . . . limit its review to the evidence favorable to the respondent. . . . '[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "Not every surface conflict of evidence remains substantial in the light of other facts." ' [Citation.]" (*People v. Johnson, supra*, 26 Cal.3d at p. 577, quoting *People v. Bassett* (1968) 69 Cal.2d 122, 138.)

### C.    *Sufficient Evidence of Duress*

As noted above, duress under section 288, subdivision (b)(1), is defined as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to . . . perform an act which otherwise would not have been performed or . . . acquiesce in an act to which one otherwise would not have submitted." (*Pitmon, supra*, 170 Cal.App.3d at p. 50, fn. omitted.) Our Supreme Court approved of *Pitmon*'s definition of duress, recognizing that it had been consistently followed for almost two decades. (*People v. Leal* (2004) 33 Cal.4th 999, 1004-1005 (*Leal*).) The high court acknowledged that the definition applied not only to forcible lewd acts committed on children under 14 (§ 288, subd. (b)(1)), but also to aggravated sexual assaults on children under 14 (§ 269). (*Leal, supra*, at p. 1005.) And the trial court gave the jury the *Pitmon* definition in its instructions in connection with both the crimes charged in counts 2 through 5 (violation of § 269, subd. (a) by committing an act upon a child under 14 that violates § 289, subd. (a)(1)); and the crimes charged in counts 6 through 9 (violation of § 288, subd. (b)(1)). (See CALJIC Nos. 10.30, 10.42.)

15

We consider the totality of the circumstances in evaluating a sufficiency-of-the-evidence challenge to a finding of duress, "including the age of the victim, and [her] relationship to [the] defendant." (*Pitmon, supra,* 170 Cal.App.3d at p. 51.)[13] Other factors include the physical size disparity between the defendant and the victim that may contribute to the victim's sense of vulnerability. (*Ibid.*) As we have previously noted: "[D]uress involves psychological coercion. [Citation.] Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes." (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.) Physical control over the victim, even if it is insufficient to constitute "force"—meaning "force substantially different from or substantially greater than that necessary to accomplish the lewd act itself" (*People v. Cicero, supra,* 157 Cal.App.3d at p. 474)—may result in the creation of "duress." (*People v. Schulz, supra,* at p. 1005.) In addition, "the position of dominance and authority of the defendant and his continuous exploitations of the victim" (*People v. Cardenas* (1994) 21 Cal.App.4th 927, 940) are relevant factors in determining whether the sex crime was accomplished through duress. Other relevant circumstances may include threats to harm the victim, physically controlling a resisting victim, and threats of retribution if the victim reveals the molestation. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 14.)

In this case, defendant was the victim's father who resided in the home full-time; he was thus in a position of trust and authority. (See *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 238 ["long-standing relationship of trust" is factor that may be considered in support of finding of duress].) According to M.'s testimony, defendant was the principal disciplinarian; he punished M. for misbehavior by sending her to her room, or, in more extreme cases, by spanking her. Defendant was much stronger than M.

---

[13] This "totality of the circumstances" standard was included in the definition of "duress" given to the jury here.

16

And, of course, there were very significant age and size disparities between father and daughter, which, coupled with their familial relationship, established " 'the position of dominance and authority of . . . defendant . . . .' " (*People v. Schulz, supra*, 2 Cal.App.4th at p. 1005.)

Further, M. testified that on a number of occasions, she attempted to resist defendant's advances, but he overpowered her by, e.g., grabbing her leg or hugging her tightly while he held her on top of him. (See, e.g., *People v. Senior* (1992) 3 Cal.App.4th 765, 775 [the defendant's acts of physically controlling victim despite resistance "suggested that greater physical resistance would be answered with greater physical force"].) Moreover, we deem defendant's continuous conduct of molesting his daughter over a period of more than three years—coupled with M.'s earlier complaint to her mother that resulted in only a brief cessation of defendant's acts of touching her bottom—to be a significant factor supporting a finding of duress. (*People v. Superior Court (Kneip), supra*, 219 Cal.App.3d at p. 239 [the defendant's "position of dominance and authority . . . and his continuous exploitation of the victim" were relevant factors concerning duress].)

The above factors suggesting duress notwithstanding, defendant argues that the evidence did not establish "a direct or implied threat of . . . hardship . . . sufficient to coerce a reasonable person of ordinary susceptibilities to . . . perform an act which otherwise would not have been performed or . . . acquiesce in an act to which one otherwise would not have submitted." (*Pitmon, supra*, 170 Cal.App.3d at p. 50, fn. omitted.) Isolating M.'s testimony that defendant would occasionally tell her that he would not take her certain places, such as singing practice, if she did not submit to him, defendant contends that the trivial nature of these threatened losses did not constitute "hardships." It is true that these threats do not involve losses of a more serious nature, such as threats to send the victim " ' . . . to juvie, and [to send her] mom . . . out on the street' " (*People v. Bergschneider* (1989) 211 Cal.App.3d 144, 151, disapproved on

17

another ground in *People v. Griffin* (2004) 33 Cal.4th 1015, 1028); or warning the victim

that reporting the molestation may result in her parents' divorce (*People v. Cochran,*

*supra,* 103 Cal.App.4th at pp. 14-15; *People v. Senior, supra,* 3 Cal.App.4th at p. 775).

