UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROGELIO MIRANDA,

    Petitioner,

    v.

DERRAL ADAMS, Warden,

    Respondent.
    _____/

No. C 08-2356 MHP (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is DENIED.

## BACKGROUND

In 2005, a Santa Clara Superior Court jury convicted Petitioner of nine sex crimes committed against his minor daughter, M.[1] The trial court sentenced Petitioner to a total term of seventy-five years to life in state prison. The California Court of Appeal for the First Appellate District affirmed the conviction, see Ans., Ex. 3, and the California Supreme Court denied a petition for review, see id., Ex. 5. It does not appear that Petitioner sought habeas relief in the state courts.

Evidence was presented at trial in support of the charges that Petitioner committed sexual offenses against M., whose testimony was summarized by the state appellate court as

follows:

> M. was 12 years old at the time of trial in July 2005. She was born in the spring of 1993 . . .
>
> Her father was mostly responsible for punishments around the house. If M. did something bad, he would send her to her room. If she "did something really, really, really bad, then he would" spank her with a belt or a sandal.
>
> When M. was six years old, [Petitioner] rubbed her bottom over her clothes. At first, M. thought "that he was just, like, playing around or something." Later, she became scared because "he started getting serious" rubbing her bottom underneath her clothes every day. She told her mother; her mother later told M. that it had possibly been an accident and that [Petitioner] had said that he wouldn't do it again. After one or two days, [Petitioner] started touching M.'s bottom again.
>
> When M. was in the fourth grade, her father "started putting his finger around [her] vagina." Initially, he tried but could not put his finger inside of her. It hurt sometimes. On other occasions while M. was in the fourth grade, [Petitioner] stuck his finger in her vagina. M. would try to get away, "but sometimes [she] couldn't because he would just grab [her] leg or something." When M. tried to stop her father from taking her pants down, "he would still . . . grab [her] leg or something . . ." (M. testified on more than one occasion that her father is stronger than she.) M. was scared when [Petitioner] did this because she thought that if she told her mother, she wouldn't believe her.
>
> M. was not afraid of her father all of the time, but was scared of him when he molested her. Sometimes M. would tell [Petitioner] that she "didn't want to, but he would say, like, if that he didn't he would just say something like I can't, like, do something. Like he wouldn't . . . take me somewhere, like where I have to go or . . . to church, like to practice to sing, he would say, 'I won't take you there' or something . . . 'I won't take you' somewhere. And that I really liked singing."
>
> On some occasions, M. would be in her parents' bedroom watching television. [Petitioner] would come into the room, grab M.'s leg "so his hand could reach [her] butt." He would unbutton M.'s clothes and pull them off and then "rub [her] butt and . . . start touching her vagina." [Petitioner] would hide what he was doing by covering them both with a blanket. The molestations occurred more than once a week while M. was in the fourth grade.
>
> When M. was in the fifth grade, [Petitioner] was still putting his finger in M.'s vagina, and it still hurt. [Petitioner] would still take down M.'s pants and would say that "he wouldn't let [M.] go places" if she didn't comply. On occasion, M. would try to get away from [Petitioner]. "[S]ometimes [she] would just go in [her] room, but then at night he would just go in." When M. tried to leave, he would grab her legs to keep her from getting off the bed. M. also tried to keep her father from putting his finger in her vagina by closing her legs. M. testified that after she did this, "Well, I think he would put 'em apart again [with his hands]."
>
> [Petitioner] "started putting [M.] on top of him" while she was in the fifth grade. [Petitioner] would lie on the bed. He would have her pants and

2

underwear off, and his pants would also be off (but his underwear would be on). She could feel [Petitioner]'s erect penis against her body. (M. testified that she felt [Petitioner]'s penis "on my ovaries." She clarified that she felt him against the bone above her vagina.) [Petitioner] would hug M. tight and would move her body against his. This would happen twice a week every week.

During the sixth grade, [Petitioner] continued to pull down M.'s pants and put his finger inside her vagina on multiple occasions. When he did this, he still told M. that she wouldn't get to do something if she refused. Specifically, on February 18, 2005 (two days before she told her mother that she was being molested), [Petitioner] took M.'s pants off. (She tried to stop him from pulling her pants down but he overpowered her.) He then put his finger inside her vagina; he could not put his finger all the way inside because it hurt M.