But we need not decide whether defendant's threats not to take M. places such as singing

practice constituted threats of "hardship" (as opposed to merely threats to deprive her of

minor conveniences). Here, based upon the totality of the circumstances described

above, there was sufficient evidence of duress to support the jury's guilty verdicts as to

the violations of sections 269 and 288, subdivision (b)(1). There was "evidence [that

was] reasonable, credible, and of solid value . . . [from which] a reasonable trier of fact

could [have found] the defendant guilty beyond a reasonable doubt." (*People v. Johnson,*

*supra,* 26 Cal.3d at p. 578.)

        D.    *Other Arguments re Duress*

Defendant also contends that the convictions for counts 2 through 9 must be

reversed because the court gave an erroneous instruction defining "duress." He argues

that the trial court—in giving CALJIC Nos. 10.30 and 10.42—twice defined "duress,"

without including the definition adopted by the Supreme Court in *Leal, supra,* 33

Cal.4th 999, requiring that the hardship be the result of "stringent compulsion."

Defendant argues further that since the court in *Leal* did not expressly decide this

instructional issue, it is an open question. We reject defendant's claim of instructional

error.[14]

As we have noted, the Supreme Court approved of the *Pitmon* court's definition of

duress, recognizing that it "ha[d] been followed consistently for almost 20 years.

[Citations.]" (*Leal, supra,* 33 Cal.4th at pp. 1004-1005.) And the challenged instructions

---

[14] The Attorney General argues that defendant forfeited this challenge by not
raising the issue of the impropriety of the duress definitional instruction below. But since
defense counsel did object to the court giving any instructions that defined "duress" as
including a threat of hardship, we will not treat the claim as having been forfeited.

(CALJIC Nos. 1030 and 10.42) directly follow the definition of duress enunciated by the court in *Pitmon*. Moreover, the Supreme Court rejected an amicus challenge that the inclusion of "hardship" in the definition of duress would result in vagueness, stating: "But the long application of the *Pitmon* definition has not demonstrated this to be the case. Only one published decision has applied the term 'hardship' in this context and no issue was raised that the term was vague." (*Leal, supra*, at p. 1009.) We reject defendant's claim that the court below gave an erroneous definition of "duress" by giving CALJIC Nos. 10.30 and 10.42.

Defendant also argues that *Leal*'s holding that duress includes, within the meaning of section 288, subdivision (b)(1)—as well as, inferentially, under section 289, subdivision (a)(1)—the threat of hardship "render[s] those statutes unconstitutionally vague under the due process clause in the 5th and 14th Amendments to the United States Constitution." Defendant relies on the dissenting opinion of Justice Kennard in *Leal, supra*, 33 Cal.4th at pages 1010-1014, in support of this contention. In asserting this position, defendant, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, acknowledges that the "argument is probably one which has to be considered by the Supreme Court in the first instance."

Six justices of the California Supreme Court in *Leal, supra*, 33 Cal.4th at pages 1009-1010, rejected an amicus challenge that the inclusion of "hardship" would render the definition of "duress" vague. We therefore reject defendant's constitutional claim. (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455 [decisions of California Supreme Court "are binding upon and must be followed by all the state courts of California"].)

III. *Claimed Prosecutorial Misconduct Regarding Unanimity Requirement*

A. *Contentions*

Defendant contends that the convictions of the offenses charged in counts 3 through 5, and counts 7 through 9, must be reversed due to prosecutorial misconduct. He

19

claims that the deputy district attorney in opening argument (quoted in detail, *post*) repeatedly told the jury that it need not reach a unanimous decision as to any specific incident charged in those six counts. Rather (defendant argues), the jury was told that it was sufficient if it agreed that at least one act was committed within each of the time periods charged, regardless of whether they agreed that the same act was committed at the same time. This improper argument was in contravention of defendant's right to receive a unanimous verdict. Defendant asserts that, while defense counsel below gave a proper argument regarding unanimity and the court gave the correct instruction on the subject, the prosecution's improper argument was prejudicial. He contends further that his trial counsel was ineffective because he failed to object to the argument.

The Attorney General naturally disputes these contentions. He first asserts that any claim of misconduct was forfeited because of defense counsel's failure to object below. But even if the appellate claim was not forfeited, there was no improper argument at all. Moreover, even were the prosecution's argument improper, it was harmless because any misunderstanding was cured by defense counsel's argument and the court's instructions concerning unanimity.