On the afternoon of February 20, 2005, while M. lay on the couch and her mother was at the corner of the couch, [Petitioner] came home from work. He covered M. with a jacket or blanket and then put his hands under M.['s] shirt and bra and touched her breast. M. did not tell her mother about the incident when it happened because she was afraid that her father would physically hurt her. But M. "felt freaked out [and she] just decided to tell [her] mom again one more time. If she d[id]n't believe [her], then [M. was] just going to tell [her] aunt or someone else." She was worried that her father's conduct was getting worse. Thus, after church that evening, M. told her mother while they were in the bathroom that [Petitioner] "was just touching around [her], like, in [her] vagina and chest, and then that he was rubbing [her] butt." M. cried and thought that her mother would not believe her, but her mother did believe her.

(Ans., Ex. 3 at 4–6.)

As grounds for federal habeas relief, Petitioner alleges that (1) the definitions of hardship and duress used in the trial court were inaccurate, and as a result, his due process rights were violated by the jury instructions and by a conviction based on an insufficient showing of duress; and (2) his sentence of seventy-five years to life sentence violates his right to be free from cruel and unusual punishment.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

3

1 as determined by the Supreme Court of the United States; or (2) resulted in a decision that 2 was based on an unreasonable determination of the facts in light of the evidence presented in 3 the State court proceeding." 28 U.S.C. § 2254(d).

4 "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state 5 court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of 6 law or if the state court decides a case differently than [the] Court has on a set of materially 7 indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).

8 "Under the 'unreasonable application' clause, a federal habeas court may grant the 9 writ if the state court identifies the correct governing legal principle from [the] Court's 10 decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 11 413. "[A] federal habeas court may not issue the writ simply because that court concludes in 12 its independent judgment that the relevant state-court decision applied clearly established 13 federal law erroneously or incorrectly. Rather, that application must also be unreasonable." 14 Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask 15 whether the state court's application of clearly established federal law was "objectively 16 unreasonable." Id. at 409.

## DISCUSSION

### 1. Duress

19 Petitioner claims that there was insufficient evidence of duress or hardship to support 20 his convictions for committing lewd and lascivious acts, as defined in Penal Code section 21 288(a), and aggravated sexual assault on a child, as defined in Penal Code sections 269 and 22 289(a)(1). (Pet. at 6.) In support of this assertion, Petitioner contends that the alleged threats 23 failed to meet the dictionary or legal definition of "duress." (Id.)

24 Under California law, the crimes defined in sections 288(a) and 289(a)(1) can be 25 accomplished "by means of force, violence, duress, menace, or fear of immediate and 26 unlawful bodily injury on the victim or another person." "Duress," which carries the same 27 meaning under both statutes, see People v. Leal, 33 Cal.4th 999, 1004–05 (2004), is "a direct

or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to . . . perform an act which otherwise would not have been performed or . . . acquiesce in an act to which one otherwise would not have submitted." People v. Pitmon, 170 Cal.App.3d 38, 50 (Cal. Ct. App. 1985). In determining whether there is evidence of duress, a court considers many factors including the age of the victim, his or her relationship to the defendant, physical disparity between victim and defendants, physical control over the victim (even if it is insufficient to constitute "force"), whether there were threats of retribution or harm, and whether the defendant was in a position of authority and dominance over the victim. (Ans., Ex. 3 at 16.)

Under these legal principles, the state appellate court rejected Petitioner's claim that the trial court's jury instructions on duress were incorrect. The state appellate court also rejected Petitioner's claim that there was insufficient evidence to support a finding of duress. Specifically, the state court found that Petitioner's age, size, and position of authority and trust in the family as M.'s father, and M's attempts to physically resist Petitioner's advances, and Petitioner's overpowering her constituted sufficient evidence of duress.

The state appellate court also rejected Petitioner's claim that his conviction was invalid because there was insufficient evidence of hardship. In support of this claim, Petitioner cited the instances in which he had told M. that he would deny her small pleasures, such as singing practice, if she did not submit to him. The court stated that "[i]t is true that these threats do not involve losses of a more serious nature, such as threats to send the victim to juvenile hall . . . or warning the victim that reporting the molestation may result in her parents' divorce." (Id. at 17–18.) (citations removed). "But," the court continued, "we need not decide whether [Petitioner's] threats not to take M. places such as singing practice constituted threats of "hardship" (as opposed to merely threats to deprive her of minor conveniences). Here, based upon the totality of the circumstances described above, there was sufficient evidence of duress to support the jury's guilty verdicts as to the violations of sections 269 and 288, subdivision (b)(1)." (Id. at 18.)

5

A reviewing federal court analyzes a state prisoner's allegations of insufficient evidence under Jackson v. Virginia, 443 U.S. 307 (1979). Under Jackson, the federal court "determines only whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. Id. at 324.