B.     *The Prosecution's Argument*

Defendant cites two portions of the record in support of his claim that the prosecution improperly advised the jury that it could disregard its obligation to reach a unanimous verdict. First, in the course of his argument, the deputy district attorney told the jury: "Count three, again, same crime as we just discussed in count two [violation of section 269 by forcible foreign object penetration in violation of section 289, subdivision (a)(1)], . . . but here what we're charging is a time period[] . . . from . . . April 27th, 2004 to February 17th, [2005], . . . And what do we know? Well, [M.] was telling you this was going on all the time. Almost every day. The defendant in his confession stated that he inserted his finger into his daughter's vagina at least two times a month. . . . This is going on all the time. . . . [¶] . . . [¶] Now, I charged a period of time. . . . [I]t's about

20

nine months, or it's a period of time here between April and February. And we know that this is happening at the very least two times a month. Probably believe [M.] that it's happening a lot more than that. [¶] Now, you don't have to agree on a specific date and time. You all don't have to agree that he did this on May 13th, and somebody else thinks that it happened on June 16th or something like that. There's no evidence of that. What you have to . . . agree upon, all 12 of you, is that between April 27th, 2004 and February 17th, 2005 that he did this at least once. [¶] There's an abundance of evidence that he did this at least once during that time period. That's what you have to agree upon to find the defendant guilty in count three. [¶] Count four, same thing. But what we're doing is we're going back the year before, between April 27th, 2003, . . . to April 26th, 2004. Again, same acts. She testified that this has been going on since she entered the fourth grade. [¶] . . . [¶] And again, . . . this has been going on, and all you have to agree upon is that . . . [o]ne time that year this guy put his finger in his daughter's vagina to arouse his own sexual passions and he did that against her will and with force, duress, or fear. . . ."

Second, the deputy district attorney made the following comments later in his opening argument which defendant now contends were improper: "The lewd or lascivious act on a child by force, violence, duress, menace, or fear again. You can take this again as the butt grabbing or the grinding that [M.] talked about. But you have to agree amongst yourselves on which it is. You don't have to tell us,[15] but [for the offense charged in count 7] between the dates of . . . April [27,] 2004 to February . . . 17th, 2005, that on at least one occasion the defendant either grabbed her butt, or as [M.] described, pulled her on top of him—[¶] . . .[¶] . . . Again, you just have to believe that on some occasion the defendant grabbed her butt, and he talks about doing it twice a week during

---

[15] The prosecution made the identical argument a short time later with respect to count 8, namely, that the jury needed to agree whether it was "the butt grabbing or grinding" that occurred.

that period of time, or the grinding that [M.] described where he picks her up and puts her on top of him and begins rubbing her back and forth against him and holding her while this is going on. . . ."

C.    *Discussion*

We initially address the Attorney General's forfeiture argument. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; see also *People v. Hill* (1998) 17 Cal.4th 800, 820.) Based upon this principle, the failure of defense counsel below to object to object to the prosecution's argument—assuming arguendo that it constituted an improper appeal for the jury to disregard its unanimity obligations— forfeited the claim on appeal. (See *People v. Pugh* (2002) 104 Cal.App.4th 66, 74 [failure to object to prosecution's misstatement of law in argument forfeited appellate challenge].)

In an attempt to avoid the effect of this court finding the claim forfeited, defendant argues further that his trial counsel rendered ineffective assistance by failing to object to the deputy district attorney's argument. Defendant asserts that "there could not have been any valid trial strategy for trial counsel to [have] refrain[ed] from protecting [defendant] from such argument."

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v.*

22

*Washington* (1984) 466 U.S. 668.) " 'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter.' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 656.) We reject defendant's ineffective assistance claim. We conclude (1) that counsel's performance was not deficient, and (2) that there was in any event no prejudice.

A reviewing court examining trial counsel's conduct in the face of an ineffective assistance claim "must in hindsight give great deference to counsel's tactical decisions. [Citation.]" (*People v. Holt, supra,* 15 Cal.4th 619, 703.) An ineffective assistance claim will be rejected on appeal unless there is a showing that there was no rational explanation for defense counsel's act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 442; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1058.) And with respect to issues of alleged prosecutorial misconduct, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance. [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 419; see also *People v. Dickey* (2005) 35 Cal.4th 884, 914.) This is not one of those rare cases.

Here, we agree that one interpretation of the first argument of the prosecution quoted above was that the jury need only agree that defendant committed the act of forcible digital penetration within the time periods charged in counts 3 and 4, but need not reach consensus as to when defendant committed that act within those time periods. Under this interpretation, for instance, the jury could have found defendant guilty of the crime charged in count 3, even if some jurors concluded that the forcible digital penetration occurred at the beginning of the charged time period (e.g., April 8, 2004), while others found that the act occurred at the end of the time period (e.g., February 16, 2005). But another plausible interpretation of the quoted argument was that the prosecution was not negating the jury's unanimity obligations. Rather, in the context of the information charging that certain crimes were committed within broad time periods, the prosecution was simply explaining to the jury that it need not ascertain the precise

23

two dates within the respective charged time periods of counts 3 and 4 that defendant committed the two acts of forcible digital penetration, as long as all members of the jury agreed that the acts were committed within the relevant time periods. The same alternative objectionable and benign interpretations apply to the second quoted argument concerning the forcible lewd act counts.

Accordingly, this was not a case in which there was no rational explanation for defense counsel's failure to object to the prosecution's argument. Defense counsel might have reasonably concluded that the argument was proper, or, at worst, ambiguous. He may have felt that he could best address any ambiguity in his own closing argument. In fact, defense counsel did correctly explain the unanimity requirement to the jury in his closing. (See fn. 16, *post*.) In short, we do not find that defense counsel was deficient in failing to object.