A reviewing federal court should take into consideration all of the evidence presented at trial. LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume — even if it does not affirmatively appear on the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

Applying these legal principles to the instant matter, the Court concludes that Petitioner's claim is without merit. Firstly, Petitioner's claim that the definition of duress was incorrect fails. The state appellate court approved of the trial court's given definition, which is reiterated above. This Court must defer to a state court's interpretation of its state's laws. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (holding that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus). Secondly, the record contains evidence on which a reasonable trier could have found that Petitioner accomplished the criminal act by duress. Petitioner not only occupied a position of physical and social dominance and authority in the family as M.'s father — he was, in fact, the family disciplinarian — but testimony was presented that when she tried to leave or otherwise prevent the molestations, Petitioner would physically grab her or force apart her legs. From this, a rational trier of fact could see Petitioner's greater age and physical size, as well as his position of authority as evidence that Petitioner coerced M. within the meaning of duress in order to accomplish his act. That evidence of hardship was lacking is of less moment considering the strength of the evidence of duress. Accordingly, Petitioner's claim is

DENIED.

## 2. Sentence

Petitioner claims that his seventy-five year sentence for the "non-violent, digital penetration of one victim on multiple occasions violates the constitutional proscriptions against cruel and unusual punishment." (Pet., Ex. 1 at 62.) The state appellate court rejected this claim largely on state law grounds, finding that Petitioner's sentence was not so disproportionate to the crime as to shock the conscience or offend fundamental notions of human dignity. (Id. at 36.)

The trial court sentenced Petitioner to an indeterminate term of sixty years to life, and a determinate term of fifteen years. (Ans., Ex. 3 at 1.)

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment. Solem v. Helm, 463 U.S. 277, 303 (1983). But "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." Id. at 289–90. Eighth Amendment jurisprudence "gives legislatures broad discretion to fashion a sentence that fits within the scope of the proportionality principle — the precise contours of which are unclear." Lockyer v. Andrade, 538 U.S. 63, 76 (2003) (internal quotations and citations omitted). "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime." Ewing v. California, 538 U.S. 11, 23 ( 2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J ., concurring)).

A challenge to the proportionality of a sentence is analyzed using objective criteria, including: (1) the gravity of the offense and harshness of the penalty; (2) a comparison of sentences imposed on other criminals in the same jurisdiction; and (3) a comparison of sentences imposed for the same crime in other jurisdictions. Solem, 463 U.S. at 290–92. Substantial deference is granted to a legislature's determination of the types and limits of punishments for crimes. See U.S. v. Gomez, 472 F.3d 671, 673–74 (9th Cir. 2006).

However, where it cannot be said as a threshold matter that the crime committed and the sentence imposed are grossly disproportionate, it is not appropriate to engage in a comparative analysis of the sentence received by the defendant to those received by other defendants for other crimes. See U.S. v. Harris, 154 F.3d 1082, 1084 (9th Cir. 1998).

In Harmelin, the Supreme Court upheld a life sentence without the possibility of parole for an offender who had no prior felony convictions and whose sole conviction was for possessing 672 grams of cocaine. 501 U.S. at 995, 961. In Andrade, the Supreme Court, under the highly deferential AEDPA standard, upheld a sentence of two consecutive 25 year terms for the nonviolent theft of $150 worth of videotapes. 538 U.S. at 77.

Here, Petitioner has not established that his sentence was grossly disproportionate to his crimes, especially considering that in Harmelin, the Supreme Court upheld as constitutional a life sentence for a nonviolent drug possession crime, and in Andrade, upheld a 50 year sentence for a nonviolent theft crime. If a life sentence for a nonviolent drug possession crime is found not to violate the Eighth Amendment, the Court cannot say that the state court's affirmation of Petitioner's seventy-five year sentence for forcible lewd and lascivious act and aggravated sexual assault on a child under the age of fourteen was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Because Petitioner has not made the threshold showing that the crime committed and the sentence imposed are grossly disproportionate, see Harris, 154 F.3d at 1084, this Court's Eighth Amendment analysis is at an end. Accordingly, the Court will deny Petitioner's claim.

## CONCLUSION

The Court concludes that the state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts. Accordingly, the petition for writ of habeas corpus is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the

district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED**.

DATED: 2/24/2010

_____
MARILYN HALL PATEL
United States District Judge

**NOTES**

1.  Petitioner was convicted of one count of a lewd and lascivious act on a child under the age of 14, see Cal. Pen. Code § 288(a), four counts of forcible lewd and lascivious acts on a child under the age of 14, see id. § 288(b)(1), and four counts of aggravated sexual assault on a child under the age of 14 by forcible foreign object penetration, see id. §§ 269, 289(a)(1).