Moreover, even assuming that defense counsel was deficient, defendant has not established prejudice. The trial court appropriately instructed the jury (under CALJIC Nos. 17.01 and 17.02) that it was required to find unanimously that defendant committed the specific act charged for each count in order to return a guilty verdict as to that count. And defendant's trial counsel ably explained to the jury—after the deputy district attorney made the argument defendant now claims to have been improper—that each of its verdicts required unanimity.[16] Accordingly, even assuming counsel was deficient (a

---

[16] Defense counsel argued in part: "One other point has to do with a what's called unanimity instruction. And the court will read this instruction to you, . . . [¶] . . . [¶] . . . Count one . . . [and c]ount two [were each] alleged to have occurred on a specific date, and then we run into seven additional counts where basically we have nine-month or year-long periods during which the offense might have been committed. [¶] And it's true, you don't have to agree, well, we're all convinced that there was an act during that year that occurred and that it occurred on a particular date. Because . . . in almost any kind of case where time has gone by since the commission of the offense, there can be some . . . uncertainty about dates, . . . So it's true you don't have to agree that the particular act upon which you're basing a conviction as to a count occurred on some

(continued)

finding we do not make here), it is not reasonably probable that the result would have been different had there been an objection to the prosecution's argument.

We therefore reject defendant's contention that the convictions of the crimes charged in counts 3 through 5 and 7 through 9 must be reversed based upon alleged prosecutorial misconduct (either by direct appellate challenge or based upon defendant's related ineffective assistance claim).

IV.    *Sufficiency Of Evidence To Support Count 5 Conviction*

Apart from his challenge to each of the four convictions of violating section 269, defendant contends that there was insufficient evidence to support the count 5 conviction, namely, the violation of section 269 occurring when between April 27, 2002, and April 26, 2003. He claims that the victim testified that the acts of digital penetration began in the summer after the fourth grade (i.e., between June and August 2003). Moreover, defendant asserts that any admission he made to the police that the acts of digital penetration began during the time period charged in count 5 did not cure this evidentiary insufficiency, because, "under the time-honored *corpus delicti* doctrine, a crime cannot be proven upon the confession of the defendant, unless there is prima facie proof of the major elements of the crime from other sources." (Original underscore.)

The Attorney General disagrees. He contends that (a) there was sufficient evidence supporting the count 5 conviction, (b) defendant's argument involves a misinterpretation of the evidence, and (c) there was not a violation of the corpus delicti

---

particular date, but you all must agree on the same act.  [¶] What that means, for example, is, . . . Juror Number 1 says, ['W]ell, I'm sure he did something in January,['] and Juror Number 2 says [,'] I'm sure he did something in February,['] and Juror Number 3 says, ['] I'm sure he did something in March,['] et cetera, through the 12 jurors and 12 months, you can't base a conviction on the fact that you all agree he did something sometime. You have to all agree on the same act, and that may be a conundrum here because of the vagueness of time."

doctrine because the conviction was not based solely on defendant's extrajudicial statements.

As seen from the detailed discussion of the facts, *ante*, M. testified that defendant "started putting his finger around [her] vagina" when she was in the fourth grade. While her father was unsuccessful initially in inserting his finger inside of her, M. later testified that he did insert his finger in her vagina while she was in the fourth grade.

Defendant argues that M.'s testimony on redirect examination established that any acts of digital penetration did not commence until the summer of 2003. The quoted testimony relied upon by defendant reads: "Q. Okay. And when your dad began putting his finger in your vagina[,] . . . you were in the fourth grade, or was it— [¶] A. Fifth— I'm not sure. [¶] Q. Okay. I think you said fourth before. Is it fourth grade? [¶] A. Yes. Like in summer." This testimony is ambiguous. It is unclear whether M. was saying that the digital penetration began (1) while she was in the fourth grade (consistent with her testimony on direct examination, and during the period charged in count 5); (2) in the summer between the third and fourth grades (between June and August 2002); or (3) in the summer between the fourth and fifth grades (between June and August 2003). This ambiguity notwithstanding, there was sufficient evidence, based upon M.'s testimony on direct examination that the violation of section 269 (based upon acts of forcible digital penetration in violation of § 289, subd. (a)) commenced between April 27, 2002, and April 26, 2003. Accordingly, we reject defendant's challenge to the count 5 conviction, based as it is, not on an absence of substantial evidence, but rather on challenges to the credibility of, and supposed inconsistencies in, the testimony of the victim, M. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [appellate court will not address sufficiency-of-evidence challenges by assessing credibility issues or weighing evidentiary conflicts]; *People v. Mayberry* (1975) 15 Cal.3d 143, 150 [evidentiary "[c]onflicts and even testimony which is subject to justifiable suspicion" are not grounds

26

for reversal, since credibility matters are "exclusive province of the trial judge or jury"].)[17]

### V.     *Claim Of Prosecutorial Misconduct*

Defendant claims that the prosecution committed misconduct in "overcharging" the case, in refusing reasonable plea bargain offers from defense counsel, and in taking unreasonably harsh positions concerning sentencing. In essence, defendant argues that the prosecution took an extremely "hard line" position, notwithstanding alleged pleas for leniency from defendant's wife and his daughter, the victim.

In support of his position, defendant cites article I, section 28 of the California Constitution (i.e., the "Victims' Bill of Rights"), a panoply of statutes, and a rule of court. (See, e.g., §§ 679 [requiring that all crime victims be "treated with dignity, respect, courtesy, and sensitivity"], 1170, subd. (b) [giving victim or victim's family right to submit statement in mitigation or aggravation], 1191.1 [victim or parent may express views that shall be considered by court in sentencing], 1203.066, subd. (c)(2) [permitting probation in interests of child in sex crime cases involving children if accused is parent], 1203.067, subd. (a)(2) [requiring notice to victim and opportunity to be heard before probation granted to defendant convicted of child molestation], Cal. Rules of Court, rule 4.414(b)(5) [requiring sentencing court to consider "[t]he likely effect of imprisonment on the defendant and his or her dependents"].) But defendant cites no authority authorizing appellate courts to review for abuse of discretion—as defendant urges us to do here—prosecutorial decisions concerning the nature of the criminal charges filed, appropriateness of plea bargaining, or positions on sentencing. The absence of such citation of authority is telling.

---

[17] Because we find that there was sufficient evidence supporting the count 5 conviction based upon M.'s testimony, we necessarily reject defendant's contention that the conviction violated the corpus delicti doctrine.

"The parties to a criminal action are the People, in whose sovereign name it is prosecuted, and the person accused [citations]; the victim of the crime is not a party [citation]. The prosecution of criminal offenses on behalf of the People is the sole responsibility of the public prosecutor." (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 451.) Thus, "[t]he prosecutor ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek. [Citation.] No private citizen, however personally aggrieved, may institute criminal proceedings independently [citation], and the prosecutor's own discretion is not subject to judicial control at the behest of persons other than the accused. [Citations.] An individual exercise of prosecutorial discretion is presumed to be ' "legitimately founded on the complex considerations necessary for the effective and efficient administration of law enforcement. . . ." ' [Citations.]" (*Ibid.*) Furthermore, "[a] prosecutor is not subject to judicial supervision in determining what charges to bring and how to draft accusatory pleadings. [Citation.]" (*People v. Adams* (1974) 43 Cal.App.3d 697, 708.)

Appellate review of prosecutorial decision making as urged here by defendant would, we believe, violate the separation of powers clause of the California Constitution. (Cal. Const., art. III, § 3.) "[U]nder the doctrine of separation of powers, courts must scrupulously avoid interfering with the executive's prosecutorial function, including the exercise of its broad charging discretion. [Citations.]" (*People v. Cortes* (1999) 71 Cal.App.4th 62, 79, fn. omitted [rejecting contentions that prosecutor was guilty of discriminatory prosecution or abuse of charging discretion].) Nor is it apparent what standards would be utilized if such review were authorized. Indeed, were appellate courts required to review the discretion exercised by a prosecutor on the mere basis of a

28

defendant's claim of overzealousness, virtually every criminal case would be a potential target of such a challenge.  We reject defendant's claim of prosecutorial misconduct.[18]

VI.    *The Imposition Of Consecutive Sentences For The Section 269 Convictions*

      A.    *Background and Contentions*

The trial court imposed four consecutive terms of 15 years to life for the section 269 convictions (counts 2 through 5).  It did so reluctantly, based upon the view that it was precluded under former section 667.6(d), and *People v. Jimenez* (2000) 80 Cal.App.4th 286 (*Jimenez*), from exercising discretion in deciding whether to impose concurrent rather than consecutive terms for the convictions.  The sentencing judge noted: "As a lower court, . . . it's my obligation, whether I agree with the law or not, to follow binding authority from the Court of Appeal or the Supreme Court. . . .  [¶] . . . [¶] . . . [E]ven though I think it's . . . wrongly decided, I think I have to follow the *Jimenez* case.  And following the *Jimenez* case, which requires the mandatory full consecutive sentence for each of the [section] 269 violations, that means on counts [2 through 5] in this matter[,] I have no alternative but to impose four consecutive 15-to-life sentences for a total of 60 years to life on [those] counts."

Defendant contends that the court erred by concluding that it had no sentencing discretion and was required to impose four consecutive terms for the section 269 convictions.  Arguing that *Jimenez* was incorrectly decided, defendant urges this court to reject that decision of the Fifth District Court of Appeal.  He asserts that offenses punishable under section 269 were not among the sex crimes listed under former section 667.6(d), for which the court was required to impose consecutive terms.  Therefore, it would be improper to infer that the Legislature intended that trial courts have no

---

[18] Because there is no merit to defendant's contention that we must review the alleged zeal of the prosecution for abuse of discretion, we need not address the Attorney General's claim that there is no competent evidence in the record that the victim sought leniency in sentencing.

sentencing discretion to impose concurrent terms for offenses punishable under section 269.[19] The Attorney General disagrees, contending that *Jimenez* was correctly decided and is controlling.

>          B.    *Discussion*

Former section 667.6(d) provided in relevant part: "A full, separate, and consecutive term shall be served for each violation of . . . subdivision (a) of Section 289 . . . if the crimes involve separate victims or involve the same victim on separate occasions." (See Stat. 2002, ch. 787, § 16, amended by Initiative Measure (Prop. 83, § 11) Nov. 7, 2006.) Admittedly, while the statute enumerated a number of specific sex crime statutes for which mandatory consecutive sentencing applied, it did not include section 269. But section 667.6 was enacted in 1979, some 14 years prior to the enactment of section 269. Defendant argues that because the Legislature did not amend section 667.6(d) to expressly include section 269, the trial court is not required to impose consecutive terms where there are multiple convictions under section 269.

In *Jimenez, supra*, 80 Cal.App.4th 286, the Fifth District Court of Appeal rejected nearly the precise argument raised here by defendant.[20] The court there reasoned: "Section 667.6 and section 269 serve two different objectives. Subdivision (d) of section 667.6 aggravates sex offenses involving multiple victims or multiple offenses. It . . . provide[s] increased punishment for cases where defendant's culpability is increased by

---

[19] Defendant makes repeated reference to a case to which the trial court made reference that is not citable. (See *People v. Dalby* (2004) 123 Cal.App.4th 1083, review granted Feb. 16, 2005, S129810, and review dismissed and cause remanded Sept. 7, 2005.) Although the court in *Dalby* rejected the analysis of the *Jimenez* court, we of course do not consider *Dalby* here.

[20] Although the defendant's conviction under section 269 in *Jimenez* was based upon his committing sodomy [§ 286] on a minor, he argued similarly that the omission of section 269 from section 667.6(d) meant that multiple violations of section 269 were not subject to mandatory consecutive-term sentencing. (*Jimenez, supra*, 80 Cal.App.4th at p. 290.)

the 'number and violence of his crimes.' [Citation.] Section 269 . . . increases the

penalties for enumerated sexual offenses where the victim is under 14 years of age and

the perpetrator is more than 10 years older than the victim. Thus, the Legislature

intended to aggravate punishment for forcible sexual offenses where the defendant's

culpability is increased by a substantial age disparity. [¶] . . . [The defendant] makes too

much of this omission [of any reference to section 269 in section 667.6(d)], ignoring the

fact that violation of section 286 is one of the predicate offenses of section 269. . . . When

the jury found [the] defendant had violated section 269 under the circumstances presented

here, it necessarily found he had violated section 286 and he had done so by force or fear.

Thus, the factual predicate necessary to apply section 667.6, subdivision (d)[,] was

proved beyond a reasonable doubt." (*Id.* at p. 291.)

The *Jimenez* court reasoned further: "It would be irrational to suppose the

Legislature intended that criminals who commit multiple violent sexual offenses would

be exempt from the aggravated punishment prescribed by section 667.6 merely because

their victims happened to be children under age 14 who were 10 or more years younger

than they. [The d]efendant does not proffer any decisional or historical support for his

assertion that by enacting section 269 the Legislature created a separate sentencing

scheme for violent sexual offenders who prey on a particular class of victims. . . . [¶] In

sum, we agree with respondent that section 667.6, subdivision (d)[,] and section 269 are

cumulative, not alternative, to each other. [The d]efendant here was rightfully subject to

enhanced penalties for two different reasons, the first being the disparity in age and the

second being the multiplicity of offenses. . . ." (*Jimenez, supra,* 80 Cal.App.4th at

pp. 291-292.)

Here, like in *Jimenez*, the predicate offenses on which defendant's section 269

convictions were based were violations of section 289, subdivision (a)(1), a statute that

was expressly mentioned under former section 667.6(d). Moreover, former section

667.6(d) required separate term sentencing for multiple *violations* of section 289,

_31

subdivision (a); it did not base this requirement upon separate *convictions* under that statute. By its terms, section 269, subdivision (a)(5), requires the commission of a predicate offense, in this instance, "[a] violation of subdivision (a) of Section 289." We conclude under the terms of the statute and based upon *Jimenez* that each "violation" of section 289, subdivision (a), that served as the predicate offense for a conviction under section 269 carried mandatory separate sentencing under former section 667.6(d). The trial court therefore was required to impose separate consecutive terms for the four convictions under section 269. There was no sentencing error.

VII.   *Cruel And Unusual Punishment*

Defendant contends that "[s]entencing [him] to 75 years to [life] term for non-violent, digital penetration of one victim on multiple occasions violates the [federal and state] constitutional proscriptions against cruel and unusual punishment." He argues that, based upon his status (i.e., no prior criminal convictions, and his gainful employment supporting his family), the minimal force and hardship involved in the commission of the offenses, and the damage to his family as a result of the punishment imposed, the sentence constituted cruel and unusual punishment.

The Eighth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." (U.S. Const., 8th Amend.) Article 1, section 17, of the California Constitution likewise declares that "[c]ruel or unusual punishment may not be inflicted or excessive fines imposed." The state and federal prohibitions are not coextensive. (*People v. Anderson* (1972) 6 Cal.3d 628, 634.)

A punishment is cruel and unusual under the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173; see also *Ewing v. California* (2003) 538 U.S. 11, 21; *Lockyer v. Andrade* (2003) 538 U.S. 63, 72.) Cruel

32

and unusual punishment under this state's constitution occurs when a penalty is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) Thus, the federal constitution "affords no greater protection than the state Constitution." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)

Because a sentence that is constitutional under the California criteria for cruel and unusual punishment is also constitutional under the Eighth Amendment, we evaluate defendant's claim that his sentence constitutes cruel and unusual punishment under California Supreme Court authority. Our high court has identified three factors to be considered in this inquiry: (1) "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society" (*In re Lynch, supra,* 8 Cal.3d at p. 425); (2) a "compar[ison of] the challenged penalty with the punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious" (*id.* at p. 426); and (3) "a comparison of the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision" (*id.* at p. 427). The defendant bears the burden of establishing that the punishment prescribed for his offense is unconstitutional. (*People v. King* (1993) 16 Cal.App.4th 567, 572.)

Before reviewing defendant's challenge here based upon the three factors enunciated in *Lynch*, we note that although not expressly stated, defendant's argument may be construed as implicitly urging that the sentencing scheme under section 667.6 constitutes cruel and unusual punishment. That argument has been uniformly rejected. (See *People v. Karsai* (1982) 131 Cal.App.3d 224, 243, disapproved on another ground in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8 [sentencing scheme for violent sex offenders under section 667.6 did not constitute cruel and unusual punishment]; *People v. Belasco* (1981) 125 Cal.App.3d 974, 984 [sentencing under section 667.6, subd. (c), did not constitute cruel and unusual punishment]; *People v. Preciado* (1981) 116

33

Cal.App.3d 409, 412 [sentencing under section 667.6(d) did not constitute cruel and unusual punishment].)

Applying the first *Lynch* factor, in evaluating the offense, we look at "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People v. Dillon* (1983) 34 Cal.3d 441, 479.) As to the particular offender, we focus on "individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

Defendant emphasizes his lack of criminal record and his employment history. But factors such as a defendant's age, employment history, and lack of criminal record are not necessarily dispositive on the issue of whether the punishment for the specific crimes committed is cruel and unusual. (Cf. *People v. Alvarado* (2001) 87 Cal.App.4th 178, 200 [life term constitutional despite defendant's age, lack of record, remorse]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 528-532 [129-year term for multiple sexual offenses constitutional despite lack of prior record and mental impairment].)

Defendant's argument in part is based upon his contention that the convictions of the offenses charged in counts 2 through 9 were improper because there was no evidence that they were committed by means of duress. But as we have discussed at length (see pt. II sec. C, *ante*), there was abundant evidence of duress that supported the verdicts that defendant (1) violated section 269 (by forcible foreign object penetration in violation of § 289, subd. (a)(1)) on four occasions (counts 2 through 5), and (2) violated section 288, subdivision (b) on four occasions (counts 6 through 9).

Further, while focusing on his background and the number of letters written on his behalf in support of lenient sentencing, defendant attempts to minimize the severity of the crimes of which he was convicted. His arguments and attempted misdirection ignore the fact that he was accused and convicted of nine serious sex offenses involving his young

34

daughter that occurred over a period of nearly four years. In committing these offenses, defendant took advantage of his authority and his superior size to inflict the harm upon his young daughter for his own personal gratification. His cruel and unusual punishment claim disregards the fact that M. complained about his lewd acts when she was only six years old; defendant denied any wrongdoing at the time and only briefly suspended his illegal conduct. Defendant also ignores the evidence that he committed these crimes repeatedly despite his daughter's resistance to the molestations. And he ignores the potential long-term emotional and psychological damage that may result from repeated sexual offenses committed against young children by trusted adult members of their own family. Defendant himself admitted to the police that he was unable to control himself. Thus, the court could readily conclude, based, inter alia, upon the seriousness of the crimes and his history of deviant behavior over a lengthy period, that defendant posed a substantial danger to children in society (both his own and others).

Defendant's position is also not supported when we apply the second *Lynch* prong. Convictions for multiple sexual offenses can result in sentences that could not possibly be served in a human lifetime. Yet such sentences are routinely upheld when challenged as unconstitutionally disproportionate. (See, e.g., *People v. Wallace* (1993) 14 Cal.App.4th 651, 666 [283-year sentence for 46 sex crimes against seven victims]; *People v. Bestelmeyer, supra*, 166 Cal.App.3d at p. 532 [129 years for 25 sex crimes against one victim); *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382 [115 years plus 444 years to life]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1134-1137 [375 years to life plus 53 years].)

Further, defendant's comparison of the aggregate punishment here for nine convictions of sex offenses (eight of which being aggravated sexual assaults) where the victim was defendant's preteen daughter with possible punishments for murder convictions is unavailing. (See, e.g., *People v. Crooks* (1997) 55 Cal.App.4th 797, 807 [rejecting argument that punishment for the defendant's rape and burglary convictions

35

was unduly harsh when compared with punishments for unlawful killings other than first degree murder].) "Whether a particular punishment is disproportionate to the offense is a question of degree. The choice of fitting and proper penalty is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will. [Citation.] Punishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual. [Citation.]" (*People v. Bestelmeyer*, *supra*, 166 Cal.App.3d at pp. 530-531.) "Because it is the Legislature which determines the appropriate penalty for criminal offenses, defendant must overcome a 'considerable burden' in convincing us his sentence was disproportionate to his level of culpability. [Citation.]" (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196-1197.)

And we reject defendant's argument (under the third *Lynch* prong) that the punishment here is excessive when compared with punishments for similar crimes in other jurisdictions. Defendant has failed to present any support for this legal argument beyond the bare conclusion stated. He has therefore failed to meet his burden of establishing that the punishment was cruel and unusual. (*People v. King*, *supra*, 16 Cal.App.4th at p. 572.)

Under these circumstances, we conclude that, under either the California or the federal constitution, the trial court's decision to impose the term of 75 years to life was not "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch*, *supra*, 8 Cal.3d at p. 424.) Taking into account the totality of the circumstances and not only the nature of the current crime, we conclude the punishment imposed is not constitutionally infirm.

## DISPOSITION

The judgment is affirmed.

36

_____

Duffy, J.


WE CONCUR:


_____

Mihara, Acting P.J.


_____

McAdams, J.


People v. Miranda
H029494

## PROOF OF SERVICE BY MAIL

I, LESTER SCHONBRUN, hereby declare under penalty of perjury that I am a citizen of the United States, over the age of eighteen years, and not a party to the within action; that my business address is 1970 Broadway, Suite 1200, Oakland, CA 94612.

On the date below, I served the following documents:

### PETITION FOR REVIEW

by placing a true copy thereof, enclosed in a sealed envelope, postage prepaid, in the United States mail addressed as follows:

Clerk, Court of Appeal
Sixth Appellate District
State of California
333 West Santa Clara St., #1060
San Jose, CA 95113

Michele Swanson, Esq.
Office of Attorney General
State of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-3664

Troy Benson
Office of District Attorney
70 W. Hedding St. -- 6th Floor
San Jose, CA 95110

Hon. C. Randall Schneider, c/o Clerk
Santa Clara Co. Superior Court
191 N. First St.
San Jose, CA 95113

Sixth District Appellate Program
100 N. Winchester Blvd. #310
Santa Clara, CA 95050

Mr. Rogelio Miranda, FO1926
Deuel Vocational Institute
P. O. Box 400
Tracy, CA 95378

Francis Cavagnaro, Esq.
Office of Public Defender
Santa Clara County
120 W. Mission Street
San Jose, CA 95110

DATED: February 22, 2007

LESTER SCHONBRUN



**EXTREMELY URGENT** — Please Rush To Addressee

PLEASE PRESS FIRMLY

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE

Flat Rate
Mailing Envelope
For Domestic and International Use

Visit us at usps.com

ENVELOPE
POSTAGE REQUIRED

U.S. POSTAGE
PAID
SAN JOSE, CA
95101
MAY 06 '08
AMOUNT
$16.25
00413337-16

RECEIVED
MAY 7 - 2008

UNITED STATES
POSTAL SERVICE

home or office at usps.com/pickup
Print postage online · Go to usps.com/postageonline

When used internationally,
affix customs declaration.
(PS Form 2976, or 2976A)

Cradle to Cradle Certification
is awarded to products that
pursue an innovative vision of
natural-intelligent design
that celebrates the concept
of waste.

This USPS packaging has been
certified to its material content,
recyclability, and manufacturing
characteristics.

Please recycle.

EP13F

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE

**ORIGIN (POSTAL SERVICE USE ONLY)**

| PO ZIP Code | Day of Delivery | Flat Rate □ or Weight | Postage | Insurance Fee |
|---|---|---|---|---|
| | □ Next □ 2nd □ 2nd Day | | $ | $ |
| Date Accepted | Scheduled Date of Delivery | | Return Receipt Fee | COD Fee |
| | Month    Day | | $ | $ |
| Time Accepted  □ AM | Scheduled Time of Delivery | | Total Postage & Fees | |
| □ PM | □ Noon  □ 3 PM | | $ | |
| | Military | | Acceptance/Emp. Initials | |
| lbs.  ozs. | □ 2nd Day  □ 3rd Day | | | |
| | Int'l Alpha Country Code | | | |

**EH000722207US**

FROM: (PLEASE PRINT)    PHONE ( )

JIGIA MIKUNDA
2570 CARE AVE #122
SAN JOSE CA 15136

**Addressee Copy**
Label 11-B, March 20

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt | Time | Employee Signature |
|---|---|---|
| Mo.    Day | □ AM  □ PM | |
| Delivery Attempt | Time | Employee Signature |
| Mo.    Day | □ AM  □ PM | |
| Delivery Date | Time | Employee Signature |
| Mo.    Day | □ AM  □ PM | |

**CUSTOMER USE ONLY**

TO: (PLEASE PRINT)    PHONE ( )

CLERK
DISTRICT COURT OF THE
NORTHERN DISTRICT OF CALIFOR
150 VE AVE SOUTH

**Post Office To Addressee**

FOR PICKUP OR TRACKING
Visit **WWW.USPS.COM**
Call 1-800-222-1811

PRESS HARD, YOU ARE MAKING 3 COPIES.